UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MAGISTRATE JUDGE
JOHNSON

CASE No **06-80111**

**CIV-HURLEY**

WILLIAM T. DOBYNS,

          Plaintiff,

v.

CITIGROUP, INC., CITICORP
INVESTMENT SERVICES, INC.,
CITIGROUP GLOBAL MARKETS,
INC., formerly SALOMON SMITH
BARNEY, INC., and SCOTT D.
SULLIVAN,

          Defendants.

_____/

**NIGHT BOX
FILED**

**JAN 3 1 2006**

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## DEFENDANTS', CITIGROUP, NOTICE OF REMOVAL

      Defendants, Citigroup, Inc., Citicorp Investment Services, Inc., Citigroup Global Markets,

Inc., formerly Salomon Smith Barney, Inc. (collectively "Citigroup"), file this Notice of Removal of

the above-captioned action, which was filed by the Plaintiff, William T. Dobyns ("Plaintiff"), in the

Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, Case Number

502006CA000092XXXXMBAI. In support of this Notice of Removal, Citigroup states that Plaintiff

has fraudulently joined Scott D. Sullivan, to tactically destroy diversity. Citigroup further states that:

**I.      INTRODUCTION**.

      Plaintiff fraudulently joined Scott Sullivan ("Sullivan") in this action with Citigroup in an

attempt to defeat diversity jurisdiction and removal to federal court and, thereby, to avoid transfer

to the Multidistrict Litigation Panel which has been empaneled to determine whether claims

involving WorldCom stock should be transferred to the United States District Court, Southern



District of New York, where approximately 65 cases are currently pending.[1] This action is the latest in a series of actions filed by Theodore Babbitt, Esq. ("Plaintiff's Counsel") in Florida state courts against Citigroup and Sullivan.

Plaintiff, an alleged owner of WorldCom stock, is suing Citigroup for comments attributable to Jack Grubman, a former Salomon Smith Barney analyst, in several nationally published magazines or newspapers and on the internet regarding the prospects and future stock prices of WorldCom. Because of the stock market collapse and WorldCom's accounting fraud (having nothing to do with Citigroup), WorldCom filed for bankruptcy in 2002. Plaintiff is not, and never was, a customer or client of Citigroup. Plaintiff did not invest in WorldCom (or any other stock) through Citigroup. Plaintiff did not maintain a brokerage account or any investment account with Citigroup. The only connection between Citigroup and Plaintiff is Plaintiff's claim that analyst Jack Grubman's opinions on WorldCom stock caused Plaintiff to buy and/or hold WorldCom stock. On that sole basis, Plaintiff filed this action against Citigroup and Sullivan.

## II.   ALLEGATIONS IN SUPPORT OF REMOVAL JURISDICTION.

1.      December 29, 2005, Plaintiff filed the above-captioned action in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. Pursuant to 28 U.S.C. § 1446, attached hereto as composite Exhibit **"A"** are copies of all process, pleadings, and orders served upon Citigroup.

2.      At the time of filing the Complaint and at the time of filing this Notice of Removal, Citigroup was a New York corporations with their principal place of business in New York.

3.      At the time of filing the Complaint and at the time of filing this Notice of Removal, Sullivan was a Florida citizen.

---

[1] Not only are individual claims pending before the United States District Court, Southern District of New York, but, before it was settled, the nationwide class action involving WorldCom stock was pending in that court. *In re WorldCom, Inc. Securities Litigation*, 02CIV.3288(DLC).

4.      Upon information and belief, at the time of filing the Complaint, Plaintiff was a citizen of the State of Texas. There is no jurisdictional information about Plaintiff in the Complaint.

5.      The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs. Despite the fact that the Complaint only alleges the state jurisdictional requirement of over $15,000.00, the Court may make an independent evaluation of the monetary value of the claim to determine whether the amount in controversy exceeds $75,000.00. *See, e.g., Lewis v. AT&T Corp.*, 898 F. Supp. 907, 909 (S.D. Fla. 1995). There is no dispute that the amount in question in this case exceeds $75,000.00.

6.      On December 20, 2005, Plaintiff's counsel advised in writing that the complaint would be filed.

7.      Citigroup was served with the Summons and Complaint on January 13, 2006.

8.      The United States District Court for the Southern District of Florida is the district in which the state court action was filed.

9.      The Complaint in this case includes four counts for state law causes of action, which are as follows: (1) False Information Negligently Supplied for the Guidance of Others (Restatement Section 552); (2) Outrageous Conduct Causing Severe Emotional Distress; (3) Fraud; and (4) Violation of Florida's Blue Sky Laws.

10.     The core factual allegations in the Complaint involve the WorldCom fraud.

11.     Jurisdiction is proper in this Court based on diversity jurisdiction under 28 U.S.C. § 1332, because the Plaintiff fraudulently joined Sullivan in the four causes of action asserted.

12.     Sullivan was included in the Complaint solely for the purpose of destroying diversity jurisdiction, and to prevent the foreign defendants from exercising their right to have this case heard in federal district court.

13.    This Court should find that Sullivan was fraudulently joined because Plaintiff cannot establish legitimate causes of action against Sullivan for any of the claims asserted in the Complaint. Further, there is no intention by Plaintiff to prosecute this action against Sullivan.

14.    A true copy of this Notice of Removal will be filed with the clerk of the state court, as required by 28 U.S.C. § 1446(d).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 31, 2006.

PAGE, MRACHEK, FITZGERALD & ROSE, P.A.
505 S. Flagler Drive, Suite 600
West Palm Beach, FL. 33401
(561) 655-2250/FAX (561) 655-5537
e-mail: rfitzgerald@pm-law.com
e-mail: lmrachek@pm-law.com
e-mail: jferguson@pm-law.com
Counsel for Defendants Citigroup

By_____
L. Louis Mrachek
Fla. Bar No. 182880
Roy E. Fitzgerald
Fla. Bar No. 856540
Julie S. Ferguson
Fla. Bar No. 0352380

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to all parties on the attached service list, by [  ]U.S. Mail, [  ]Facsimile, [  ]Hand Delivery, [  ] overnight delivery, this 31th day of January, 2006.

PAGE, MRACHEK, FITZGERALD & ROSE, P.A.
505 S. Flagler Drive, Suite 600
West Palm Beach, FL. 33401
(561) 655-2250/FAX (561) 655-5537
e-mail: rfitzgerald@pm-law.com
e-mail: lmrachek@pm-law.com
e-mail: jferguson@pm-law.com
Counsel for Defendants Citigroup

By_____
     L. Louis Mrachek
     Fla. Bar No. 182880
     Roy E. Fitzgerald
     Fla. Bar No. 856540
     Julie S. Ferguson
     Fla. Bar No. 0352380

## SERVICE LIST

Theodore Babbitt, Esquire
Babbitt, Johnson, Osborne & LeClainche, P.A.
1450 Centrepark Boulevard, Suite 100
Post Office Box 4426
West Palm Beach, FL 33402-4426
Telephone: (561) 684-2500
Facsimile:  (561) 684-6308
E-mail:  tbabbitt@babbitt-johnson.com
Counsel for Plaintiffs

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA. CIVIL DIVISION.

Case No: 50 2006 CA 000092 XXXX MB

Florida Bar No: 091146

WILLIAM T. DOBYNS,

       Plaintiff,

vs.

CITIGROUP, INC., CITICORP
INVESTMENT SERVICES, INC.,
CITIGROUP GLOBAL MARKETS,
INC., formerly SALOMON SMITH
BARNEY, INC., and SCOTT D.
SULLIVAN,

       Defendants.

_____/

*rec'd 1/12/06 @ 2:00pm*
*Served 1/13/06 @ 2.10pm*
*& 463*

## SUMMONS

**THE STATE OF FLORIDA:**

**TO ALL AND SINGULAR THE SHERIFFS OF SAID STATE:**

    **YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint or Petition, in the above styled cause upon the Defendant:

### CITIGROUP, INC.

By Serving Registered Agent:   CT Corporation System
1200 South Pine Island Road
Plantation, FL  33324

*Served*

    Each Defendant is hereby required to serve written defenses to said Complaint or Petition on Plaintiff's attorney, whose name and address is:

1



EXHIBIT
A

Theodore Babbitt
1450 Centrepark Boulevard
Suite 100
West Palm Beach, FL  33401
(561) 684-2500
FBN#091146

within twenty (20) days after service of this Summons upon that Defendant,
exclusive of the day or service, and to file the original of said written defenses
with the Clerk of said Court either before service on Plaintiff's attorney or
immediately thereafter.  If a Defendant fails to do so, a default will be entered
against that Defendant for the relief demanded in the Complaint or Petition.

   **WITNESS** my hand and the seal of the Court on JAN 0 5 2006 _____, 2005.


            SHARON BOCK
            Clerk of Circuit and County Courts


(Court Seal)                          FRANCES D. RUIZ


            By:_____
                DEPUTY CLERK


SHARON R. BOCK
Clerk & Comptroller
P.O. Box 4667
West Palm Beach, Florida
33402-4667

2

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY,
FLORIDA.  CIVIL DIVISION

Case No:

WILLIAM T. DOBYNS,

    Plaintiff,

vs.

CITIGROUP,   INC.,   CITICORP
INVESTMENT   SERVICES,   INC.,
CITIGROUP GLOBAL MARKETS, INC.,
formerly SALOMON SMITH BARNEY,
INC., and SCOTT D. SULLIVAN,

    Defendants.

_____/

COPY
RECEIVED FOR FILING
JAN 0 4 2006
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

## **COMPLAINT**

COMES NOW the Plaintiff, WILLIAM T. DOBYNS, by and through his undersigned counsel, and sues the Defendants, CITIGROUP, INC. (hereinafter referred to as CITIGROUP), CITICORP INVESTMENT SERVICES, INC. (hereinafter referred to as CITICORP) CITIGROUP GLOBAL MARKETS, INC., formerly SALOMON SMITH BARNEY, INC. (hereinafter referred to as SALOMON), and SCOTT D. SULLIVAN, and alleges:

## COUNT I -
## JURISDICTIONAL ALLEGATIONS

1.     This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs and attorney's fees.

2.     At all times material hereto, the Defendant, CITIGROUP, was a corporation conducting business and maintaining offices and employees within Palm Beach County and throughout the State of Florida.

3.     At all times material hereto, Defendant, SALOMON, was a corporation conducting business and maintaining offices and employees within Palm Beach County and throughout the State of Florida.

4.     At all times material hereto, Defendant, CITICORP, was a corporation conducting business and maintaining offices and employees within Palm Beach County and throughout the State of Florida.

5.     At all times relevant hereto, Defendant, SALOMON, was a wholly owned subsidiary of CITIGROUP.

6.     At all times material hereto, Jack B. Grubman ("Grubman") was a telecommunications financial analyst, who was employed by the Defendants herein.

7.     At all times material hereto, WorldCom was a telecommunications company doing business with the Defendants and each of them.  At all times relevant hereto, WorldCom's CEO was Bernard Ebbers ("Ebbers").

8.     At all times material hereto, Sanford Weill ("Weill") was the CEO of CITIGROUP and was employed by the Defendants herein.

9.     At all times material hereto, Charles Prince was employed by the

2

Defendants herein.

10.     At all times material hereto, John B. Hoffmann was the head of Global Research for SALOMON SMITH BARNEY and was employed by the Defendants herein.

11.     The Defendant, SCOTT D. SULLIVAN, was chief financial officer and Director of WorldCom at all times material to this action until June 25, 2002, when he was terminated.  Between April 30, 2002, and June 25, 2002, he also served   as Executive Vice President of WorldCom.   The Defendant, SULLIVAN, signed the company's annual reports for the years 1999 through 2001 and the company's quarterly reports for each quarter for the years 1999 through 2001 and the first quarter of 2002.   The Defendant, SULLIVAN, was at all times material to this action and is currently a Florida citizen and resident having his place of residence at 6318 Woodbury Road, Boca Raton, Florida, having a Florida Driver's License No. X415-784-61-345-0 and being registered to vote in the State of Florida.  Venue lies in Palm Beach County since SULLIVAN's home is located in Palm Beach County, Florida, and he is a resident of Palm Beach County.

12.     The Defendant, CITIGROUP, at all times material to this action is and was authorized to transact business in the State of Florida and qualified to transact business in the State of Florida on December 10, 1992, as further shown by Composite Exhibit "A" attached hereto and made a part hereof.

13.     The Defendant, CITICORP, at all times material to this action is and

3

was authorized to transact business in the State of Florida and qualified to transact business in the State of Florida on March 29, 1991, as further shown by Composite Exhibit "B" attached hereto and made a part hereof.

14.     The Defendant, SALOMON, at all times material to this action is and was authorized to transact business in the State of Florida and qualified to transact business in the State of Florida on November 2, 1965, as further shown by Composite Exhibit "C" attached hereto and made a part hereof.

15.     Pursuant to each of the corporate Defendants affirmatively requesting that they be authorized to do business in the State of Florida pursuant to the aforesaid registering with the Secretary of State to do business in Florida, each of the Defendants have named an authorized agent for the service of process as set forth in the attached Exhibits "A," "B," and "C."

16.     That each of the corporate Defendants at all times material to the acts set forth in the Amended Complaint herein were doing business in the State of Florida in that they were operating, conducting, engaging in or carrying on a business or business venture in this State or having an office or agency in this State.

17.     That the corporate Defendants and each of them as set forth in this Count and in the remainder of this Amended Complaint, committed a tortious act within this State.

18.     The Defendants and each of them at all times material to the acts set forth in this Amended Complaint, were engaged in substantial activity and not isolated activity within this State.

**COUNT II –**

4

## FACTS COMMON TO ALL COUNTS

The following intentional acts were committed by the Defendants:

## THE PLAN

19.     In the late 1990's long-standing restrictions on the financial industry were relaxed allowing firms of all kinds to join together.  On November 28, 1997, Salomon Brothers merged with Smith Barney which was owned by Travelers Group which then merged with CITIGROUP.  On October 8, 1998, Citicorp and Travelers Group merged to become Citigroup, Inc.  At that time all of the individual divisions of both corporations were merged under the same leadership.  That merger was made in apparent violation of the Glass Stegal Act, a Federal law which prohibited that joinder.  The purpose of Glass Stegal was to protect the public from unfettered interaction between different types of financial corporations. The acts described in the complaint are the exact kinds of acts which Glass Stegal was designed to prevent.  What resulted was a new all purpose financial supermarket which was a bundle of conflict of interests.  At that time, because of the burgeoning technology sector of stocks, there were countless cash strapped companies which were seeking to raise money and CITIGROUP recognized that there was a huge potential for cash in the underwriting of their IPOs.  CITIGROUP transformed its analysts into "rain makers," that is, generators of lucrative deals. For every hundred million dollars that a company raised in IPOs, it paid to CITIGROUP for organizing the offering $7 million in commissions.  Between 1996 and 2001, SALOMON SMITH BARNEY issued $199 billion worth of stocks and

5

bonds for 81 telecom firms, many of which were building their own networks. Jack Grubman orchestrated the raising of the capital for these companies. He had close personal links to Bernie Ebbers, the chairman of WorldCom, Philip Anschutz, the founder of Quest, and Gary Winnick, the founder of Global Crossing. Jack Grubman helped to generate more than a $1 billion in investment banking fees for SALOMON SMITH BARNEY and, in return, they paid him an average of $20 million a year which made him the highest paid stock analyst ever.

20.    The Defendants realized prior to instituting the plan described herein that their research department consisted of analysts who analyzed stocks such as WorldCom and was a loss leader. That is, the research department did not earn substantial money, it cost money to run. The Defendants made the intentional decision, therefore, to utilize analysts to earn investment banking fees and to compensate those analysts based in large part upon the investment banking fees that they could earn. Defendants knew that by doing this they were putting the analysts in a hopeless conflict of interest because their own income was dependent upon earning these investment banking fees and the only way the analysts could earn those fees was by issuing positive reports on the stocks of the companies providing the investment banking fees. At about the time of the acquisition of Salomon Brothers, Defendants knowingly began requiring their analysts to issue positive reports on companies providing investment banking fees to the Defendants even though those reports were not honest or objective. Defendants knew that the reports were not honest or objective and hid those facts from the Plaintiffs. The Defendants intentionally carried out this plan knowing it

6

would affect the Plaintiffs and cause them to lose their life savings. The motive, intent and plan was a common plan and motive relative to the companies and stocks hereinafter set forth.

21.     Prior to the acquisition of Salomon Brothers by Smith Barney, Jack Grubman was an analyst employed by Salomon Brothers. As such, he had created a personal relationship with Bernie Ebbers, the then CEO of WorldCom. WorldCom was rapidly expanding at the time such that it was acquiring other smaller companies at a rapid rate. Each acquisition involved lucrative investment banking fees which the Defendants wanted to acquire. Mr. Grubman's relationship with Bernie Ebbers and WorldCom was dependent upon him issuing positive glowing reports on WorldCom even before he was hired by the Defendants.

22.     Prior to the merger of Salomon Brothers and Smith Barney, Smith Barney had analysts by the name of Timothy Horan and Charles W. Schelke. These analysts in 1997 issued four (4) WorldCom reports which were markedly less positive with respect to WorldCom than the reports which were being issued by Jack Grubman. These reports expressly warned of the high risk associated with investing in WorldCom. Reports by these analysts were issued on January 7, 1997; April 10, 1997; September 4, 1997; and September 26, 1997; all with a high risk rating. The stock in January was rated as a three while in April and September it was rated as a 2. The high risk rating was described by SALOMON as equating to a stock with low predictability and high volatility. Charles Schelke had been an analyst for thirty (30) years and was considered to be an excellent analyst.

On the other hand, Jack Grubman was so tied in with WorldCom that in October, 1997, WorldCom appointed Jack Grubman to act as a proxy or to solicit proxies on its behalf in connection with the MCI/WorldCom merger. This fact was filed with the SEC and Jack Grubman never withdrew his name as a proxy for WorldCom. An analyst can hardly be independent when acting as a proxy for a company. Jack Grubman did nothing about this because he wanted to maintain his close relationship with Bernie Ebbers and WorldCom in order to secure investment banking deals for his employers.

The Defendants recognized that with reports like the analysts they employed before Jack Grubman were issuing they could not hope to garner the lucrative investment banking fees which WorldCom promised. As a consequence, on July 22, 1998, the Defendants entered into an employment agreement with Jack Grubman that resulted in paying him approximately $20 million a year for each of the four (4) years from 1998 to and including 2001. These payments were not made to Jack Grubman to be an honest and independent analyst but rather to take advantage of his relationship with Bernie Ebbers and WorldCom and the other CEO's and companies described herein and his ability to garner investment banking fees from WorldCom and other telecommunication companies. Defendants knew throughout this period that Jack Grubman was not rendering honest and objective reports on WorldCom or many other telecom stocks but rather was issuing false reports for the sole purpose of earning investment banking fees for the Defendants.

When Jack Grubman took over as SALOMON SMITH BARNEY's chief telecommunication analyst, he immediately changed the risk rating on WorldCom

8

from a high risk to a moderate risk which was defined as moderate predictability and volatility.  Whereas before previous reports specifically warned consumers about WorldCom "in addition, we want to emphasize that this is a highly risky investment" that warning was deleted by Jack Grubman.  Jack Grubman rated WorldCom as moderate risk in 48 out of the 51 reports that he issued on WorldCom.  Even when he changed the risk to high in April of 2002, he still recommended the stock as a buy.

23.    Defendants carried out their plan to have their analysts issue false analysis of stocks in return for investment banking fees by:

i.    Paying analysts based upon how much investment banking fees they could earn rather than on their ability to analyze stocks;

ii.    Requiring analysts to allow investment bankers to review any changes in their analysis prior to making those changes and when that review, in the opinion of the investment banker assigned to the company issuing stocks which provided important investment banking fees to the Defendants felt that a change could cost the Defendants investment banking fees, the investment banker would contact the analysts either directly or indirectly and persuade that analyst not to issue the change.

iii.    By allowing investment bankers to influence the compensation to be paid to analysts and have input in the amount of that compensation which input would be directly related to how cooperative the analyst was in issuing false reports in order to allow the Defendants to earn those investment banking fees.

iv.    In allowing investment bankers direct access to

9

analysts in violation of any reasonable policy, to persuade those analysts not to issue negative reports on companies providing investment banking fees to the Defendants and in allowing their analysts to be persuaded not to issue those negative reports for that purpose.

v.  In the selective issuance of IPO allocations to executives of companies in return for investment banking fees.

vi.  In the granting of favorable loans to executives in return for investment banking fees.

24.    The Defendants herein publicly advertised in advertisements read by the Plaintiffs that Defendants' analysts were good at what they did, were independent and could be trusted for advice on stocks such as WorldCom.  Those advertisements were materially misleading because they failed to state the truth, that analysts' income was dependent upon the amount of investment banking fees that they could generate, that before any analyst could make any change in the analyst's analysis of the stock, the change had to be reviewed by investment bankers, that Defendants were selectively providing IPO allocations to high placed executives of companies like Bernie Ebbers, that the Defendants were in the business of analyzing so that those executives could earn millions of dollars in flipping or short term selling of those allocations, that the Defendants made loans to high placed executives like Bernie Ebbers while the stock that was used to collateralize the loans was the very same stock that the Defendant's analysts were analyzing, that the analysts employed by the Defendants allowed investment bankers to influence their analysis of stocks and failed to give negative reviews because of the interests of investment bankers in

receiving fees from those companies.   All of these omitted statements were statements that the Plaintiff, as investors, would want to know and had he known them, never would have purchased stocks based upon the false statements of Jack Grubman or held those stocks beyond a time that was reasonable to sell them.

25.    As part of the plan of the Defendants to sacrifice research integrity for investment banking fees, all research analysts including Jack Grubman were required to notify investment bankers assigned to a company being analyzed by that analyst before any changes were made in research opinions by an analyst.  On September 9, 1999, all US research division employees received an e-mail from Kevin McCaffrey and Jeff Waters telling analysts that they were required to have conversations with the investment banker assigned to a company before a change in analysis could be made and telling them if the banker wanted to discuss the matter further, that they should involve research management in the conversation.   The e-mail also told analysts that they must confidentially, either themselves, or through a banker, inform the company on whom the change was going to be made about any material change in the analyst's opinion prior to disseminating word of that change to investors.  This e-mail reflects a lack of integrity on the part of analysts and a breach of any semblance of independence on the part of analysts for the sake of investment banking fees.  This policy continued until after WorldCom went bankrupt.

26.    For each and every year between 1998 and 2001, all US equity research analysts were required to provide a performance assessments in which they were required to attach a detailed list showing their involvement in investment banking transactions over the previous year and other information about their

11

connection with investment banking and their ability to earn investment banking fees. An example of information requested by the Defendants of their analysts, is shown in an interoffice memo dated October 18, 2001, which relates to the 2001 performance assessment for all equity research analysts and was sent by Kevin McCaffrey, Jeff Waters and David Dwyer. That document requested Jack Grubman and all other analysts to attach a detailed list showing their involvement in investment banking transactions over the previous year. In addition, they were required to provide qualitative comments on banking activities and opportunities in their sector. They were asked which three of their companies were most likely to issue equity or equity linked instruments in the following year and which three seemed to be the most likely candidates for merger and acquisition activity during the following 12 months. The sole purpose of doing that was to allow the Defendants to determine the bonus of analysts based upon the amount of investment banking fees they had generated or would be able to generate in the future. This was a clear conflict of interest and violation of trust of persons such as the Plaintiffs.

27. On January 5, 2000, Jeffrey Waters, one of Mr. Grubman's supervisors, at a research best practice seminar speaking to all analysts present from SALOMON SMITH BARNEY told them that the true goal of the department was obtaining investment banking fees, not giving fair analysis of stocks. He told them that there was a billion dollars in potential revenue out there in the way of investment banking fees and that if they could obtain that for their employers, the Defendants herein, not only would their employers benefit but that they would personally benefit. This message was intended to convey and did convey to analysts that their primary

12

objective was the earning of these investment banking fees and they could be expected to be compensated handsomely by getting these fees at the expense of honest analysis.

28.     The extent to which the Defendants were willing to compromise themselves to please Bernie Ebbers and obtain his investment banking business is shown in an e-mail dated October 6, 2000, from David Trautenberg to, among others, Jack Grubman.  In it he discusses the fact that a competitor, Bank of America, was reported by the press as being used by Bernie Ebbers to execute a 3 million share EMS (variable forward trade).  Mr. Trautenberg implored Jack Grubman, among others, to treat Bernie Ebbers completely differently than anyone else who was a client of the Defendants including putting together Bernie Ebbers and the top levels of SALOMON SMITH BARNEY with Jack Grubman to show Bernie Ebbers that the Defendants would support Bernie Ebbers even though his position was "rocky" then and for a long time in the future.

29.     On October 17, 2000, an e-mail was sent from David Trautenberg to Jay Mandelbaum with copies to Jack Grubman and others calling a conference on Bernie Ebbers with Jack Grubman and various bankers employed by the Defendants stating "We are at a critical stage with Bernie Ebbers and need to speak prior to the private bank selling him out through SSB." At this conference an agreement was reached to intercede with the bank and prevent it from calling Bernie Ebbers loans even though the WorldCom stock which collateralized those loans had fallen below any reasonable margin level.  The result was that the bank violated its own rules and treated Bernie Ebbers completely differently than any

13

other borrower by allowing the loan to be undercollateralized in violation of its own rules. By utilizing Jack Grubman in this scheme, it was clear to Jack Grubman that he had to continue issuing positive reports on WorldCom in the hopes of increasing the value of WorldCom stock. If he failed to do that, not only would the loan be undercollateralized but if the stock failed and Bernie Ebbers was unable to pay the loan this left the CITIGROUP Defendants holding the bag on a huge loan with no collateral. This conflict of interest was patent and obvious and forced Jack Grubman to issue reports which were dishonest and falsely inflated the value of WorldCom stock to the detriment of the Plaintiffs.

30.     Defendants knew their analysts had a clear conflict of interest. On March 30, 2001, Jeffrey Waters, as well as Kevin McCaffrey and John Hoffmann all of whom were bosses of Jack Grubman, received an e-mail from Maryellen Hilliary of the Global corporate investment bank in which she reflected that sell sided analysts like Mr. Grubman could not criticize management of companies that they were analyzing because of the potential loss of investment banking fees. She further reflected that while SALOMON SMITH BARNEY used a five (5) point rating scale, no companies were rated a five (5) and only one was rated a four (4) because such ratings, if given honestly, would reflect poorly on companies who were providing investment banking fees and analysts, like Mr. Grubman could not do that. This reflected a clear conflict of interest with respect to honest and objective analysis, yet neither Mr. Waters, Mr. McCaffrey nor Mr. Hoffmann did anything to change the way these companies were rated because it was the clear plan and intent of the

14

Defendants to continue earning investment banking fees at the expense of honest and objective analysis by persons such as Jack Grubman.

31.    A presentation was made by Kevin McCaffrey, the director of equity research and Jack Grubman's supervisor, on April 4, 2001, in which he said that investment bank revenue productivity of an analyst was a bigger determination of compensation for the analyst than what his institutional investment ranking.  Kevin McCaffrey was one of the people who determined what Jack Grubman's compensation would be.  This is a clear indication of a plan of the Defendants to determine analyst compensation based upon investment banking. Jack Grubman, himself, has admitted under oath that the more investment banking revenues he obtained the more beneficial it would be to his bonus.

32.    On July 2, 2001, Timothy Tucker, in equity research management, wrote an e-mail to all analysts for SALOMON SMITH BARNEY.  In talking about discounted cash flows, he stated "Often the DCFs we see use aggressive inputs to arrive at **predetermined** valuation outcomes constraining us to ratchet up discount rates and cut down terminal multiples to more reasonable levels.  At other times, key inputs are chosen too casually in light of their impact on the model.  Generally speaking, we would be appreciative if the models could be **smell tested** just a bit more rigorously before we see them especially when the DCF derived target prices are 100% or more above the current share price....  Clearly projected long-term growth rates for many of our companies are too high and would benefit from a thoughtful reappraisal." (emphasis supplied).  Discounted cash flows are important

15

indicators of a company's health.   Inputs to determine them should not be predetermined by an analyst or the notes are not honest.  Apart from management telling their analysts that their models needed to be "smell tested" nothing was done about the fact that their analysts' reports were not only unrealistic but untrue.  While Mr. Tucker indicated that long-term growth rates for many of the companies being analyzed by SALOMON SMITH BARNEY analysts were too high, nothing was done to lower them or make them more realistic.

One analyst responded to Mr. Tucker's e-mail on July 2, 2001, stating "Amen! You should have cc this to Grubman just to make sure."  Obviously reflecting on Mr. Grubman being guiltier than most with respect to his unrealistic analysis of stocks like WorldCom.  Mr. Tucker replied on the same date "No comment on that. At least not in writing."  Mr. Tucker clearly agreed that Mr. Grubman's notes about stocks like WorldCom were worse than most analysts yet was going to do nothing to stop Jack Grubman or to correct his false statements.

33. The extent to which the Defendants' plan was executed is shown by the conduct of its Atlanta WorldCom options group headquartered in Atlanta and its relationship to WorldCom executives.  Shortly after the MCI WorldCom merger in August, 1998, SALOMON SMITH BARNEY was named by WorldCom to be the only broker with respect to executives' ability to exercise stock options after the merger was completed.  Each such WorldCom executive was thereafter contacted by SALOMON SMITH BARNEY and told that SALOMON SMITH BARNEY had been selected to administer MCI WorldCom's employee stock option program and, as such, the executive had become a part of the

16

SALOMON SMITH BARNEY corporate client group.

From that time until mid-2002, SALOMON SMITH BARNEY engaged in an aggressive plan of saturating the MCI/WorldCom employee information network with Jack Grubman hype and propaganda about MCI/WorldCom's stellar future as an investment.  Every employee of MCI WorldCom during this period received at work Jack Grubman research reports or portions of those reports attached to e-mails or included in e-mail blasts and each such employee was force fed the SALOMON SMITH BARNEY notion that Jack Grubman was the telecom industries top telecom analyst.

The Atlanta WorldCom options group was led by the team of Phil Spartis, David Hobby and Amy Elias.  These brokers and half a dozen others were given orders by SALOMON SMITH BARNEY to instruct WorldCom executives to hold any vested stock options because Jack Grubman had projected WorldCom to reach $120 per share by the end of 1999.  Every executive was further told that as to any options that were executable that the executives should exercise and hold all such options because the stock was going to climb to that $120 level. SALOMON SMITH BARNEY, through these brokers, told all these executives to take out margin loans and borrow against vested stock options to purchase more WorldCom stock.  These brokers violated the confidentiality of other executives by giving executives the names of other executives who had agreed to exercise their options and hold the stock in an effort to convince all executives to do the same.

It was extremely important to the Defendants that executives at WorldCom who held large positions in WorldCom stock not sell their stock because to do so

17

would drive the price of the stock down thereby affecting the Defendants collateral on their loans to Bernie Ebbers as well as displeasing Bernie Ebbers and risking the loss of investment banking fees from WorldCom.  The Defendants, therefore, entered into an agreement with Bernie Ebbers riddled with incredible conflicts of interest and breaches of their fiduciary duties.  In that agreement, Bernie Ebbers created what became known as "Bernie's list" which was a list of executive employees that the Defendants and Bernie Ebbers agreed to prevent selling their WorldCom stock without prior approval from Bernie Ebbers.  The Defendants knew that this violated every rule of the regulatory bodies under which they practiced, was fraudulent and illegal but they did it anyway because it fit into their plan.  The executives on this list had large positions in WorldCom stock and allowing those executives to sell that stock would defeat the Defendants' plans. Therefore, the SALOMON SMITH BARNEY Atlanta branch made every effort to convince these executives to exercise their options and hold their WorldCom stock but if that failed and the executive insisted on exercising the options and selling the stock, SALOMON SMITH BARNEY would simply tell the executive that they refused to do so unless the sale was approved by Bernie Ebbers.  Not only is it unheard of that a nationally recognized brokerage firm like SALOMON SMITH BARNEY regulated by the New York Stock Exchange would block a sale to a client to whom it owed a fiduciary duty but even more disconcerting is the fact that they threatened these executive clients with discussing the potential sale of stock directly with the CEO of their employer, Bernie Ebbers.  Incredibly, SALOMON SMITH BARNEY had made an agreement with Bernie Ebbers that it would refuse

to accept trade orders from these executives who tried to exercise and sell their employee stock options without first getting Bernie Ebbers' approval. SALOMON SMITH BARNEY had no right under any known industry rule to make such a deal or refuse to accept a trade order without prior approval from someone who was not a party to the relationship between SALOMON SMITH BARNEY and the executives. Not surprising, the chilling effect of the threat of reporting the executive to Bernie Ebbers alone was enough to prevent these executives from following their own investment decisions and selling WorldCom stock. The Defendants intentionally set up the Atlanta WorldCom option group without even basic supervision. They arranged to have it operate on its own separate floor space with its own unsupervised communication system and without the usual supervision employed over brokers.

If all of that were not enough, incredibly the Defendants recorded numerous planned stock transactions of executives on Bernie Ebber's list without informing the executives that they were making such recordings. In total disregard of their fiduciary duty of loyalty and the confidential nature of their role as an agent of these executives, SALOMON SMITH BARNEY's Atlanta financial consultants often delayed placing orders under the pretext of "processing time" and they tipped off Bernie Ebbers about the pending sale. Bernie Ebbers, then armed with this confidential information that the employee was trying to exercise options or sell shares, would contact the executive and threaten the executive to avoid the sale of those shares. This incredible breach of loyalty and breach of privacy on the part of the Defendants shows just how far the Defendants were willing to go to

19

exercise their plan.  These tape recordings not only violated privacy but were illegal but such illegality did not stop the Defendants who were willing to do virtually anything to preserve their lucrative investment banking fees based upon the house of cards built by Jack Grubman.

34.  The plan of the Defendants to sacrifice independent analysis for investment banking fees has been previously recognized in the settlements reached by various regulatory agencies.  The website of the Massachusetts Security Division at http://www.state.ma.us/sec/sct/sctlist.htm contains the following statement:

"The following is a list of stocks which were included in various settlement agreements reached between the states, the SROs (the NASD and the NYSE) and the SEC in various investment firms…. These investigations showed there was a **pervasive scheme of using research to garner investment banking fees:**

> AT&T - - AT&T Wireless
> Focal Communications
> Metromedia Fiber Networks
> Level 3 Communications
> Williams Communications Group
> XO Communications
> Adelphia Business Solutions
> RCN Communications
> WorldCom
> Global Crossing
> Quest Communications
> Rhythm Net Connections
> Nippon Telecom
> McLeod USA

This list of companies are the very companies that Jack Grubman

was analyzing.  This recognition of a pervasive scheme of using research to garner investment banking fees relating to all of these companies shows that Jack Grubman and the Defendants clearly had a plan to use Jack Grubman as a shill for these companies to issue false reports for the sake of investment banking fees.  This plan was common to all of these companies and Jack Grubman's actions with respect to each one shows the motive, intent and plan of the Defendants.

**JACK GRUBMAN**

35.    The following acts of the Defendants that relate to Jack Grubman and Jack Grubman's own acts are examples of some of the intentional acts of the Defendants relating to Jack Grubman and of Jack Grubman's own intentional acts.  They are only examples and are not intended to include all evidence as it relates to Jack Grubman.

36.    The Defendants had the following corporate plan with respect to Jack Grubman to sacrifice his research integrity for investment banking fees which was a violation of trust to persons such as the Plaintiff relying upon analysts employed by the Defendants.

a.  To pay Jack Grubman not to be an independent and competent analyst but, rather, because of the investment banking fees that he generated.  They did this without telling the Plaintiff who was relying upon Jack Grubman to be an independent and competent analyst.

b.  To communicate to Jack Grubman that he was expected to sacrifice

21

his integrity for the sake of investment banking fees.

      c.  To have Jack Grubman issue bullish WorldCom predictions explicitly recommending investors, such as the Plaintiffs herein, to build over-concentrated positions in WorldCom stock.

      d.  To give investment advice to the Plaintiffs herein that was materially false and misleading and, based in large part, on Jack Grubman's reports and statements.  The Defendants knew that the reports and statements of Jack Grubman and his group were false and misleading and were generated because of the money earned by the Defendants as a consequence of their relationship with WorldCom and the earnings which came to the Defendants as a result of that relationship. The false reports and statements of the Defendants and Jack Grubman were made to the Plaintiffs because of the relationships that the Defendants had with WorldCom and the money that they were earning because of that relationship.  These false reports and statements were issued for the sole purpose of getting the Plaintiff to buy or hold WorldCom stock because the purchase and holding of that stock falsely inflated its value and thereby benefited both WorldCom and the Defendants herein.  The reports and statements were false and if accurately made would have shown that the WorldCom stock was grossly over inflated and that reasonable advice to the Plaintiff would be to sell the stock and avoid the inevitable disaster which was going to occur because of the overvaluation of these stocks caused by these false reports and statements.  The Defendants knew that they were giving false advice to the Plaintiff, knew that their analysts including Jack Grubman were not being objective and were making false, inflated claims concerning WorldCom stock but nevertheless allowed

these false reports to be made to the Plaintiff for the sole purpose of increasing the Defendants' own profit as a result of the relationship with WorldCom and the over inflation of WorldCom stock.

e.     The Defendants encouraged Jack Grubman to make public statements such as those set forth herein. They knew and encouraged Mr. Grubman to make the statements set forth herein to the sources which the Plaintiffs relied upon because they knew that engrandized Mr. Grubman as well as the Defendants and encouraged people like the Plaintiff to rely upon Mr. Grubman. Defendants were fully aware that Mr. Grubman's statements were exaggerated, false, and misleading, yet far from doing anything to stop him, permitted him to continue and encouraged him because such statements were viewed favorably by WorldCom executives and helped keep the value of WorldCom stock high and persuaded those executives to continue providing investment banking fees to the Defendants. While Defendants had supervising analysts review all reports of Mr. Grubman before they went out, they had no such safeguards regarding Mr. Grubman's public statements nor did they correct any inaccuracies in such public statements after the fact.

37.     Jack Grubman was paid to earn investment banking fees for the Defendants. He was not paid his exorbitant salary because he was a good analyst or a competent or honest employee. To the contrary, Defendants recognized at all times material hereto that Jack Grubman was consistently dishonest in both his personal and business relationships, that he was not respected by his fellow employees particularly the retail brokers who worked for SALOMON SMITH BARNEY who relied upon Jack Grubman's pronouncements concerning stocks including

23

WorldCom who ranked him lower than any other analyst employed by the Defendants because they, unlike the Plaintiff, recognized that his true role was to gain investment banking fees for the Defendants and not to be an honest, independent or competent analyst. Examples of this dishonesty and lack of repute which the Defendants were fully aware of but condoned because of the investment banking fees being earned by Jack Grubman are as follows:

a.  Jack Grubman for years lied about where he had been brought up, telling everyone, including the press, that he had been brought up in South Philadelphia which is a rough section of Philadelphia because it enhanced his "machismo" image when, in fact, he grew up in the blue collar neighborhood of Oxford Circle.

b.  In the late 80's Jack Grubman started telling people that he had gone to MIT and received a mathematics degree and perpetuated that lie until May of 2000, when the lie was discovered by a reporter.  He, in fact, had never been enrolled at MIT but went to Boston University;

c.  Jack Grubman falsified his application with the National Futures Association by putting down not only that he had gone to MIT and earned a mathematics degree but the address of the institution and the dates that he had attended and received his degree.  He signed this application under penalties of perjury for the purpose of avoiding having to take certain tests or obtain certain licenses. Defendants were aware of this false application, aware that it was being offered to excuse Jack Grubman from taking the examination and aware of the fact

24

that they, by virtue of that knowledge, were also guilty of perjury but did nothing to correct it.

   d. On December 13, 1996, Jack Grubman sought to be excused from taking the series 7 examination in order to be licensed as a securities broker. Salomon Brothers, through its Vice President of Compliance Counsel Joan Caridi, wrote a letter to the National Association of Securities Dealers (NASD) on Mr. Grubman's behalf. Mr. Grubman received a copy of that letter. In the letter, as part of the basis for being granted a waiver from the series 7 exam, Ms. Caridl, on Mr. Grubman's behalf, asserted that he had earned a B.S. in mathematics at the Massachusetts of Technology. That statement was false and Mr. Grubman knew it was false yet he asked his employer to write that letter on his behalf and did nothing about the lie that was contained within that letter that was sent to the NASD. Salomon Brothers did nothing in that regard either.

   e. Despite being married and having children, Jack Grubman had ongoing affairs with women, some or all of whom were customers of the Defendants. Defendants were fully aware of this and of the potential compromise that it created relative to Jack Grubman's independent status but did nothing to correct it or to dissuade Jack Grubman from continuing that activity.

   f. When Jack Grubman was first employed by the Defendants, he agreed as a condition to employment to take three (3) examinations and pass them no later than March 31, 1999, failing which he would be terminated. These included the series 7, series 24 and series 63 exams all of which were necessary for Jack Grubman to continue doing his job. Jack Grubman, in fact, never took the series 7,

24, or 63 exams before March of 1999, failed one of them when he did take it, and never at any time took the series 24 exam. Despite the fact that this was in direct violation of his employment contract, he was continued as an employee because of the investment banking fees he was earning for the Defendants.

        g. Jack Grubman received the worst score of any analyst from the brokers who were handling customer accounts for Salomon Smith Barney. When these retail brokers were asked what they thought of Jack Grubman, the following are the kinds of comments that were made about him:

1.     "Should be arrested and placed in jail."

2.     "Never tells the truth."

3.     "Should be selling used cars."

4.     "I am ashamed that he works for us. He caused me more assets, losses, good work, business and face than any other analyst in my life. Drop the liar. He is not honest. Bad for our reputation. We had a rough year. . . I wish we did better."

5.     "Can him and press charges."

6.     "It amazes me that Grubman can be ranked #1 by II and there isn't a single retail broker that respects the guy. It's criminal what he has done to retail clients. He should be in jail. I am embarrassed that I work under the same umbrella as him."

7.  "This analyst is a joke.  Couldn't you save a few jobs if you let this crook go."

8.  "Should be sued for manipulation and fraud!!!!!!  He should not represent this firm in any capacity!!!"

9.  "Maybe as a banker he makes the firm a lot of money but on the retail side the damage he has caused is a disgrace!  I hope my many clients sue."

10. "Grubman is an investment bank whore!"

11. "When is the firm going to stop  pimping him."

12. "In my sixteen years in the retail brokerage business, never have I received such misguided, horrific recommendations from an analyst."

13. "Some of his calls may come or perhaps, put us in positions where we have to defend ourselves legally. Why does management and our research department continue to defend his advice?"

14. "Should have his wages garnished and have the funds returned to all the clients who took his advice – What a travesty!"

15. "It's criminal what he has done to retail clients.  He should be in jail."

16.  "I believe the firm is at risk for legal action in any case where an analyst is also an investment banker (GRUBMAN)."

17.  "One question – will he come to arbitration with us when the lawsuits begin."

18.  "I hope many clients sue!"

19.  "There are no words to express how deplorable and sickening his guidance has been."

20.  "We need disclaimer on his stocks 'buyer beware.'"

21.  "Perhaps Enron could use his expertise."

22.  "Banking whore, zero credibility."

23.  "An investment banking prostitute."

24.  "the original pump and jump."

25.  He is a confirmed liar (Business Week, June 2000)."

26.  "Drop the liar."

27.  "Grubman has been a neutron bomb to this company. Get rid of him."

28.  "[November 2, 2001] report [after WorldCom's massive accounting fraud was made public]: 'Change is the only constant in life.  If one is prepared, it is catastrophic.'  If that isn't the most flippant, condescending remark imaginable.  I thought he was the recognized telecom guru who was supposed to prepare us."

29.    "I'm bewildered and dumbfounded at the blatant use of power as demonstrated by Jack Grubman. The upgrade and downgrade of AT&T was so clearly political, I'm mortified."

30.    "If you shorted his buys you would have made a fortune."

31.    "No analyst in my 20+ years in this business has cost me, my family, and my clients more money."

32.    "Poster child for conspicuous conflicts of interest."

33.    "I hope Smith Barney enjoyed the investment banking fees he generated, because they come at the expense of the retail clients."

34.    "Let him be a banker, not a research analyst."

35.    "His opinions are completely tainted by 'investment banking' relationships (padding his business)."

36.    "Grubman has made a fortune for himself personally and for the investment banking division.  However, his investment recommendations have impoverished the portfolio of my clients and I have had to spend endless hours with my clients discussing the losses Grubman has caused them."

h.  On January 16, 2001, Jack Grubman wrote to Carol Cutler explaining to her that he didn't have to worry about these reviews or the fact that he was rated last by these retail brokers and actually had a negative score because

despite the complaining of John Hoffmann, the global heard of research, because he had scored so low, that Sandy Weill liked the over $600 million in banking revenues he earned so John Hoffmann would have to grin and bear it.

   i.   There were some 1,410 negative comments from brokers about Jack Grubman all of which were ignored by SALOMON SMITH BARNEY.

   38.   Mr. Grubman was unique among analysts. While the highest compensation of analysts was somewhere near $2.5 million during the period from 1998 through 2001, Mr. Grubman was earning approximately $20 million a year. It was no mystery why. The Defendants knew that in 1998 alone Mr. Grubman's investment banking revenue was listed at $255 million while the next highest analyst earned $101 million in revenue. In total, Mr. Grubman was responsible for more than $790 million in investment banking revenue from telecom companies covered by him. Unbeknownst to the Plaintiff, Jack Grubman was acting as more than just an analyst for the Defendants. In fact, Jack Grubman was recognized by the Defendants as the most important factor in their investment banking success particularly because of his relationship with WorldCom CEO, Bernard Ebbers, and other telecom executives and principally because of Jack Grubman's widely disseminated bullish research reports concerning WorldCom and other telecommunication stocks. Unbeknownst to the Plaintiff, SALOMON SMITH BARNEY in 1998 earned THREE HUNDRED FORTY-THREE MILLION DOLLARS ($343,000,000.00) in fees from telecom investment banking deals, an 88% increase from its prior year. These fees were attributable to Jack Grubman's efforts as an investment banker masquerading as an analyst. Unbeknownst to the Plaintiff, from 1998 to 2001, SALOMON SMITH BARNEY earned

over $10.8 billion in investment banking revenues from telecom deals including those related to WorldCom. As a direct result of Jack Grubman's consistent high ratings of WorldCom and other telecom stocks, Jack Grubman received an approximate TWENTY MILLION DOLLARS ($20,000,000.00) per year compensation package from 1998 to 2001. That compensation was directly related to the amount of profit Defendants' investment banking division made that was never disclosed to the Plaintiff. The Defendants knew and bragged that because of Jack Grubman, SALOMON SMITH BARNEY was involved in financing virtually all major entrants into the telecom industry.

39.     Because of the investment banking fees that he was able to earn for the Defendants, Jack Grubman made nearly ten (10) times more than John Hoffmann who was two (2) levels above Mr. Grubman despite the fact that Mr. Hoffmann was responsible for 350 analysts like Mr. Grubman  and had been manager of US equity research for SALOMON SMITH BARNEY or its predecessor since 1987 or early 1988. In fact, during at least one year, Mr. Grubman made more than Sanford Weill, the then CEO of CITIGROUP. Defendants knew Mr. Grubman was being paid not to be honest and objective as an analyst but because he was able to earn investment banking fees for the Defendants.

40. Unlike other analysts, Jack Grubman was very much aware of exactly what was happening with respect to WorldCom including the lack of financial underpinning for WorldCom's public reports. He attended at least three different WorldCom Board meetings, one on August of 1996, one on November of 1997, and one on October of 1999. This was nonpublic information in violation of Federal

Regulations restricting the kind of information available to analysts. Jack Grubman and Scott Sullivan spoke at least several times a month between January 1, 2000, and the declared bankruptcy of WorldCom.

41. It started even before there was a SALOMON SMITH BARNEY. Jack Grubman was told while he was with Salomon Brothers that the top priority of Salomon Brothers was for him, as an analyst, to get Salomon lead managed deals especially in equity and especially in high profile IPOs. Deryck Maughn, then CEO of Salomon Brothers, told that to Mr. Grubman. Mr. Grubman on September 8, 1997, sent a memo to Jim Crandell of Salomon in which he listed the transactions in which he had collected fees for the period from October, 1996, to September 30, 1997, and claimed that he had earned Salomon Brothers $93 million in investment banking fees. In that memo, he recounted the above comments from Mr. Maughn.

42. In January of 1998, in a presentation to Travelers made by J. Dimond, a co-CEO of SALOMON SMITH BARNEY, Mr. Dimond reflected on the fact that analysts such as Mr. Grubman were the key to the success of obtaining investment banking fees. Defendants knew that allowing Mr. Grubman and other analysts to be the key to the success of the Defendants earning investment fees was a violation of trust owed the Plaintiffs depending upon those analysts.

43. Jack Grubman was not even trusted within his own firm because of his avarice with regard to investment banking fees. On August 15, 2001, an e-mail was sent from Michael Klein, an investment banker with SALOMON SMITH BARNEY, to Scott Miller, another investment banker with SALOMON SMITH BARNEY, concerning a company called Fulcrum. A copy of this was sent to Michael Carpenter, the head of

32

SALOMON SMITH BARNEY. The e-mail discusses the concern that the parties had about Jack Grubman and stated that he was not trustworthy because while Jack Grubman was espousing the view that a Fulcrum loss was a WorldCom gain, he was, in fact, trying to broker a deal to merge the two companies. The concern was that if Jack Grubman was aware of an upcoming bond issuance, he would leak information about which would raise the price of the bonds. This level of distrust was ignored by Michael Carpenter.

44. An e-mail was circulated on October 9, 2001, through October 22, 2001, entitled "Jack on the Box" had a picture of Jack Grubman on a wanted poster for the murder of U.S. stocks and conspiracy to murder stocks such as WorldCom. Subsequent to the distribution of that, there were e-mails from Kerry Buckley, of human resources for the Defendants, to Kevin McCaffrey, of research, explaining that a written warning had been issued to the financial consultant (broker) who had sent that e-mail. SALOMON SMITH BARNEY's reaction to this broker who was blowing the whistle on Jack Grubman because of Jack Grubman's dishonest analyses concerning WorldCom was to punish the broker rather than stop the inappropriate analyses.

45. On February 8, 2002, Jack Grubman wrote an e-mail about Quest giving their equity banking dealings to one of two other companies and stating that if they did that "we will kill them." Jack Grubman recognized that his positive reports made or broke a company. Mr. Grubman's threat with respect to Quest reflects his recognition that his reports were not honest but were motivated strictly by the amount of the banking fees that he could generate.

33

46.   Even as late as March of 2002, shortly before the WorldCom debacle became public, SALOMON SMITH BARNEY was still doing nothing about the obvious bias of Jack Grubman.   On March 12, 2002, Kevin McCaffrey, Jack Grubman's senior supervisor, wrote to Timothy Tucker, also another supervisor of Jack Grubman, asking how the market was.  Timothy Tucker responded that it wasn't very pretty.  That thanks to WorldCom the Dow Jones was down 71 points and that Citigroup's stock was down 36 points thanks in part to its ties to these "telecom dogs." He pointed out that Jack Grubman had not yet issued a note on WorldCom.  He said if he were Jack Grubman, he would be all over this stuff.  Jack Grubman was still recommending a buy on WorldCom but neither Kevin McCaffrey nor Timothy Tucker, who was supposed to be supervising Jack Grubman, ever bothered to even question Jack Grubman's actions.

### JACK GRUBMAN DID NOT BELIEVE WHAT HE WROTE ABOUT WORLDCOM

47.   It is obvious that Jack Grubman had an impossible conflict of interest with respect to the reports and public statements he made about WorldCom and other telecom stocks.   His huge salary was dependent upon the earning of investment banking fees which could only be earned if his stock reports and public statements were positive.  His income, therefore, was directly related to his issuing positive reports whether he believed them or not.  The evidence is he, in fact, did not believe them.

48.   Jack Grubman's assistant, Sherlyn McMahon, gave a speech in the summer of 1998 to employees of SALOMON SMITH BARNEY.  Mr. Grubman told

34

Ms. McMahon that she was to tell this group that he had the strongest relationship with WorldCom of anyone, that he had been involved in every MFS transaction and that he and Bernie Ebbers typically discussed strategy at a pool hall called the Turkey Bar and Grill in Jackson, Mississippi. Jack Grubman could not possibly have been an independent analyst of WorldCom if he had the kind of relationship with Bernie Ebbers and was "discussing strategy" with the CEO of a company he was supposedly analyzing.

49. By late 1999, WorldCom's increased capital expenditures were cutting deeper and deeper into WorldCom's revenue. WorldCom was in trouble and Jack Grubman knew it. But Jack Grubman also knew that he couldn't justify "buy" ratings if he used the standard "discounted free cash flow" model ordinarily used by analysts such as himself. The problem is that Jack Grubman has been justifying his buy ratings on WorldCom because of the supposedly high amount of what he termed "discounted free cash flow." This was the discretionary money left over after WorldCom's necessary expenses were met. By late 1999, WorldCom's increasing capital expenditures were cutting deeper and deeper into WorldCom's revenues.

In August of 1999, Jack Grubman was still trying to justify his value for WorldCom stock based upon a discounted cash flow model. Discounted cash flow models forecast future cast flows and discounted the cash flows to reflect that they are future and are uncertain and add the discounted cash flows up to create a value for the stock. In April of 1998, Jack Grubman used a 13% discount rate against WorldCom's weighted average cost of capital. Jack Grubman consistently lowered his forecast of Worldom's future cash flows with each of these successive analyst

reports after April, 1998, showing that WorldCom had shrinking available cash. Despite this, Jack Grubman's target price doubled from April of 1998, to August of 1999. In order to justify this increased price target by August of 1999, Jack Grubman manipulated his analysis by lowering the discount rate from 13% to 11% despite the fact that WorldCom's weighted average cost of capital had risen 2% during this period and by increasing the terminal multiple from 9 to 12 even though WorldCom's growth was slowing and its risk was increasing. He also inexplicably eliminated the trading discount.

Instead of alerting investors to WorldCom's decreasing prospects and how he had to change his models in order to justify his buy ratings, in October of 1999, Jack Grubman created an entirely different financial model. He called it the "earnings per share" model. He created this new model because the standard discounted free cash flow model used by WorldCom could no longer justify Jack Grubman's buy rating without even more manipulation.

On October 4, 1999, two days before informing SALOMON SMITH BARNEY's brokers about his new financial model created just for WorldCom, Jack Grubman attended a WorldCom Board Meeting, at which the Sprint merger was discussed. The "research" report Jack Grubman issued two days later on October 6 – which made no mention of his role as financial advisor to WorldCom – repeatedly extolled the "cash eps" (earnings per share) approach, and showed WorldCom stock to be "a steal" at just under $68. Jack Grubman said his new model supported a stock price of $130.

During the WorldCom-Sprint merger negotiations, SALOMON SMITH BARNEY valued Sprint for the WorldCom Board of Directors by using the standard "discounted free cash flow" model rather than the new "earnings per share" model specially created by Jack Grubman for WorldCom.  The minutes of the October 4, 1999, board meeting show that when it came to valuing the target telecom company, Sprint, for the WorldCom Board, the Grubman team used the standard discounted cash flow model, not the "cash earning" analysis as the accurate measure.

Jack Grubman did not disclose even to SALOMON SMITH BARNEY's retail sales force his changed approach to valuing WorldCom until October 6, 1999, at a SALOMON SMITH BARNEY in-house conference.  Not coincidentally, October 6, 1999, was the date the merger of WorldCom with Sprint was announced.  Also, on October 6, 1999, Jack Grubman issued a research report which made no mention of the fact that he had attended the WorldCom board meeting and had been listed as a "financial advisor to the company" by WorldCom.  Instead, he extolled his "cash earnings per share" methodology and claimed that it showed WorldCom to be a steal at its current price of just under $68 claiming that the new model supported a stock price of $130.  In October and November of 1999, Jack Grubman made widely publicized statements detailed in this Complaint that WorldCom was a must own stock and that investors had to load up the truck on this stock.

50. Jack Grubman knew he had to have the cooperation of WorldCom executives to sell his phony analyses.  Scott Miller, an investment banker with SALOMON SMITH BARNEY, obtained from Jack Grubman and Sherlyn McMahon potential investor questions to be provided to WorldCom executives to tell them in

advance the kinds of questions that might be asked of them on road shows relative to their stock. The role of investment advisors like Jack Grubman and Sherlyn McMahon was to probe a company like WorldCom to be sure that all weaknesses in the company were uncovered. At road shows, investors and analysts were given an opportunity to make inquiries of company executives to make objective analyses of the company. That is what Jack Grubman should have been doing. By telegraphing to the very company that Jack Grubman was supposed to be analyzing the questions that would probably come up not just from him but from other analysts and investors, Jack Grubman was attempting to shield WorldCom from a meaningful inquiry. This was all part of the plan to falsely inflate the value of WorldCom stock to ensure the continued earning of investment banking fees for the Defendants and to secure the value of the collateral of the loans made to WorldCom executives such as Bernie Ebbers. Thus, on October 17, 2000, Scott Miller sent to Jack Grubman potential investor questions that he had discussed with Jack Grubman and Sherlyn McMahon and which eventually made their way to WorldCom executives. The same thing happened on March 27, 2001, prior to WorldCom offering the largest bond deal in history. Scott Miller sent to WorldCom the questions prepared by Jack Grubman and Sandy Weill assuring Scott Sullivan and other WorldCom executives that Jack Grubman would have a "refreshed perspective" about the WorldCom bond deal.

51. On November 1, 2000, at an annual meeting that WorldCom called for analysts, WorldCom released its earnings report and Jack Grubman was present. Sherlyn McMahon has testified that that earnings report along with other evidence in the fall of 2000 indicated that WorldCom's long distance business was deteriorating

and Jack Grubman knew it. At the November 1, 2000, meeting, there were people who were crying because of that report yet Jack Grubman did absolutely nothing to include this information in the information he was supplying to individuals like the Plaintiffs about WorldCom.

52.   On November 2, 2000, John Hoffmann wrote an e-mail to Michael Sargent, Kevin McCaffrey and Jeffrey Waters in which he described stocks like WorldCom where Jack Grubman had put an $85 price target on WorldCom and then went to $45 and John Hoffmann knew the $45 price target was unrealistic let alone the $85 price target. He said as much in the e-mail but did nothing about it.

53.   On November 9, 2000, a note was sent to John Hoffmann from Alex Carberry who was the branch manager in the SALOMON SMITH BARNEY branch in Media, Pennsylvania. Mr. Carberry recounted a discussion he had had with Sherlyn McMahon, Jack Grubman's primary assistant. Mr. Carberry was complaining to Ms. McMahon about the fact that when WorldCom was at $25, Jack Grubman was saying that we should load up the trucks on this stock and it would be $85 within a year. Ms. McMahon stated "I don't know what you are complaining about. Everybody knew there were a lot of negatives about this stock: 1) Margins were being squeezed. 2) long distance was deteriorating, 3) likely to have earning per share and ratings downgraded when earnings were released and 4) the stock could go to 18. Also concerns about credit wellness of company and ratings on outstanding debt." In fact, not everybody knew that. Certainly Jack Grubman had never stated those negatives in his reports or in his public statements. To the contrary, his reports and public statements were always positive on WorldCom stock. Despite Sherlyn McMahon's

39

statements, there was nothing in any of Jack Grubman's reports which alerted investors about Jack Grubman's true thoughts about WorldCom stock as expressed by Sherlyn McMahon. John Hoffmann did absolutely nothing about this and made no investigation whatsoever.

54.    On January 4, 2001, Jack Grubman prepared quarterly model books for Bell South, SBC Communications and the WorldCom tracker stock. These models used a discounted flow analysis and the discount rate used for all of the stocks except the WorldCom tracker was 8%. Jack Grubman used 11% for the WorldCom tracker stock reflecting an artificial enhancement of the value of that stock. On July 2, 2001, a similar disparity in discount rates for the WorldCom tracker stock was used by Jack Grubman using 10% for WorldCom tracker stock and 8% for all other stocks. On October 10, 2001, Jack Grubman dropped WorldCom's tracker stock discount rate to 7 1/2 % reflecting a drop of 2 1/2 % in one quarter. These numbers reflect artificial analyses that have no relationship with reality and are designed simply to enhance the value of WorldCom stock or its tracker stock.

55. On February 28, 2001, Matt Candel wrote an e-mail to Arzu Cevik, a junior analyst under Jack Grubman. Mr. Candel was asking for help in  telecom stocks  and asked "What name should I absolutely stay away from. I am really out of touch with the earnings forecast models, revenue and EBITDA expectations and any other catalysts or events that may move these stocks." Ms. Cevik responded "I would keep an eye on WCOM." Arzu Cevik, who was in Jack Grubman's group, was aware of Jack Grubman's true feelings about WorldCom. Jack Grubman was not telling the Plaintiffs or anyone else to keep an eye on WorldCom or that there was any kind of a

problem with WorldCom's forecast models, revenue or EBITDA expectations. The truth is there were plenty of reasons for investors to "keep an eye on WorldCom" and to be skeptical about WorldCom's value as stated by Jack Grubman but Jack Grubman was not passing this information on because of the lucrative investment banking fees he was garnering through WorldCom for the Defendants. While Jack Grubman was continuing to recommend WorldCom, this e-mail indicates Jack Grubman's true thoughts that WorldCom was not a stock that should be bought or held.

In contrast to the caution that Ms. Cevik had privately provided her friend on February 28, 2001, there were at least three analyst reports during that same month by Jack Grubman and his research team, including Ms. Cevik, which urged investors to purchase as much WorldCom stock as possible. For example, on the first page of Jack Grubman's February 8, report in a "bullet" just to the right of Ms. Cevik's name, investors were told "we believe (WorldCom's) stock could more than double" and later on in the same report investors were told "we would much rather be aggressive buyers on WorldCom.... We aggressively reiterate our buy."

56. Jack Grubman and Sherlyn McMahon knew very well about the lack of credibility of their continuous touting of WorldCom stock. Insiders didn't believe it but the Plaintiffs and the public did because Jack Grubman never receded from his positive stance on WorldCom regardless of the fact that an accurate analysis would show such recommendations to be entirely false. On March 7, 2001, Lisa Mullan sent an e-mail to Sheri McMahon about WorldCom stating "I am so sick of this WorldCom speculation. . . who, in their right mind, would want to buy this!!!" Lisa

Mullan was sophisticated in investment analysis unlike the Plaintiffs and others targeted by Jack Grubman.

57. WorldCom issued an $11.6 billion bond issue, the largest issuance of bonds in the history of the world. Jack Grubman took credit for having SALOMON SMITH BARNEY become the underwriter for that bond issuance. The fees earned from that bond issuance by the Defendants were part of the reason that Mr. Grubman was paid the enormous salary that he was. Prior to the issuance of those bonds and the naming of who would be the book runner for that bond issuance, there was a competition between SALOMON SMITH BARNEY and J.P. Morgan as to who would be named book runner or joint book runner on this bond issuance. Employees of WorldCom went to SALOMON SMITH BARNEY and asked them to arrange a $1 billion line of credit with Citibank, another subsidiary of CITIGROUP, which SALOMON SMITH BARNEY, in fact, did. On March 27, 2001, an analysis was done by Citibank. The purpose of that analysis was to permit the $1 billion line of credit to be issued to permit SALOMON SMITH BARNEY to become the joint book runner on the bond issuance and, thus, earn a $20 million fee. That analysis drew on estimates done by Jack Grubman concerning WorldCom. Using the very same numbers as Mr. Grubman, the analysis of Citibank on March 27, 2001, showed that WorldCom would have a negative cash flow from 2001 through and including 2005 and would not become positive until 2006. Jack Grubman, on the other hand, issued notes which the Defendants made public and were available to the Plaintiff and on which the Plaintiff relied which used the same figures that were used in the March 27, 2001, analysis, and showed WorldCom having a positive free cash flow by 2002. Mr.

42

Grubman's notes were false. Citibank's analysis was correct. Despite the analysis of Citibank showing that WorldCom would not have a positive cash flow until 2006, Citibank approved a $1 billion line of credit on March 29, 2001. The Defendants did not make public Citibank's analysis showing that WorldCom would not have a positive cash flow until 2006. Plaintiff would not have continued to hold WorldCom stock as he did had he known the truth as reflected by the Citibank analysis.

58.     The review of the mathematics utilized to predict WorldCom's discounted free cash flow for 2001 through 2010 shows Jack Grubman's math to be off by nearly $2 billion without explanation. This cavalier use of numbers reflects that Jack Grubman did not honestly believe the analysis which he was producing with respect to WorldCom.

59.     On April 27, 2001, Carol Cutler, Jack Grubman's girl friend, wrote an e-mail explaining that the numbers that Sherlyn McMahon had put in regarding WorldCom absolutely made no sense and were completely contrary to every other analysts' numbers. Carol Cutler was trying to protect Jack Grubman from, what she thought, was a mistake. Jack Grubman did nothing about this and continued to use those numbers because there was no mistake. He knew the numbers made no sense because they were his numbers and he created them to falsely reassure the Plaintiff not to sell his WorldCom stock.

60.     On April 27, 2001, Sherlyn McMahon wrote an e-mail to Jack Grubman about a conversation that she had had with among others Scott Hamilton of WorldCom. She spoke specifically about the fact that WorldCom's accounting made no sense and that upon analyzing WorldCom's statement that "our normalized

43

income statement best reflects the operating results of the company going forward" she recognized that her analysis showed that there was a $45 million loss that was not explained. When she asked Scott Hamilton as to why WorldCom had not made that adjustment, he gave her no further explanation. She explained that the reason she and Jack Grubman couldn't get sophisticated investors to buy WorldCom was because of serious questions about WorldCom's accounting. Jack Grubman, of course, never mentioned any of this in any of his public or customer statements. He knew very well there were problems with WorldCom's accounting.

61.    There were risks associated with WorldCom which were known to the research department of SALOMON SMITH BARNEY which were not made available to the Plaintiff or the public. On May 1, 2001, in connection with the bond offering by WorldCom, SALOMON SMITH BARNEY prepared a document for internal use only. In it, SALOMON SMITH BARNEY identified the risks regarding WorldCom which were reflected by WorldCom in its 10K filed at the end of the year 2000. The document also divulged additional risks identified by SALOMON SMITH BARNEY's research department. Jack Grubman was the head telecom research analyst in that department. Those risks included continued pricing pressure and the fact that various services offered by WorldCom's prices had been falling, the fact that S&P had downgraded WorldCom from an A to a triple B plus citing the company's increased risk profile, the potential for spin off of the MCI tracker stock and the debt and asset sales of Intermedia. None of these risks were made public or communicated to the Plaintiffs but Jack Grubman surely knew of them.

44

62.     On May 9, 2001, Sherlyn McMahon sent an e-mail to Scott Hamilton with a copy to Jack Grubman asking for help in justifying $1.25 for cash earnings per share on a Worldcom tracker stock.  Jack Grubman replied a few minutes later "I heard Reingold made more disparaging comments on WorldCom numbers.  See what Scott H thinks and ask how they get to our number."  Jack Grubman was admitting in this e-mail that he could not justify the numbers that he was putting in his notes regarding WorldCom and was asking for WorldCom's assistance in justifying this inflated analysis.

63.     On May 18, 2001, Jack Grubman wrote an e-mail to Sherlyn McMahon, his first assistant, and to Frank D. Yeary, the head of investment banking, in which he said "If anything the record shows we support our banking clients too well and for too long."  Sherlyn McMahon wrote back to Jack Grubman "You know you are crazy but that is how you got to where you are.  If they wanted someone safe who followed the rules they wouldn't get the banking pull."  Jack Grubman replied "Thanks for your support.  This boils me."  Jack Grubman knew what he was, a banker, not an analyst.

Sherlyn McMahon replied:  "I told Scott Miller (an investment banker of the Defendants) that you get the good and the bad with you and to look at all the bad deals we sold for them in the past.  He agreed with me."  Selling bad deals was exactly what Jack Grubman was being paid for.

64.     On June 20, 2001, Jack Grubman received an e-mail from Sherlyn McMahon telling him that he was being ridiculous recommending a target price of $45 while WorldCom was trading at $14, that people were actually laughing at her about

Jack Grubman's analysis.   Unfortunately the joke was on the Plaintiffs.   Jack Grubman knew his target prices on WorldCom were ridiculous.

65.    On June 21, 2001, Jack Grubman and Sherlyn McMahon received information about TGNT and WCII both of which were customers of WorldCom that the financial condition of those customers were declining rapidly.  Jack Grubman wrote an e-mail to Sherlyn McMahon at 9:42 p.m. in which he asked "did you know that the wholesale data was still in WorldCom group. I thought it was in tracker but Bernie told me it was in WorldCom.  The problem is that guys like TGNT and WCII were customers."  Sherlyn McMahon responded two minutes later "what? I have been telling everyone that it was in MCIT (the tracker) and even wrote that in our note!!!!!"   Jack Grubman knew that this would adversely impact revenues for WorldCom.  Yet Jack Grubman did not pass on this information to either the Plaintiffs or any people who were depending upon Jack Grubman for the purchase or holding of WorldCom stock.

Sherlyn McMahon wrote back to Jack Grubman saying that because of the information about TGNT and WCII, they needed to "come clean" with their numbers before their competitors did, yet Jack Grubman did not change his analysis.

66.    On June 22, 2001, Sherlyn McMahon wrote an e-mail to Donna Jaegers with a copy to Jack Grubman.  In that e-mail she said "I am praying hard that WorldCom can somehow get out of this terrible deal but they claim they cannot and it is going to close July 1."  She was referring to a contract which WorldCom had entered into which resulted in obtaining ICIX business.  She stated "WorldCom knew that ICIX business was crap when they bought it."  None of that information was

passed on to the Plaintiff or to anyone else. Jack Grubman continued his positive stance on WorldCom without noting any of the negatives.

67. On June 24, 2001, Jack Grubman wrote to Sherlyn McMahon an e-mail stating "I had dinner with Frank (Frank Yeary, the head of investment banking) and Kevin (Kevin McCaffrey, Jack Grubman's boss). I bet to discuss banking displeasure with our commentary on some names. Screw them. We should have put a sell on everything a year ago." This was the truth. Jack Grubman was revealing privately what he never revealed publicly. Had Jack Grubman a year before in June of 2000, done what he should have done and put a sell on WorldCom, Plaintiff's losses would have been greatly reduced.

68. On June 25, 2001, Sherlyn McMahon wrote to Jack Grubman about a luncheon that she had had with Lanette Donovan stating "she just thinks we make ourselves look stupid by recommending names right up to the point of bankruptcy like WCII, XOXO, MFNX, etc." She told Jack Grubman that Ms. Donovan understood the banking relationship and understood that was why Jack Grubman was recommending these stocks right up to the point of bankruptcy. Sherlyn McMahon didn't protest and neither did Jack Grubman. They knew that Lynette Donovan was just saying what was happening and that was that Jack Grubman was recommending stocks to the point of bankruptcy because of the banking relationship of the Defendants to those companies.

69. On June 25, 2001, Jack Grubman wrote an e-mail to his boss, Kevin McCaffrey regarding "dinner." In it he said "see you at dinner. If Frank (Frank Yeary, the head of investment banking) starts up, I will lace into him. On the phone all day

47

with attorneys over an AT&T complaint that wants both Sandy (Sandy Weill) and I to give sworn depositions. On top of that, most of our banking clients are going to zero and you know I wanted to downgrade them months ago but got huge pushback from banking. I wonder what use bankers are if all they can depend on to get business is analysts who recommended their banking clients. Maybe for equity there is a legitimate link but for debt and particularly M&A, bankers should have relationships. The truth is bankers have gotten lazy and have depended on research way too long. See you at dinner." For Jack Grubman to admit he, as an analyst, wanted to downgrade stocks but didn't because he was talked out of it by investment bankers is nothing less than an admission of the very fraudulent conduct this complaint is based upon.

70.     On July 6, 2001, Ehren Mendum wrote a note to Jack Grubman regarding his notes which indicated that WorldCom's cash flow was improving. Mr. Mendum stated "How can you say that WCOM's free cash flow performance is improving? If you looked at your team's model, you would see that FCF is non-existent. Please clarify." Jack Grubman knew very well that WorldCom did not have positive free cash flow and wouldn't have it for many years to come. His notes were simply false.

71.     In August of 2001, WorldCom sent a jet to Teterboro airport to pick up both Jack Grubman and Sherlyn McMahon to take them to Mississippi for a nonpublic meeting. They received information concerning WorldCom's earnings which was not public information and thus violated Regulation FD. Jack Grubman knew very well that he was required to issue a note about this information but he didn't want to do it

48

because he had promised Bernie Ebbers not to make it public. On August 29, 2001, an e-mail was sent from Sherlyn McMahon to Jack Grubman stating "You promised Bernie that we wouldn't do a note so how can we?"  Jack Grubman, in fact, had promised that to Bernie Ebbers, a violation of the Federal Regulations concerning security analysts. Jack Grubman decided that he would write a note, not because the public deserved to have the information but because he was concerned that once it came out people would wonder why a note had not been written. He, thus, asked Sherlyn McMahon to write Bernie Ebbers, send him a copy of the proposed note before it went out and have him approve it. Sherlyn McMahon did that on August 30, 2001, by sending an e-mail to Scott Hamilton of WorldCom and informing him "I am going to try to slip this one by them but I may have to lower the price target." She was referring to a regulation of SALOMON SMITH BARNEY which required price targets to be no more than 75% of the current selling price of the stock.  She acknowledged that she and Jack Grubman were wiling to violate that internal regulation to assist WorldCom in artificially raising the value of its stock.  Scott Hamilton indicated that Scott Sullivan was aware of the e-mail and was looking at it and would get back to her as what to do about it.  Subsequently, Bernie Ebbers reviewed the note and told her that it was all right and so she then released it. This kind of prior approval of an analyst's note by the very company being analyzed is nothing short of fraud.

72.     Sherlyn McMahon, the analyst closest to Jack Grubman and his right hand person, because of the information which both she and Jack Grubman had about WorldCom declining sold the shares of stock which she owned in WorldCom at

or near September 11, 2001. She then sold the remaining 315 shares of WorldCom which she owned on October 17, 2001. She and Jack Grubman kept reassuring the Plaintiffs not to sell their stock.

73.     Even though he was permitted to do so, Jack Grubman never invested any money in WorldCom stock or WorldCom bonds reflecting that the did not believe what he was saying about WorldCom.

74.     Jack Grubman knew very well that WorldCom was in trouble long before he downgraded it in June, 2002. He knew that substantial loans had been made to Bernie Ebbers by SALOMON SMITH BARNEY secured by WorldCom stock and that as WorldCom stock decreased in value, the pressure increased on Bernie Ebbers because the collateral for his loans was dwindling. On September 12, 2001, Sherlyn McMahon wrote an e-mail to Jack Grubman saying that Eduardo Mestre, the head of investment banking for SALOMON SMITH BARNEY called her that morning needing Bernie Ebbers' phone number because the "credit guys" for SALOMON SMITH BARNEY were worried about his margin account.   Jack Grubman acknowledged that he knew precisely what she was talking about because he didn't question her about what she meant about Bernie Ebbers margin account. He simply responded "not good."

75.     Jack Grubman didn't want anything to interfere with the facade he was creating with his own notes and public statements. When SALOMON SMITH BARNEY decided to create what they called a recommended list, he was very much against that because he didn't want anyone else second guessing his phony analysis of WorldCom. SALOMON SMITH BARNEY, nevertheless, went forward with their

recommended list and Jack Grubman was irate. On September 28, 2001, he wrote an e-mail to Sherlyn McMahon in which he said when Scott Sullivan found out WorldCom was put on the recommended list his reaction was "weren't we already on Jack's list. They should just kill this thing."

76.     Both Jack Grubman and Sherlyn McMahon knew that they were hyping WorldCom solely for the investment banking fees that were being earned. On October 17, 2001, Jack Grubman sent an e-mail to Sherlyn McMahon concerning a conversation he had had with John Small, an institutional client at GLG, concerning WorldCom and AT&T. Sherlyn McMahon responded that she and Jack Grubman should start "sticking their necks out a little more" with respect to their calls on WorldCom telling Jack Grubman "you only live once" and "even if we were wrong, we would have generated commission and trading dollars." Jack Grubman and Sherlyn McMahon were supposedly basing their analyses on independent judgment unrelated to the amount of fees they were earning for the Defendants but this e-mail shows that wasn't the case. Investment fees, commissions and trading dollars were the sole basis for their analysis of WorldCom and the other telecom stocks supposedly being analyzed by Jack Grubman.

77.     On November 14, 2001, a series of e-mails showed that both Jack Grubman and Sherlyn McMahon knew very well that there were problems with the accounting for WorldCom. On that date, Sherlyn McMahon sent a series of e-mails to Jack Grubman entitled "Trouble with WorldCom 10Q" referring to the public report sent quarterly by WorldCom. She stated that the numbers did not make any sense and she was incredulous about the accounting of Scott Sullivan. She told Jack

Grubman to get an answer from Scott Sullivan that night because "others will find it and we need to be the ones to tell everyone about it, not Dan or Simon." She was talking about Dan Reingold and Simon Flannery, analysts with other brokerage houses. This e-mail shows that neither Jack Grubman nor Sherlyn McMahon believed the fundamentals of WorldCom and were simply covering up problems which they had discovered unless and until others outside the Defendants' companies uncovered the information.

78. Jack Grubman's relationship with WorldCom executives shows not only the extent to which he went to please them but the fact that he wasn't acting as an independent analyst but merely a shill of WorldCom. On December 19, 2001, an e-mail was written from Sherlyn McMahon to Blair Bingham and Scott Hamilton of WorldCom. Attached to that e-mail were the proposed models on WorldCom and the MCIT WorlCom tracker stock. Prior to putting those models in their model book, Sherlyn McMahon sent them for approval by the very company on whom Jack Grubman was supposed to be providing an independent analysis.

79. Jack Grubman received an e-mail from Sherlyn McMahon on December 20, 2001, at 6:24 p.m. casting some doubts about the revenues that were being reported by WorldCom. Four hours later at 10:02 p.m., Sherlyn McMahon sent another e-mail to Jack Grubman. In it she specifically referred to the probability that the revenues being reported by WorldCom were probably "a little light."

On December 20, 2001, near midnight, Jack Grubman sent to Sherlyn McMahon an e-mail asking whether they should tweak down their revenues of WorldCom for their model book. The next morning at 8:03 a.m. Sherlyn McMahon

responded that they could tweak down their revenues but that would show a sequential decline in fourth quarter revenues and people would notice so instead they should probably do a note but they would have to be careful and think about the wording. Jack Grubman and Sherlyn McMahon knew that the model they were creating for WorldCom was artificial. They knew that they were intentionally keeping from the Plaintiff and the public WorldCom's sequential decline in revenues and, therefore, its sequential decline in value. They recognized that the artificial analysis that they were making of WorldCom was designed for one purpose only and that was to continue to get the lucrative investment banking fees at the expense of an honest analysis of the stock.

80.     At the same time that Jack Grubman was giving glowing reports about WorldCom, SALOMON SMITH BARNEY analysts' staff was sending e-mails internally warning about WorldCom's cash problems. The SALOMON SMITH BARNEY analyst staff even went so far as to warn WorldCom management of an upcoming negative report by a different brokerage firm. WorldCom executives and Jack Grubman knew exactly what they were doing, and that is fraudulently painting an unrealistic picture of WorldCom's finances.

81.     SALOMON SMITH BARNEY and CITIGROUP were certainly aware that Jack Grubman's continued recommendation of WorldCom as it was sliding to its depths made no sense. On January 30, 2002, David Trautenberg, with the private banking group, sent an e-mail to Scott Miller, an investment banker, concerning an upcoming meeting between Scott Miller and Bernie Ebbers. He told Scott Miller to be sure to tell Bernie Ebbers that behind the scenes David Trautenberg was his "pitbull

here at the firm." He mentioned that Deborah Blackwell, Bernie Ebbers' assistant, was almost in tears recognizing that Bernie Ebbers was feeling the pressure.

Reference was made to a rumor that WorldCom was going to be dropped by the S&P and that that would kill the stock, that the stock was probably going to go down to $7 or $8. At the same time this information was available to Jack Grubman as well as everyone else at SALOMON SMITH BARNEY, Jack Grubman was continuing to recommend unrealistic price targets and a strong buy on WorldCom.

82.     Jack Grubman and Sherlyn McMahon knew very well that Jack Grubman's notes were false. On February 7, 2002, Sherlyn McMahon exchanged a series of e-mails with Louis Haym. Louis Haym reassured Sherlyn McMahon that the WorldCom bonds looked better than its stock to which she replied "praise the lord." Mr. Haym then said "you sound like you have saggy diapers that leak. Why so sad?" Sherlyn McMahon responded "because WorldCom is a single digit midget and when I have to talk about your guy's stuff all day long it is not a good sign." Jack Grubman, however, was still issuing "buy" recommendations on WorldCom.

83.     When WorldCom was taken off SALOMON SMITH BARNEY's recommended stock list on March 12, 2002, Jack Grubman apologized to Scott Sullivan telling him it wasn't him but rather a strategist who worked at SALOMON SMITH BARNEY saying that that was why he hated ever having a name like WorldCom on that list and Sherlyn McMahon on the same day sent an e-mail to Jack Grubman bemoaning the fact that some of their clients would misunderstand and think that they had downgraded WorldCom. Instead of recognizing that their analysis

54

of WorldCom was phony, as shown by their own company removing it from the recommended buy list, Jack Grubman continued to recommend buy.

84.    On March 12, 2002, Timothy Tucker wrote an e-mail to Jack Grubman's supervisors, Andrew Barrett, Jeffrey Waters and Kevin McCaffrey, informing them that the Wall Street Journal on-line had reported that WorldCom was being informally investigated by the SEC. He remarked that Jack Grubman was still rating WorldCom as having moderate risk but that there was no way, in his opinion, that that kind of a risk rating could be maintained under these circumstances and that WorldCom should be downgraded to a 3. Jack Grubman still had it as a 1 recommending that investors buy it. A 3 would be interpreted by investors as meaning to sell. Timothy Tucker said that while it would be massively painful, it was the right thing to do at long last. He indicated that no one was answering Jack Grubman's phone and that since he hadn't seen the e-mails asking for the approval of a rating change, he would assume Jack Grubman wasn't contemplating any. He was right. Jack Grubman did not downgrade WorldCom until June 21, 2002.

85.    In March of 2002, Jack Grubman made a decision to take WorldCom off the internal document called Salomon Smith Barney's Best Ideas but Tim Tucker, one of his supervisors, countermanded that order and told him not to change it and so he didn't. The reason was that this public information would lower the value of WorldCom stock, something that SALOMON SMITH BARNEY  did not want to happen for the reasons expressed in this Complaint. Jack Grubman has testified under oath that his honest opinion was that WorldCom did not belong on the Best

Ideas list but because research management talked him out of it, the public never knew that Jack Grubman wanted to take WorldCom off that list.

## THE DEFENDANTS' PLAN REGARDING WORLDCOM IS REFLECTED IN THE OTHER STOCKS REPORTED ON BY GRUBMAN

86. The following paragraphs as well as Sandy Weill's conduct regarding AT&T, as detailed hereinafter, show the Defendants' plan, motive and intent.

87. Focal Communications selected SALOMON SMITH BARNEY to be its joint book runner on several IPO offerings. After that was done, Jack Grubman published four notes on April 1, 2000; April 18, 2000; April 26, 2000; and July 31, 2000; intentionally failing to disclose that Focal had significant capital expenditures and required additional capital to complete its new business plan and faced risks that it could not raise that capital and could not complete its plan. That meant that Focal would potentially have substantial negative operating cash flow and substantial net operating losses for both 2000 and 2001 so that Mr. Grubman's notes were not only false but completely misleading.

88. SALOMON SMITH BARNEY earned approximately $11.8 million in investment banking fees from Focal Communications. On February 21, 2001, Jack Grubman published a note on Focal stating that Focal's results were in line with expectations and had a revenue mix that continued to improve. On the very same day, Jack Grubman wrote an e-mail concerning that note to Mark J. Cozzi and Stephen Cunningham, investment bankers, stating "I hear company complained about our note. I did too. I screamed at Arzu (Arzu Cevik, a member of Jack Grubman's team) for saying "reiterate buy." If I so much as hear one more fucking

56

peep out of them, we will put the proper rating (i.e., 4 not even 3) on the stock which every single smart buysider feels is going to zero. We lose credibility on MCLD (McLeod) and XO (XO Communications) because we support pigs like Focal." Clearly Jack Grubman did not believe the note that had been published in his name by Arzu Cevik but did nothing to correct it. In fact, his note of February 21, as well as a note of April 30, 2001, advised investors not only to buy Focal Communications but predicted that the company's stock would at least double over the next 12 to 18 months.

89.     Jack Grubman was plainly for sale regarding his opinion concerning investment banking clients.

On April 18, 2001, he wrote an e-mail to Frank Yeary, the head of investment banking concerning XO Communications, McLeod, Level III Communications, Williams Communications, Focal Communications, and Allegiance, all stocks that Jack Grubman had a buy rating on and companies in which SALOMON SMITH BARNEY had made huge investment banking fees. Regarding those stocks he stated "Also to be blunt, we in research have to downgrade stocks lest our retail force of (which Sandy (Sandy Weill)) cares about a lot which I know too well) end up having buy rated stocks that go under. So part of this call will be our view that LVLT WCG XOXO FCOM ABIZ RCNC must not remain buys. Only MCLD ALGX GX BRW FTHL ICM have no funding issues. If MFNX does not get credit facility they too get downgraded." After that e-mail was written indicating Jack Grubman's plain intent to downgrade those stocks in his next note, Mr. Yeary told Mr. Grubman not to downgrade the stocks because doing so would anger those

companies and hurt SALOMON SMITH BARNEY's investment banking business. Mr. Grubman was also pressured by Chris Lawrence, the head of telecom banking, who also called Jack Grubman and told him that he needed to discuss any proposed downgrades because some of the companies were more sensitive than others. As a result of this pressure from investment banking, Mr. Grubman intentionally failed to downgrade these stocks until months later and continued to advise investors to buy those stocks. Obviously, Mr. Grubman did not believe in those reports any more than he believed in the reports about WorldCom.

90. SALOMON SMITH BARNEY earned approximately $49 million in investment banking fees from Metromedia Fiber deals. Jack Grubman initiated coverage of Metromedia with a buy rating which he maintained until July 25, 2001. In Mr. Grubman's note of April 30, 2001, he indicated that Metromedia would obtain a $350 million loan from Citicorp and on June 6, 2001, Mr. Grubman issued a note indicating "we strongly reiterate our buy and we would be aggressive at current prices. That we continue to believe the $350 million bank loan which would bring Metromedia to fully funded status will close by the end of June." In the e-mail dated April 18, 2001, from Jack Grubman to Frank Yeary, Mr. Grubman specifically said there was a substantial chance that Metromedia would not get that loan. Yet only 12 days later he indicated that the commitment had already been made when he knew that wasn't the case. In fact, as of March, 2001, Metromedia itself stated that it might not be able to close on that $350 million credit facility from Citicorp. Mr. Grubman knew that his notes about Metromedia were false but because of their importance as an investment banking client, he issued those false reports.

58

91.    On May 1, 2001, Jack Grubman issued a note on Williams

Communication. In that note he reiterated a buy recommendation and stated that the

visibility on the funding for Williams was better than it was six (6) months ago. A

month and a half earlier, on February 28, 2001, an e-mail was sent from Arzu Cevik,

an analyst that worked under Jack Grubman to Matt Candel in which he indicated

that Williams Communications needed money and that he had warned an institutional

investor to be careful about Williams. Jack Grubman himself sent an e-mail on April

19, 2001, to Peter O'Neal describing that Williams as "a tough one. They still need

ney." Jack Grubman's note about Williams was not true, he knew it wasn't true, and

it was only issued because Williams was an important SALOMON SMITH BARNEY

investment banking client.

SCOTT SULLIVAN

92.    Scott Sullivan was the chief financial officer of WorldCom. The

following acts are examples of the conspiracy between Scott Sullivan, Jack Grubman

and the Defendants. These acts were intentional on the part of Scott Sullivan and

the Defendants and the Defendants' employees and what follows in this complaint

are examples of those acts but is not intended to include all such acts.

93.    Scott Sullivan conspired with Jack Grubman and Sherlyn McMahon to

hide the negative information Mr. Sullivan had about WorldCom. Jack Grubman

knew very well that there was something wrong with WorldCom's accounting

numbers as prepared by Scott Sullivan but the three of them made certain that that

information never reached the Plaintiffs.

59

94.    On March 9, 2001, Jack Grubman wrote an e-mail to Carol Cutler in which he talked about having meetings at the Oak Bridge between Bernie Ebbers, Eduardo Mestre, the head of investment banking, and Scott Sullivan in which they startegized about WorldCom.  Jack Grubman was supposed to be an independent analyst but was strategizing with the very company he was supposed to be analyzing.

95. On March 9, 2001, an e-mail was sent by Jack Grubman to Karen Young in which he bragged about the fact that Bernie Ebbers gave him information that was not public information or put in the 10Q of WorldCom.  While this violated security regulations it showed the access Jack Grubman had concerning WorldCom's finances.

96.    On March 16, 2001, or shortly thereafter Jack Grubman had a meeting with Scott Miller, an investment banker with SALOMON SMITH BARNEY, in which Mr. Miller asked Sherlyn McMahon and Jack Grubman to supply the kinds of questions that WorldCom might get when it went on a road show where analysts were present from various securities firms.  Jack Grubman instructed Sherlyn McMahon to draft potential questions and a series of e-mails dated March 26, 2001, were created in which key investor issues which WorldCom would have to respond to on these road shows were prepared by Jack Grubman and Sherlyn McMahon and sent to WorldCom to get around misgivings that Jack Grubman had as a result of a November 1, 2000, meeting and an earnings report and other information received by Mr. Grubman from WorldCom.  Scott Sullivan received copies of the e-mails providing all of this information.  The information told Scott Sullivan and other employees of WorldCom that they should not be completely forthcoming to analysts

60

or investors stating that among other things that "some of these questions are easy to respond to, others are more difficult and others probably shouldn't be afforded a direct answer." Far from trying to insure that persons such as the Plaintiffs received adequate information, the Defendants, through their employees in concert with Scott Sullivan, were making sure that negative information was not revealed to Plaintiffs and others.

97.    Jack Grubman, unlike other analysts, had unprecedented access to WorldCom's financial information. He was able to ask specific questions of senior members of WorldCom's financial department eliciting information that was often material, nonpublic, and in violation of regulation FD. On March 21, 2001, for example, Sherlyn McMahon sent an e-mail, with a copy to Jack Grubman, to Scott Sullivan and two other senior WorldCom financial managers, Blair Bingham and Scott Hamilton. In it, she asked for specific information on changes in working capital during 2000 relating to the cash flow statement and why it was $4.8 billion in 2000 and only $2 billion in 2001. She explained that it seemed very high. She also asked about intangible assets of $938 million in 2000 and increases of other assets of $1.7 billion. She explained that "the value accounts are attempted to buy but these issues are holding them back. Love from one of your only two friends on the sell side. Sheri."

98.    On April 27, 2001, Sherlyn McMahon sent an e-mail asking additional financial questions to Scott Sullivan. He wrote back on the same date "Scott Hamilton and David Myers, controller, will call you this morning to walk through the non-deductible goodwill amounts and reconciliation back to state and federal

statutory tax rates." There is no way that Ms. McMahon and Mr. Grubman were hoodwinked by the financial shennagians of Scott Sullivan. They knew all too well that there were problems with Scott Sullivan's accounting but never revealed it to the Plaintiffs.

99.    On May 2, 2001, Karen Young sent an e-mail to Jack Grubman in which she specifically said that people thought that WorldCom was overstating its earnings by being aggressive on capitalization of operating expenses, the very accounting fraud which was not made public until mid-2002. Jack Grubman hid this from the Plaintiffs.

100.    On May 9, 2001, Jack Grubman responded to an e-mail of Karen Young in which Karen Young asked him why WorldCom was so low and he responded "I think accounting stuff is still swirling" reflecting his knowledge of the accounting problems of WorldCom created by Scott Sullivan and Bernie Ebbers but Jack Grubman hid this from the Plaintiffs.

101.    On May 9, 2001, Sherlyn McMahon sent an e-mail to Scott Hamilton which Scott Sullivan read in which she stated that it was difficult for Jack Grubman to get to $1.25 earnings per share even though Jack Grubman had been utilizing $1.25 earnings per share since March 13, thus recognizing that the number was phony.

102.    On May 9, 2001, an opposing analyst by the name of Daniel Reingold had issued a note on WorldCom's accounting that was negative. Jack Grubman wrote an e-mail to Sherlyn McMahon referring to that note and asked her to contact Scott Hamilton at WorldCom to ask him how they get to "our number." Jack Grubman, as an analyst, was supposed to be creating his own numbers not copying

them from Scott Hamilton. As requested on the same date, Sherlyn McMahon wrote to Scott Hamilton explaining to him that because Scott Sullivan's depreciation was so different than what was contained in the Grubman model, it wasn't easy for them to maintain their numbers. She asked Scott Hamilton to give her a call to help her to continue to claim numbers for WorldCom that neither she nor Jack Grubman could justify.

103. On May 31, 2001, Jack Grubman sent an e-mail to Carol Cutler in response to her e-mail of the same date telling him that she was going to go to a meeting with WorldCom and asking what kinds of questions to ask. Jack Grubman told her to "In general hone in on balance sheet/cash flow stuff that is what shorts are all over." Jack Grubman was referring to the fact that there were substantial rumors about the accounting practices of WorldCom yet he did not warn investors such as the Plaintiffs about the accounting fraud.

104. In June of 2001, Sherlyn McMahon learned that Morgan Stanley was planning to issue a report that questioned the accounting of WorldCom. When she told Jack Grubman, instead of investigating himself he promptly forwarded her e-mail to Scott Hamilton of WorldCom with the warnings "beware, apparently Morgan going after you guys next on accounting." Scott Hamilton, in turn, forwarded Jack Grubman's e-mail to Scott Sullivan with the warning "Sheri seems to think that Morgan Stanley is going to go after **us** on accounting issues next." (Emphasis supplied.) Jack Grubman's duty was to investigate these questionable accounting problems, not tip off Scott Sullivan to the possibility they might be revealed.

105.   On July 6, 2001, Tim Tucker sent Sherlyn McMahon a Wall Street Journal article about accounting fraud.   He sent that article because of the information that Jack Grubman and Sherlyn McMahon had received about possible accounting fraud with respect to WorldCom.   Sherlyn McMahon asked Mr. Tucker to save the article but did nothing about investigating that accounting fraud.

106.   Even Jack Grubman has admitted under oath that he became concerned about WorldCom's accounting in the fall of 2001 while in truth he knew about it before then.   On August 29, 2001, he wrote Karen Young stating that he thought people didn't trust WorldCom's accounting. Jack Grubman wrote that e-mail to Karen Young while sitting in WorldCom's offices in Mississippi yet he never told the public or the Plaintiff at any time before WorldCom filed bankruptcy that there were people reporting to him that they didn't trust WorldCom's accounting.   Jack Grubman knew about problems with WorldCom's accounting but failed to advise the Plaintiff or anyone of those concerns and continued to recommend purchase and holding of the stock.

107.   On October 25, 2001, Jack Grubman got an e-mail from David Fizel, an institutional investor, specifically asking him about bad information that he had received concerning WorldCom's accounting.   Jack Grubman did nothing about passing this information on or investigating it.

108.   On November 14, 2001, Jack Grubman received an e-mail from Sherlyn McMahon entitled "Trouble with WorldCom 10Q" in which Sherlyn McMahon discussed a call that she had received from a client telling her that the revenues from Intermedia that WorldCom was claiming in its public reports showed a growth rate

64

that in her words were apples to oranges.  Jack Grubman never even bothered to go back to review WorldCom's quarterly reports but Sherlyn McMahon did and she then wrote an e-mail to Jack Grubman in which she said that the numbers looked really shitty and that they needed to get an answer from Scott Sullivan because other people besides them might find it.  Clearly Jack Grubman, Sherlyn McMahon and Scott Sullivan all knew the problem with WorldCom's 10Qs which were being improperly prepared by Scott Sullivan as a result of accounting fraud.  Jack Grubman continued to recommend WorldCom stock.

109.    On November 15, 2001, Jack Grubman sent an e-mail to Scott Sullivan. He asked whether Scott Sullivan had received his voice mails and asked specific questions as to whether any of the revenues from ICIX were included in the WorldCom third quarter revenues.  He also questioned why the charges that were listed in ICIX's quarterly return were not mentioned in WorldCom's quarterly return. He explained that "I fear some folks will try to make issues out of this given  language of the Q since ICIx's frame and CLEC ops were not specifically cited as held for sale.  Thanks."    Jack Grubman was more than a mere observer of WorldCom's accounting.    He was involved in the cover-up of questions concerning that accounting.  He viewed his job as helping Scott Sullivan and Bernie Ebbers hide any problems relating to that accounting.  In April of 2001, after an institutional client complained to Sherlyn McMahon about how another telecom company had explained its utilization rates as compared with WorldCom, Sherlyn McMahon forwarded the e-mail to WorldCom executives with the recommendation "maybe Bernie could mention

next week on his call, what the real utilization number is. I think it will help your stock."

110.    Jack Grubman recognized that he was going to have trouble continuing to pretend that there was nothing wrong with the numbers being reported by Scott Sullivan. On December 21, 2001, Jack Grubman wrote to Sherlyn McMahon about a conversation he had had with Bernie Ebbers. He had received nonpublic information from Bernie Ebbers in violation of regulation FD which indicated that revenues were not going to increase incrementally and that earnings per share and cash flow were going to be a "tad light." Instead of informing the Plaintiff of this information, he told Ms. McMahon that he was not going to write a note or change his model and he was going to do nothing.

111.    Sherlyn McMahon and Jack Grubman were in a quandary as to what to do about the negative information that Jack Grubman had received from Bernie Ebbers prior to Christmas. They had gone to a WorldCom conference in January of 2002 and recognized that they had to write a note eventually releasing this information. They finally decided on January 11, 2002, to cut the 2002 cash earnings growth rates of WorldCom to .90 cents and Jack Grubman sent an e-mail on that date to Sherlyn McMahon telling her to tell Shaw Kasaab to adjust the note accordingly. On January 11, they issued a note to that effect but claimed that WorldCom's free cash flow was ahead of schedule and that WorldCom remained their top pick. On January 13, Sherlyn McMahon confided to her friend, Lisa Mullan, that she and Jack Grubman had hoped to bury this information and that in the past

66

they had done that and gotten "blasted" by sales people and so they decided to come clean and not bury the information.

112.    Jack Grubman has admitted under oath that Scott Sullivan would give him financial information that was not available to the public.

113.    Jack Grubman received information indicating that WorldCom's working capital decreased year after year from $2 billion to $1.5 billion to $1 billion and then to $500 million but he never took that into account in discussing WorldCom's future even though he knew that honest analysis required that. Jack Grubman knew with this decline in working capital that Scott Sullivan's accounting couldn't make any sense.

114.    WorldCom regularly had meetings at which analysts were invited. Jack Grubman attended these meetings. The object of the meeting was to allow the analysts to ask questions about WorldCom's future, its accounting practices and its general financial health. As previously described, Jack Grubman regularly shared his questions in advance with both Bernie Ebbers and Scott Sullivan telegraphing to them what he intended to ask to make sure that WorldCom was not embarrassed by the questions. Jack Grubman thus was complicit in Scott Sullivan's ongoing accounting fraud. How could Jack Grubman possibly be an independent analyst if he was having meetings with the head of investment banking, the CEO and CFO of a company he was analyzing for the purpose of strategizing with them about that company?

115.    Jack Grubman was hardly an independent analyst. He had admitted

under oath that he would often have conferences with executives from WorldCom before they announced their quarterly earnings. These discussions would revolve around the issues and questions that competing analysts or investors might ask. These conference calls were designed to probe the accounting information contained within these quarterly earnings reports. Jack Grubman, instead of asking probing questions, was rehearsing Scott Sullivan and others about how to answer questions about his accounting.

116.    On January 31, 2002, Jack Grubman sent an e-mail to Scott Sullivan in which he advised him how to prepare answers to "these off-balance sheet stuff" that related to the accounting fraud Scott Sullivan had committed with respect to WorldCom.   Jack Grubman explained in detail how to explain to the public the off balance sheet questions that were being asked.  Jack Grubman told Scott Sullivan what to say to make sure nobody accused him of hiding something.  He told him to be aware that the public was on to him about shifting more than normal costs.  He told him not to be completely forthcoming with respect to quarter one guidance and told him to simply blame it on the economy.

117.    On February 4, 2002, Jack Grubman sent an e-mail to Bernie Ebbers advising him as to the issues that would be addressed on the Thursday call that was to be placed concerning WorldCom's accounting problems. He specifically listed for Bernie Ebbers six issues that he should bring up at this conference call and told him to be sure to say that the company was not going to have any problem meeting debt. He told him what to say about off balance sheet stuff and about off loading costs from WorldCom to MCI and told Bernie Ebbers not to worry to "hang in there."

118.   On February 5, 2002, Jack Grubman sent a series of e-mails to Bernie Ebbers and Scott Sullivan giving them advice on how to handle questions at a conference call about the integrity of their accounting.  He warned them that there would be questions about integrity of accounting liquidity and free cash flow issues at the upcoming call.  Jack Grubman then sent an e-mail to Scott Sullivan explaining some of the things that were being said about Scott Sullivan's accounting and warning him to be prepared about the fact that the public was aware of off balance sheet liability that would be triggered by a write down.  He forwarded an e-mail which was sent to him by Mick Frelinghuysen, who was an institutional investor from Oppenheimer Capital, which explained what was needed to be said in order to convince people that WorldCom was not going under.  Jack Grubman then sent the same e-mail to Bernie Ebbers.  Later on that afternoon, Jack Grubman sent another e-mail to Scott Sullivan forwarding on an e-mail he had received from Sherlyn McMahon detailing the problems with Scott Sullivan's accounting.  Instead of asking questions about these questionable accounting principles, Jack Grubman lamented to Scott Sullivan that that was more that Scott Sullivan had to deal with.

119.   On February 6, 2002, Jack Grubman sent a series of e-mails to Scott Sullivan again suggesting the kinds of problems that were going to come up at the upcoming conference call so Scott Sullivan would be able to answer them and convince other analysts that the accounting problem didn't exist. He specifically told Scott Sullivan that he would be getting questions about whether or not he uses purchase accounting methods to "goose" earnings via drawing off of reserves.  He invited Scott Sullivan to call him even if it was 7:00 o'clock in the morning.  Jack

Grubman has admitted under oath that the e-mails in February were sent in the hopes that the stock value would remain high consistent with the buy rating that he continued to have on WorldCom.

120.   On February 7, 2002, a series of e-mails were sent from Jack Grubman to Scott Sullivan on the morning of the conference call in which Jack Grubman questioned a news release that had been sent out by WorldCom in which Scott Sullivan had added $29 million in revenue that wasn't there before. Jack Grubman then sent an e-mail to Sherlyn McMahon explaining that Scott Hamilton's explanation didn't make any sense. Jack Grubman continued to keep a buy rating on WorldCom and never disclosed this to the public or the Plaintiffs.

121.   On February 7, 2002, Jack Grubman sent an e-mail in which he specifically telegraphed to Scott Sullivan a question and asked him whether if he asked that question at the upcoming conference he would "get the right answer," obviously implying that if he didn't get the answer that kept WorldCom's false stock price afloat, he wouldn't ask the question. Scott Sullivan then sent an e-mail to Jack Grubman thanking him for sticking up for WorldCom and Jack Grubman indicated that he would mention to "our guys" that what worked for the 2001 bond deal might work now. Jack Grubman was referring to hiding valuable information from the public about the bond deal and about the problems that were being raised about Scott Sullivan's accounting. Telegraphing to a company's chief financial officer questions that would only be asked if he were able to answer them only makes sense in light of the trade off of Jack Grubman's integrity for banking fees.

70

122.   On February 7, 2002, Jack Grubman wrote to Sherlyn McMahon concerning an explanation he had received from Scott Hamilton of WorldCom about Scott Sullivan's treatment of some $29 million in revenue which was included in the fourth quarter of 2000 but which wasn't even part of the company the year before. He admitted that the explanation made no sense and Sherlyn McMahon agreed by writing back "apples to oranges." Sherlyn McMahon then wrote to Jack Grubman an e-mail that stated "If fon (Sprint) tried to pull this crap, you would blast them" reflecting that Jack Grubman knew very well that Scott Sullivan's accounting was phony but that Jack Grubman was not going to blow the whistle on WorldCom.

123.   On February 18, 2002, Jack Grubman sent to Scott Sullivan an e-mail that referred to an article that appeared in Forbes about accounting irregularities and that included a reference to WorldCom. Instead of questioning Scott Sullivan about his accounting as an independent analyst would do, Jack Grubman merely said that the article was absurd and that WorldCom was included by Forbes without an explanation. He didn't ask for any explanation from Scott Sullivan. He simply closed his eyes and ignored the problem.

124.   On February 21, 2001, e-mails were passed between Scott Sullivan and Jack Grubman in which Scott Sullivan reminded Jack Grubman that in a deal that was pending SALOMON SMITH BARNEY was making a $4.2 million fee on an $870 million deal.  Jack Grubman forwarded that on to Eduardo Mestre, the head of investment banking.  This was a not so subtle reminder of the deal between Scott Sullivan and Jack Grubman to keep touting WorldCom stock despite its obvious

71

problems.  Jack Grubman complied.  He continued to tell people to hang on to their WorldCom stock and buy more.

125.    Jack Grubman sent an e-mail to Scott Sullivan on February 24, 2002, in which he discussed the fact that there were real problems with Scott Sullivan's accounting and stated "The accounting police are everywhere.  Jack Grubman maintained his buy rating on WorldCom.

126.    On March 12, 2002, Jack Grubman was informed that SALOMON SMITH BARNEY was taking WorldCom off their recommended list of stocks.  Jack Grubman replied that is exactly why he hated having WorldCom on that list to begin with.  He then wrote to Scott Sullivan and let him know that he was not going to take WorldCom off his list and that he had nothing to do with a strategist who had taken WorldCom off the recommended list of SALOMON SMITH BARNEY.

127.    On March 19, 2002, Jack Grubman wrote an e-mail to Karen Young which discussed WorldCom going into bankruptcy yet Jack Grubman maintained his buy rating on WorldCom.

128.    Around May 13, 2002, Jack Grubman learned that WorldCom was going to be dropped by the S&P, that SALOMON SMITH BARNEY had told Jack Grubman that 240 million shares of WorldCom which were shares owned by SALOMON SMITH BARNEY would hit the market but none of this information was ever passed on to the public until June 21, 2002, when Jack Grubman finally downgraded WorldCom.

### JOHN HOFFMANN

129.   John Hoffmann at all times material to this Complaint, was the head of SALOMON SMITH BARNEY's research department and an employee of the Defendants. What follows are intentional acts committed by John Hoffmann but are only examples of said intentional acts and are not intended to include all of the evidence as it relates to John Hoffmann.

130.   In October, 2000, John Hoffmann sent an interoffice memo to the equity research directors in each region around the world who reported directly to him. He indicated his concern that on morning calls, analysts in the United States were explaining company shortfalls and adjusting near term estimates yet leaving the long-term growth rates and price targets intact.  That statement applied to Jack Grubman's treatment of WorldCom more than any other analyst's treatment of any stock yet John Hoffmann never attempted to discipline Jack Grubman or change anything about the way Jack Grubman was predicting the target price of WorldCom. He didn't because he knew that Jack Grubman's proposterious target prices for WorldCom were designed to influence people like the Plaintiff not to sell their stock and was not designed to give an honest analysis of the potential target price of WorldCom.

131.   On November 2, 2000, Kevin McCaffrey, a direct supervisor of Mr. Grubman, sent an e-mail to John Hoffmann, the head of analysts for SALOMON SMITH BARNEY  which attached another e-mail from James Zisson.  Mr. Zisson pointed out what he said was an obvious and ongoing conflict of interest in investment banking concerning WorldCom stock. He suggested that certain failsafe mechanisms be put in place to prevent the unrealistic buy ratings and price targets

73

which had been issued by Mr. Grubman and on which the Plaintiff had relied. He told the recipients of that e-mail, which included both Kevin McCaffrey and John Hoffmann, that to do otherwise was a violation of the fiduciary duty of clients of Salomon Smith Barney. Kevin McCaffrey wrote an e-mail to John Hoffmann telling him that while this was a great concept, it would never work. The reason it would never work was because the Defendants real goal was investment banking fees, not giving reliable, honest analysis of stocks. The Defendants, including Hoffmann, failed to do anything about the obvious and ongoing conflict of interest in investment banking issues regarding WorldCom stock reflected in this e-mail and instead continued to allow Mr. Grubman to issue what they knew were false, misleading reports about WorldCom because they wanted to continue to earn the investment banking fees they were earning through WorldCom.

132.    In that same e-mail of November 2, 2000, from James Zisson, Mr. Zisson pointed out that the technology strategy group was recommending that selected individuals sell their WorldCom stock and were advising their clients not to buy it. John Hoffmann knew that Jack Grubman was recommending the purchase of WorldCom stock to the public and to the Plaintiffs yet he did nothing about this obvious inconsistency that his leading technology analyst was making a recommendation to purchase WorldCom in direct contradiction to the advice given by the Technology Strategy Group of the same company.

133.    On November 4, 2000, John Hoffmann received a copy of an e-mail to Jack Grubman sent from Joseph West, a certified financial analyst and a Vice President of Investments of SALOMON SMITH BARNEY, which stated:

To say that I feel sand-bagged by your past
 and current recommendation of WorldCom is
an understatement.

The stock has broken another important
price support this past week and the negative
money flow has been massive for months.
The on-balance-volume has been negative since
last winter.  It's very clear that there are large
sellers in the market who implicitly disagree with
your opinion and recommendations.

As of June 30, the current liabilities of WCOM
exceed the current assets.  The free cash flow,
after turning positive briefly for 1999, has now
turned strongly negative again in the March and
June quarters – so much so that the positive
number for 1999 has been more than wiped out
in the first two quarters of 2000.  I have yet to see
the September numbers from either you or the
company.  The company's non-current liabilities
are more than 50% of the stockholders equity
(such that it is), thanks to the addition of another
$5 billion of long-term debt as of June 30.  If
the company needs further large infusions of
capital, what will be the market atmosphere
if, and when, an attempted issue is floated?
Your "Medium Risk" rating is a puzzle to me.
Should it not be "High" or Even "Speculative?"

I have learned, after 38 years in this business,
that sometimes we simply make huge mistakes
and find ourselves with losers in our stock
selections.  The standard advice always has
been:  Let your profits run and cut off your
losers – usually much sooner than before
a stock has declined more than 70% from its high!

Your November 2 note in the FCI system is less
than convincing as to why the stock is still
rated 1H.  Early in your analysis, you state "If
World Com Group is executing, we truly believe
the WorldCom Group will be trading at 1.5-2 times
its cash eps growth rate."  This is little more than
an article of faith and not an analysis of what
markets are willing to value stocks at.  Since the

75

current management has failed to "execute" so
far, on what basis am I to presume that they will
in the future – Bernie Ebbers' willing it?  He may
have been on to something when he suggested
last week that the board may decide someone
else would be more capable of running the
company.  I see no discussion in your note
regarding this issue.

Also, I note that Alan Shaw's staff does not
have a rating, though I presume it to be a "6."
Perhaps you can try to explain your recommendation
in another manner or perhaps you should
declare it a mistake and go on.  In either case,
I must say that your credibility as a stock picker
and analyst is on the line.

Some of my clients have suffered serious losses
in this stock, but I wish to state that I do not blame
you.  I blame myself for not being more alert
regarding your capabilities.  The Fortune article
which picked you as an All-Analyst also helped
to cloud my own judgment; perhaps it also went
to your head.

Obviously, I would like to hear further from you as
to the reasons for your continued "strong buy,
medium risk" recommendation on WCOM.
Perhaps I'm missing something.

Hoffmann did absolutely nothing about this.  He didn't investigate it, he didn't

call Mr. West, he didn't call Jack Grubman, he just let Jack Grubman continue to

make his false, misleading, inaccurate and phony statements because he knew that

his employers, the Defendants, were earning huge investment banking fees from

WorldCom because of these false analyses.

134.   John Hoffmann had plenty of warning about the influence of banking on

Jack Grubman.  On November 9, 2000, he received an e-mail from Peter Feibleman,

a broker employed by Salomon Smith Barney, complaining about Jack Grubman's

rating WorldCom a 1 and AT&T a 3 saying that this summed up what we had been dealing within our research department.  He stated that he could appreciate how powerful the banking side was referring to the influence it had on Jack Grubman but that it cost his clients who were purchasing or holding these stocks enormously.  He indicated that "something has to change."  He specifically referred to WorldCom saying that he had stayed in that stock against his better judgment and that he just wanted to kick himself regarding Jack Grubman even though in his heart he knew Jack Grubman was recommending the stock because of banking reasons not because of honest analysis but that Jack Grubman wrote "so compelling that I went along…."  Obviously if someone as sophisticated as this broker could be taken in by Jack Grubman, there was little hope that someone as unsophisticated at the Plaintiffs would not.  Mr. Feiblemen went on to say that every time he gave too much credence to people like Jack Grubman he "got screwed" and that he should not have to spend so much time second guessing the motives of Jack Grubman behind his ratings.  Jack Hoffmann replied to the memo stating "I am not sure it is **entirely** banking" thus admitting that he recognized that banking was involved in Jack Grubman's analysis of WorldCom and that Jack Grubman's analysis of WorldCom was neither honest nor independent but rather based upon investment banking fees.

135.   John Hoffmann knew that even the Defendants own employees were sick of the obvious conflict of interest between investment banking and analysts.  On December 5, 2000, he received an e-mail from Steven Schultz regarding a stock called Rhythms.  He pointed out that Jack Grubman's target price on that stock had

gone from $90, then to $45, then to $10 and then to $1. He explained that that was obviously absurd. He told John Hoffmann that when he replied "Please don't say anything about this being an investment banking client, that excuse is over." The excuse may have been over but John Hoffmann did nothing to correct the problem.

136.    On December 8, 2000, John Hoffmann wrote his 2000 performance review which he sent to Michael Carpenter. In that review, he expressed to Mr. Carpenter that his primary goal as the head of all analysts with SALOMON SMITH BARNEY was to increase the amount of fees generated from investment banking by analysts, a clear violation of trust to people such as the Plaintiff. In that memo, John Hoffmann told Michael Carpenter that there was a legitimate concern that analysts under him were not free of influence from investment banking yet the Defendants did absolutely nothing to correct that. Both Sandy Weill and Charles Prince have indicated under oath that John Hoffmann should have done something about this earlier if he felt that way, which he obviously did.

137.    In that performance review, John Hoffmann told Mr. Carpenter that in the United States the practice was to have senior analysts reviewed by investment bankers, a practice which meant that investment bankers were determining the amount of money earned by senior analysts at SALOMON SMITH BARNEY a fact which reflected that Mr. Grubman's incredible $20 million yearly salary was determined primarily by investment banking. Mr. Carpenter did nothing and neither did Mr. Hoffmann because the Defendants were sacrificing the integrity of analysts such as Mr. Grubman for the purpose of obtaining investment banking fees for the Defendants.

78

138.   John Hoffmann knew that the rating system used by analysts under him was a sham.  While that rating system included five levels, 1) buy, 2) outperform, 3) neutral, 4) underperform and 5) sell.  As of January 29, 2001, the analysts under John Hoffmann rated 463 companies as a buy, 351 as an outperform, 33 as a neutral, only one as an underperform and none in the sell category.  Jack Grubman never had anything but buy ratings on all of the companies in the telecom sector which he was analyzing.  This is so obviously inaccurate that an analyst with Mr. Hoffmann's experience had to know this was deceptive to persons such as the Plaintiffs.  He did nothing about it.  Sanford Weill has admitted under oath that a good analyst alters his recommendations on a stock from buy to sell depending upon circumstances and recognizing that he should be recommending sell even at a time when a stock is doing well in order for a stockholder to take a profit.  Jack Grubman never altered his rating from a buy and John Hoffmann had to know that something was terribly wrong.  That something was the fact that Jack Grubman was doing nothing but being a shill for the companies he was analyzing because of the investing banking fees generated for the Defendants and the Defendants knew very well that that was the case but intentionally permitted Jack Grubman's conduct to continue.

139.   John Hoffmann, in early 2001, issued what he termed a state of the union address in a presentation he made to equity managers.  He stated that out of 1,179 stock ratings there were absolutely no sell ratings and only one (1) under perform rating, a situation which Mr. Hoffmann described as being "the worst and ridiculous on its face" and reflecting what he termed "a rising issue of research integrity" based upon an "inherent conflict of interest between investment banking,

equity and retail." Mr. Hoffmann knew this was the case and yet did nothing about it and made no effort to change what was clearly a conflict of interest which resulted in dishonest analyses by the Defendants' analysts because of the plan of the Defendants to sacrifice research integrity for investment banking fees.

140.    On February 22, 2001, John Hoffmann issued a memo to all managing directors of the US equity research division in which he told them that Jay Mandelbaum, the global head of SALOMON SMITH BARNEY's retail division, felt that SALOMON SMITH BARNEY's research was "basically worthless" because of its dependence on investment banking.  This terrible indictment of the independence and competence of people like Jack Grubman resulted in no change in the way in which the Defendants did business.  John Hoffmann did nothing about this.  The Defendants continued to permit what they knew was dishonest and unreliable analysis for the sake of investment banking fees because that was the plan of the Defendants throughout this period of time.

141. On June 13, 2001, a memorandum was received by John Hoffmann concerning a telecom research discussion.  In that memorandum Mr. Hoffmann was told that SALOMON SMITH BARNEY had a uniquely pro WorldCom bias which was compromising the balance of its research generally.   He was also told that corporations which were out of favor claimed that SALOMON SMITH BARNEY's research was done without input from them and that some had not been visited by Jack Grubman in over a year and infrequently before that.  In addition, he was told that the impression was that SALOMON SMITH BARNEY's telecom research had been allowed to act in ways to suit its narrow objectives at the expense of the firm

and its clients. The "narrow objectives" referred to the earning of investment banking fees. Certain recommendations were made that included a core message from the highest levels of SALOMON SMITH BARNEY that rogue behavior would not be tolerated. That reference dealt with Jack Grubman. A specific reference was made to Jack Grubman about mandating biannual visits to all companies on the coverage list and setting up an editorial mechanism to screen out unusual pro WorldCom bias. There was a specific recommendation that SALOMON SMITH BARNEY consider additional and specific disciplinary mechanisms with respect to Jack Grubman for SALOMON SMITH BARNEY to implement if the foregoing suggestions did not influence his behavior. Absolutely nothing was done to correct this problem or to try to influence Jack Grubman or correct his rogue behavior. The reason nothing was done was because Jack Grubman was implementing the plan of the Defendants to earn investment banking fees from WorldCom rather than provide honest evaluation and analysis of WorldCom.

142.   On July 19, 2001, Mr. Hoffmann received an e-mail from Richard Dale, the co-head of research from Europe, asking "please, could you let us know what your strategy is with regard to managing Jack." This directly related to Jack Grubman's obvious bias on behalf of WorldCom yet John Hoffmann did absolutely nothing about it.

143.   On July 31, 2001, Mr. Hoffmann received an e-mail from Rob Thomas, the CEO of SALOMON SMITH BARNEY in Australia, concerning a stock entitled Micro Fiber which was being analyzed by Jack Grubman and which related to what were described as Jack Grubman's absurd assumptions pervading many of his

discounted cash flow models. Mr. Thomas specifically stated "When you add the heavy layer of banking involvement into the mix, this very problematic situation gets easier to understand." John Hoffmann did nothing about this memo and did not try to correct Jack Grubman's inappropriate assumptions which pervaded his discounted cash flows models including those that related to WorldCom.

144. On August 10, 2001, John Hoffmann sent an e-mail to Timothy Tucker within his research department forwarding on SALOMON SMITH BARNEY's CEO in Australia, Rob Thomas', complaints about Jack Grubman and Micro Fiber. He asked Timothy Tucker what had happened and Timothy Tucker responded on the same day that all that he knew about the unfortunate situation was included in a chronology of the notes that Jack Grubman had issued on Micro Fiber (MFNX). Timothy Tucker explained that Jack Grubman had excessive optimism that led to unattainable target prices that should have been brought down much more quickly and earlier than they had been. He opined that how Jack Grubman or anyone could think those levels could be attained could not be explained and that that underscored the absurd assumptions that Jack Grubman was making which pervaded many of the discounted cash flow models of Jack Grubman. He complained that Jack Grubman's observations about the funding of this company could hardly be called enlightening and he complained that Jack Grubman's later notes did not make it clear that it was Citibank that was involved in MFNX's credit situation and that Jack Grubman had failed to explain what Citibank required in exchange for the loan to MFNX and that should have been explained because there were material risks to the company obtaining the funding it needed. He pointed out that Jack Grubman's April 30, 2001,

and May 6, 2001, notes "breezily" omitted any real hint that obtaining the needed financing might prove problematic for the company.  He concluded that "what could have prevented this?  The US research division issued over 13,000 research notes in the first six months of 2001.  Even with all notes going through FX and many being scrutinized by research legal as well, we clearly rely on senior analysts to do careful work, disclose all important data and to note all material risks.  In the case of MFNX and in other telecom situations that I could name, our approach was inadequate.  There was a failure in analysis and it pains me to confess a failure of management.  This is the only explanation I can offer."  This admission by Timothy Tucker that no one was watching over Jack Grubman's shoulder and that Jack Grubman was being not only sloppy but inaccurate were not just about MFNX but reflected the kind of work he was doing with WorldCom.  Not only was his work less than adequate, it was less than honest.

145.    There was an obvious economic downturn in the spring of 2001, and Jack Grubman was unrealistically insisting that WorldCom had a silver bullet that would give it immunity from the rest of the industry.  John Hoffmann knew this but did nothing about it.

146.    On March 22, 2002, John B. Hoffmann, who was then the head of SALOMON SMITH BARNEY'S research department, admitted in a  memo sent to Michael Carpenter, the head of SALOMON SMITH BARNEY'S global and corporate investment bank, that analysts, such as Jack Grubman, intentionally failed to give negative ratings on stocks solely because of pressure put on them by corporate management and by investment bankers.  He admitted that SALOMON SMITH

BARNEY had a rating system used by analysts which was neither honest nor objective and which was intentionally biased and confusing for the very purpose of hiding the analyst's true negative feelings about a stock even though such a negative and biased rating system resulted in substantial losses to purchasers of those stocks. He admitted the rating system was biased and confusing because an honest rating system would have resulted in losses of investment banking fees to the Defendants. Mr. Hoffmann further admitted in that memo that the primary goal of the Defendants was obtaining investment banking fees and everybody understood that an analyst had to give favorable stock ratings in order to obtain a positive view from the corporation issuing those stocks and thus obtain the investment banking fees. Mr. Hoffmann further admitted that the only reason a fair and honest rating system did not exist was because, if it did, it would cost the Defendants billions in lost revenue because such a rating system would honestly reflect that many of the companies should have negative ratings but did not have negative ratings and, if they did, such companies would not give their investment banking business to the Defendants thus costing the Defendants billions of dollars in lost revenue. Mr. Hoffmann further admitted in that memo that the Defendants, as compared with other investment banks, was even more dependent upon its analysts earning investment banking fees than the investment banks with which the Defendants competed. Mr. Hoffmann admitted that there was a clear conflict in having analysts dependent on investment banking fees and that the scope of the conflict was obvious to the Defendants.     Mr. Hoffmann admitted that an honest rating system would

84

competitively disadvantage the Defendants with other investment banks because of their unusual and excessive reliance upon analysts earning investment banking fees.

Mr. Hoffman was not talking about something that had just happened in March of 2002. He was talking about the entire period from 1998 to 2002 when Jack Grubman was making his unrealistic and dishonest ratings of WorldCom.

147.    Mr. Hoffmann recognized that if the public and regulators found out about the admissions made in the March 22, 2002, memo that it would result in civil and criminal penalties and loss of trust of the public in the Defendants. Thus, Mr. Hoffmann, despite a memo having been issued from the Defendants' general counsel's office on March 20, 2002, instructing all analysts, including himself, not to destroy any documents that related to the very subject of this memo because of investigations being conducted by regulators and litigation on the subject of the relationship between investment bankers and analysts, Mr. Hoffmann nevertheless instructed a lawyer for the general counsel's office to destroy prior drafts of this memo and instructed Michael Carpenter, to whom the memo was addressed, to destroy what he thought was the only existing copy of that memo once he had read it. This intentional destruction of evidence was designed to prevent the Plaintiff and other investors from knowing the intentional fraud committed upon them by the Defendants as set forth herein. Furthermore, the Defendants intentionally failed to honor subpoenas from the regulators investigating the Defendants by failing to provide this memo of Mr. Hoffmann because Defendants knew that revealing that memo could lead to both civil and criminal penalties for the intentional conduct of the Defendants as set forth herein. The attempted destruction of this memo also violated

85

document retention policies which specifically forbade such destruction which were in existence at the time of the attempted destruction of that evidence. One such policy dated October 14, 1998, applied to investment banking and thus the research department which was in that department, it specifically prohibited John Hoffmann's conduct regarding the destruction of this memo warning that:

> "If you are aware of any actual or imminent
> litigation or governmental investigation relating
> to a transaction, you cannot destroy or alter any
> document related to that matter regardless of
> these guidelines. . . . The destruction or
> alteration of documents once you are aware
> of an actual or threatened litigation or investigation
> can be criminal and can jeopardize Salomon
> Smith Barney's or your own position or credibility
> In the litigation or investigation."

148. In the further effort to cover up Defendants' misdeeds, Mr. Hoffmann made sure that he typed the memo himself rather than having a secretary type it and hand delivered it to Mr. Carpenter rather than using some other alternate means of delivery. Further, he attempted to destroy evidence of the memo by deleting it from his computer not realizing that a copy could be recovered from the hard disc of his computer. Mr. Hoffman thought that by deleting it from his computer, by telling Mr. Carpenter to destroy it once he had read it, and by telling a lawyer to destroy prior drafts that he had successfully destroyed the evidence of this memorandum and covered up the misdeeds of the Defendants.

149. John Hoffmann recognized that there was supposed to be a so called "Chinese wall" which meant that an analyst like Jack Grubman, or for that matter any other analyst, if they were given specific investment banking information concerning

an investment banking deal were not supposed to publish any research reports during the time they had that information until that information became public. During the period that they were in possession of that information and before it became public, their condition was described as being "over the wall." Sherlyn McMahon has testified under oath that there were no such restrictions put on either she or Jack Grubman so far as their ability to publish research reports when either of them were "over the wall." John Hoffmann knew about this and did nothing about it.

### SANFORD WEILL

150.   Sanford Weill (hereinafter Sandy Weill) has been chairman of the board of directors of CITIGROUP since 1998 and is expected to retain that position until April of 2006. He was the chief executive officer (CEO) of CITIGROUP from 1986 to 1998 and again from April of 2002, until September 30, 2003, and occupied the office of co-chief executive officer from 1998 through March of 2002. Thus from January, 1998, through July, 2002, the critical period when Jack Grubman was analyzing WorldCom stock for the Defendants, Sandy Weill, as the leader of the parent corporation of SALOMON SMITH BARNEY who often exercised investment banking duties on behalf of both corporations, was in a position to lead by example. His personal actions set the tone for the conduct of all of those employees of the Defendants under him and his conduct reflected the plan described herein to sacrifice research integrity for investment banking fees at the expense of investors such as the Plaintiffs. His actions described in this complaint were done intentionally knowing full well that such conduct was fraudulent to the Plaintiff, violated anyone's concept of fair

87

play and fair business dealings and were done for no other purpose than to increase the income of the Defendants and enlarge his own power at the expense of individual investors such as the Plaintiff. What follows in this complaint are only examples of some of his actions and are not intended to include all evidence relating to Sanford Weill.

151.    Sanford Weill has admitted under oath that when Smith Barney merged with SALOMON, he wanted to be in control of all stock options given to analysts and so he decreed that before any stock options of analysts could be approved, he personally had to review the granting of those options. During the period 1998, through 2002, enormous grants of stock options were given to Jack Grubman because of his ability to create investment banking income and not because of any value he had as an analyst. Mr. Weill was fully aware of this and authorized those stock options for that purpose. He has admitted under oath that analysts were actually under the investment banking division, not under a separate research division because analysts were so tied to investment banking.

152.    Mr. Weill has admitted under oath that a decision was made by the Defendants on a planning basis in November or December of 1997 when Salomon Brothers merged with Smith Barney to start emphasizing investment banking fees because the Defendants were not a leader in the investment banking business and it was a very profitable business and they wanted to get bigger in it.

153.    Sandy Weill was the creator of the master plan to exchange research integrity for investment banking fees. As part of that plan, he was involved in the hiring of Jack Grubman and the promise to pay him the largest salary ever paid to a

stock analyst. On September 15, 1998, Sandy Weill was present at a meeting of the nominations and compensation board of the Board of Directors of Travelers Group even though he wasn't a member of that Committee. The sole purpose of the meeting was to approve an agreement orchestrated by Sandy Weill with Jack Grubman. That agreement was attached to the minutes of that meeting dated September 15, 1998. The agreement guaranteed Jack Grubman a job through December 31, 2002, with an annual salary of only $200,000.00 but with a guaranteed bonus of $11,800,000 for 1998 and $7,800,000 for 1999, as well as a $15 million loan 100% forgivable at the end of five years and 50,000 shares of stock options for each of the years between 1998 and 2001. In recognition of what were called Jack Grubman's extraordinary accomplishments for 1999 (referring to the enormous amount of investment banking fees he had garnered), Jack Grubman was eventually granted additional bonuses and stocks including a restricted stock grant of $5 million as well as a $14,800,000 bonus in 1999 and additional stock option grant of 75,0000 shares valued at a little over a $1 million.

154. A perfect example of how Sandy Weill "led by example" is his successful effort to influence Jack Grubman to change his opinion concerning AT&T. What follows is the intentional conduct of Sandy Weill, knowing it to be wrong, knowing it to violate all principles of fair play and fair business dealings and to violate the policies of his own company.

a. Beginning in July of 1998, Sandy Weill became a member of the

AT&T Board of Directors. At the same time, Michael Armstrong, the CEO of AT&T, was on the Board of Directors of CITIGROUP and remained on that Board throughout all times material to these allegations.

b.      At an October, 1998, trade show, Jack Grubman failed to mention AT&T as one of the important telecommunications companies of the future. Mike Armstrong complained to Sandy Weill. Sandy Weill, in turn, relayed the complaint to Euardo Mestre and Chris Lawrence, senior SALOMON SMITH BARNEY investment bankers. The message was that Jack Grubman should apologize to Michael Armstrong. Sandy Weill asked Jack Grubman to make that apology and on October 9, 1998, Jack Grubman sent an e-mail to Eduardo Mestre and Chris Lawrence, containing the apology and suggesting that Sandy Weill could show this apology to Mike Armstrong.

c.      Sandy Weill approved the apology to Michael Armstrong before it was sent to Mr. Mestre and Mr. Lawrence and told Mr. Grubman that he thought the apology was good.

d.      Three days after the apology, on October 12, 1998, Sandy Weill and an investment banker covering AT&T went to AT&T's Basking Ridge, New Jersey, headquarters and met with Michael Armstrong. At that meeting the apology of Mr. Grubman was either delivered or discussed.

e.      Sandy Weill knew that there were strict rules and regulations as to who could contact an analyst like Jack Grubman directly about a stock. SALOMON SMITH BARNEY had a compliance department with a whole cadre of lawyers whose job it was to determine whether any information sought to be delivered

to an analyst by an investment banker or, for that matter, anyone else, provided information that the analyst should not receive because by doing so it would bring him or her over the "Chinese wall" which precluded analysts from learning certain investment banking information. The reason for such a "Chinese wall" was to prevent an analyst from having inside information which would make that analyst less than independent. The rules were designed to preclude an analyst from speaking publicly concerning any stock on which he had such inside information. In addition, these rules and regulations were in effect to preclude any undue pressure being placed on analysts such as Jack Grubman which might affect their independence. Sandy Weill certainly understood and knew about these rules and regulations and recognized that in contacting Jack Grubman directly he was acting in an investment banking role and that he, like every other employee of the Defendants, was precluded from such direct contact by these rules and regulations. This was particularly true of Sandy Weill because of his position. Sandy Weill, as CEO of the parent company of SALOMON SMITH BARNEY, Jack Grubman's employer, wielded enormous power over Jack Grubman. With one word, he could fire Jack Grubman and take away his $20 million a year income. He was, in essence, Jack Grubman's boss of all bosses. Despite this, Sandy Weill went to Jack Grubman and asked him in October of 1998 to "take a fresh look" at AT&T. When he did that, Sandy Weill knew that for four and a half years, Jack Grubman had been negative on AT&T. In fact, during that four and a half years, he had consistently ranked AT&T as a three, a "hold." That rating was the lowest rating that Jack Grubman gave to any telecom company during the entire four year period from 1998 through 2002 before WorldCom went bankrupt. Sandy Weill

knew that by telling Jack Grubman to "take a fresh look" at AT&T, the message had to be that he expected Jack Grubman to raise AT&T's rating. By "taking a fresh look" he certainly didn't mean to keep the same negative rating. Jack Grubman knew that Sandy Weill was on the board of AT&T, that he was friendly with Mike Armstrong, its CEO, and that AT&T was about to issue an IPO of its wireless spin off that could create huge investment banking fees for the Defendants. There was no mystery as to why Sandy Weill directly contacted Jack Grubman in violation of the rules and regulations concerning direct contact with analysts. Sandy Weill knew very well that he was telling Jack Grubman to raise AT&T's rating and he knew that it was wrong to do that.

       f.    At some time prior to June 11, 1999, Sandy Weill also asked Jack Grubman to send AT&T questions regarding their cable strategy. Sandy Weill imparted information to Jack Grubman concerning this cable strategy in violation of the rules referred to herein.

       g.    On June 30, 1999, after being told to take a fresh look at AT&T, Jack Grubman sent another memo to Sandy Weill telling him that AT&T had asked Jack Grubman to resend the questions that he had sent previously. This was done because Sandy Weill had again contacted Mike Armstrong to make sure that the appropriate information was given to Jack Grubman. In that memo, Jack Grubman told Sandy Weill that "As a follow-up to the last memo I sent you, I don't know if you said something or not – but now three months after the fact, AT&T's Investor Relations Department has actually called and asked us to resend the 7-page list of

questions. Maybe this time we can actually make some progress in **closing the deal with Mike**." (emphasis supplied).  That memo meant that Grubman understood that the "deal" was that he was going to upgrade AT&T because he had been asked to do so by Sandy Weill, a deal which was very important to Sandy Weill.

h.       On August 5, 1999, Sandy Weill traveled with Jack Grubman to AT&T's headquarters for a meeting with Mike Armstrong that Sandy Weill had arranged.  Sandy Weill set the meeting up, and attended personally, traveling by helicopter with Jack Grubman to attend the meeting.  At that meeting, Sandy Weill discussed with Mike Armstrong the fact that he had asked Jack Grubman to "take a fresh look at AT&T."  Both Sandy Weill and Jack Grubman understood what that meant.  On August 19, 1999, Jack Grubman sent Sandy Weill a memorandum saying that he was writing this memorandum as a follow-up to their meeting with Mike Armstrong.  In that memo Jack Grubman stated "When my analysis is complete and if the results are in line with **what you and I both are anticipating**, **once I'm onboard** there will be no better supporter than I." (emphasis supplied).  The clear meaning of that statement was that Mr. Grubman understood that he was promising Mike Armstrong an upgrade because of the influence asserted by Sandy Weill.  By Sandy Weill arranging for and attending a meeting between Jack Grubman and Michael Armstrong, there was no doubt as to the message sent to Jack Grubman. For the CEO of CITIGROUP to take time out of his day to not only arrange such a meeting but to attend it personally himself meant nothing less than that Sandy Weill fully expected Jack Grubman to comply with his wishes to have AT&T upgraded.

Sandy Weill made no mystery of the fact that he thought AT&T ought to be upgraded and Jack Grubman would have to have been brain dead not to understand that his job depended upon his complying with his boss' wishes to have that upgrade occur. No other investment banker could meet with an analyst at the same time as the head of the company that the analyst was analyzing. That would violate every rule and regulation applying to SALOMON SMITH BARNEY. For Sandy Weill to do the same thing was even more of a violation because of his position as CEO of the company.

   i.     Beginning on October 29, 1999, Mr. Grubman and Mr. Weill began entering into an extraordinary volume of telephone conversations until the end of November. Prior to that time, they had rarely spoken to each other on the telephone but on October 29, Mr. Grubman and Mr. Weill spoke for some fourteen (14) minutes on the telephone wherein Mr. Weill reiterated his desire to have AT&T upgraded.

   j.     On November 4, 1999, Mr. Grubman met with Michael Armstrong at the AT&T headquarters for 2 ½ hours. He then attempted to call Mr. Weill twice on November 5. Having failed to reach Mr. Weill by telephone, he wrote a memo dated November 5, 1999, entitled   "AT&T and the 92nd Street Y." In that memo Mr. Grubman discussed the progress that he had made with Mike Armstrong and his planned meetings with other employees at AT&T. He informed Sandy Weill of his progress with AT&T and told him he would keep him posted pursuant to his directions that he was to upgrade AT&T.

   k.     In that same November 5, 1999, memorandum Mr. Grubman

explained to Sandy Weill about what they had spoken about earlier on the phone. Apparently the subject had come up during the October 29, call. Mr. Grubman was trying to get his 2 and a half year old twin girls into the 92nd Street Y nursery school that he said was harder to get into than Harvard. He attached a list of Board of Director members of the 92nd Street Y and asked Sandy Weill to do his best to get his children into the nursery school. Jack Grubman, in his November 5, memorandum and in the telephone conversation with Sandy Weill made it clear that he was willing to sacrifice his integrity and give AT&T a rating which he felt it did not deserve not only to please his boss, Sandy Weill, but to get his children in this nursery school. Both Jack Grubman and Sandy Weill understood this that it was a quid pro quo and that it was part of the benefit that Jack Grubman would receive in addition to pleasing his boss.

l.      Sandy Weill did his part to get Jack Grubman to make the change he wanted in AT&T. He called Kenneth Bialkin who was on the Board of Directors of Citigroup and was familiar with John Ruskay who was on the Board of the United Jewish Appeal. A letter was sent from Mr. Bialkin to John Ruskay asking that the 92nd Street Y give Jack Grubman's children preferential treatment and move them up on the list. This letter was sent because Sandy Weill asked that it be sent. He made every effort to get Jack Grubman's children into this nursery school because he wanted AT&T upgraded and he knew that part of the price that had to be paid was to use his influence to get Jack Grubman's children into the 92nd Street Y.

m.      Before November 5, 1999, Jack Grubman and Sandy Weill

95

rarely spoke on the telephone. Sandy Weill was the CEO of the parent corporation of SALOMON SMITH BARNEY and Jack Grubman was one of 350 analysts working for SALOMON SMITH BARNEY. They did not have a close personal relationship, yet starting October 29, 1999, the volume of calls markedly increased. On the 11th, they spoke together for a few minutes. Mr. Grubman called Mr. Weill again on the 22nd and spoke to him for about a minute. Sandy Weill then called him back and spoke with Mr. Grubman for thirteen (13) minutes. On the 24th of November, they spoke for four and a half minutes and on the 30th, they spoke to each other for a little over five (5) minutes. This volume of calls was very atypical and it is no coincidence that they came between the time on November 5, that Jack Grubman asked Sandy Weill to get his children into the 92nd Street Y and November 30, when Jack Grubman agreed to Sandy Weill's request and raised his rating on AT&T.

n.      On November 17, Sandy Weill attended an AT&T board meeting in which the issuance of a tracking stock for AT&T's wireless business was approved. Sandy Weill recognized that the issuance of that tracking stock could mean potential substantial fees for the Defendants.  The Defendants had gotten little or no investment banking business from AT&T during the four and a half years that Jack Grubman had downgraded AT&T.  On the night of November 17, Jack Grubman placed  a call to Sandy Weill while Mr. Grubman was in Milan, Italy.  That call gave Sandy Weill the opportunity to tell Jack Grubman about the issuance of this tracking stock and the potential fees that could be earned if a positive rating of AT&T were timely made.

o.      On both November 22, or November 24, 1999, Jack Grubman and Sandy Weill spoke on the telephone and Jack Grubman told Sandy Weill that he would soon be issuing a report upgrading AT&T.  Time was of the essence for Sandy Weill because of the potential issuance of that tracking stock.  An e-mail was sent from Jack Grubman's secretary to John Hoffmann and Kevin McCaffrey on November 29, 1999.  That e-mail was sent as an urgent message regarding AT&T stating that it was imperative that Jack Grubman's report upgrading AT&T go to the printers that day so that it could be distributed in time to meet Sandy Weill's deadline for a meeting.

p.      On November 29, 1999, Sandy Weill spoke with Jack Grubman for a little over five (5) minutes on the telephone.  Thereafter, twenty-five days after the November 5, memo, on November 30, 1999, despite having been negative on AT&T for 4 ½ years and having kept it at a 3 or a hold, Jack Grubman changed his rating of AT&T from a 3 to a 1, a "buy," bypassing the two (2) rating, an "outperform." A one (1), a "buy" was the highest possible rating Jack Grubman could give AT&T. He further indicated that AT&T stock which was then selling for $53.19 would be up to $75.00 within the next twelve (12) months.  He made that change because he had been told by his boss of all bosses, Sandy Weill, to change his rating, a thing which Sandy Weill fully intended to accomplish and made it clear  that Jack Grubman was to accomplish for him.

q.      Once Grubman had raised his rating because that was what Sandy Weill wanted, Sandy Weill began following up on his promise to help get Jack Grubman's children into the 92nd Street Y Nursery School.  On December 17, 1999,

97

he made a call to Joan Tish, a member of the 92nd Street Y Board. He told her that he would be very "appreciative" if Jack Grubman's children got into the Y nursery school. He knew full well that by being "appreciative" he meant that a donation would be forthcoming from the Citigroup Foundation which Mr. Weill controlled.

      r.    At some time prior to January 13, 2000, Sandy Weill had a conversation with Michael Armstrong concerning SALOMON SMITH BARNEY being the co-book runner on the IPO offering which was about to be released for AT&T. This was the largest IPO ever in the history of the world. AT&T was considering allowing SALOMON SMITH BARNEY to be the co-book runner on this IPO offering only because Sandy Weill had successfully engineered a higher rating for AT&T through Jack Grubman.

      s.    In February of 2000 as a direct result of Jack Grubman's upgrade, SALOMON SMITH BARNEY was not only chosen as one of three (3) joint book runners of the wireless spin off of AT&T but also was the lead underwriter for that IPO offering. This generated $63 million in fees for SALOMON SMITH BARNEY.

      t.    On February 27, 2000, there was a special meeting of the Board of Directors of CITIGROUP for the purpose of determining who to choose as sole CEO of CITIGROUP. At that time, Sandy Weill shared the CEO position with John Reed and it was a very close question as to who would be chosen to lead CITIGROUP as its CEO. This meeting was a showdown between John Reed and Sandy Weill. While Bob Rubin was in the running for the job, he decided he did not want it. Thus, in what Sandy Weill has described in a draft of his memoirs as a "cliff hanger" of a meeting Sandy Weill was chosen over John Reed as sole CEO of

CITIGROUP. Sandy Weill very much needed Michael Armstrong's vote to secure that election. The election was a close one in which seven (7) people not counting Michael Armstrong, voted for Sandy Weill and seven (7) people either voted for John Reed, to keep the status quo of John Reed and Sandy Weill as co-CEOs or to search out a completely new person to replace both of them. Michael Armstrong thus cast the deciding vote making Sandy Weill the sole CEO. While the minutes reflected a unanimous decision, that did not reflect the true vote prior to Sandy Weill winning that election by the vote of Michael Armstrong. Sandy Weill's ability to get Jack Grubman to upgrade AT&T was a material fact in Michael Armstrong's decision to vote for Sandy Weill and was one of the motivating factors for Sandy Weill to get Jack Grubman to give Michael Armstrong that upgrade.

u.     In March of 2000, Mr. Grubman's children were admitted to the Y. Sandy Weill then received a call from the Y suggesting that his "appreciation" should be shown in the form of getting a $1 million contribution from the Citigroup Foundation for the 92nd Street Y. CITIGROUP had never before given a single dime to the 92nd Street Y for any reason. Nevertheless, to show his "appreciation," he along with Charles Prince signed a Citigroup Foundation proposal on July 24, 2000, donating $1 million to the 92nd Street Y. That donation was part of the quid pro quo for Jack Grubman raising his rating on AT&T as requested by Sandy Weill.

v.     On May 17, 2000, three (3) weeks after the IPO was issued and the $63 million was earned and two (2) months after Jack Grubman's children were admitted to the 92nd Street Y, and after Michael Armstrong voted to make Sandy Weill sole CEO of Citigroup, Jack Grubman issued a research report in which he

unfavorably compared AT&T with WorldCom and lowered his target price. That was
a clear message to institutional investors that this was a virtual downgrade and on
October 25, 2000, Mr. Grubman again downgraded AT&T to a three (3), the same
rating he had had for four and a half years before his November 30, 1999, change of
heart.

          w.      In an e-mail dated November 17, 2000, Mr. Grubman stated
that he thought that all the legal stuff on AT&T should be forwarded to Sandy Weill
and Eduardo Mestre, the head of investment banking for SALOMON SMITH
BARNEY as "Exhibit A" on why research needed to be left alone. He said "these
guys (meaning Sandy Weill and Eduardo Mestre) never understand the lingering
consequences." He was referring to the pressure put upon him by Sandy Weill in
upgrading AT&T when it didn't deserve upgrading. Jack Grubman was referring to
lawsuits which had been filed by purchasers of the AWE wireless stock offering.

          x.      Jack Grubman admitted in an e-mail on January
13, 2001, to Carol Cutler that he did not upgrade AT&T solely to get a lead for their
wireless spin off AWE, instead he did it to get his children into the 92nd Street Y and
he confirmed that Sandy Weill needed Mike Armstrong's vote on the Citigroup Board
in order to become sole CEO of Citigroup. Later in the evening of January 13, 2001,
Jack Grubman sent another e-mail to Carol Cutler in which he said "the biggest thing
that pissed me off is that T (AT&T) did exactly as I knew they would for precisely the
reasons I thought." Shortly after that, Carol Cutler wrote back, in part, "BTW (by the
way) what did you mean that T (AT&T) did exactly as you knew they would for
precisely the reasons you thought." Jack Grubman responded "That the stock would

collapse because the core business would fall apart." On January 14, 2001, Jack Grubman admitted in another e-mail to Carol Cutler that he had always viewed AT&T as a business deal between he and Sandy Weill. In two separate conversations, one to an analyst reporting to him and another to an institutional investor, he admitted the same facts he had detailed in his e-mails to Carol Cutler. Clearly these e-mails reflect that Jack Grubman's true opinion about AT&T was that it should not have been upgraded and it was only upgraded because of the pressure but on him by Sandy Weill.

y.    Jack Grubman has since denied the truth of the e-mails to Carol Cutler and the conversation in the preceding paragraph. He made those denials only after he resigned from SALOMON SMITH BARNEY and took with him over $32 million tax free and is still being paid $200,000.00 per year to "assist" the Defendants in the defense of cases just like this. He made those denials only after the Defendants agreed to pay for all of his lawyers to defend him in any cases arising out of the WorldCom fraud, pay any judgments against him in those cases, and after the Defendants agreed to provide him with an office in Manhattan to do nothing but "assist" them in the defense of cases like this. No explanation has been forthcoming as to what that assistance means. Mr. Grubman has to show up for depositions and tell the truth without being paid anything. He is in a position of not only being able to keep all of the money he earned but he got the severance package without having to pay a dime in taxes or anything to defend himself. His denials are, in the least, suspect.

z.    Sandy Weill knew that when he contacted Jack Grubman he did

it as an investment banker.  He knew what being an investment banker meant.  He knew that it was wrong to contact an analyst like Jack Grubman directly.  On April 28, 2003, Mr. Weill issued a press release in which he stated:

> "We never again want to have questions raised about the objectivity of our research.  I have been reminded myself of how the appearance of what we do would be questioned and of how we must take care to ensure that our conduct does not raise such questions or in any way undermine our customers' or shareholders' confidence in the integrity of our business practices.  Building on our efforts to separate our research and investment banking operations, I have asked that all senior Citigroup executives, including myself, who perform an investment banking function with respect to any company be subject to the same rules and policies governing interactions between investment bankers and research analysts.  Under this policy, such senior executives will not communicate with individual analysts regarding specific companies they cover.  Information that these executives believe to be of value and relevance to analysis of a stock will be conveyed solely to research management who, together with Smith Barney's legal/compliance departments, will control all information that is conveyed to individual analysts."

This announcement made it sound like this was a policy change instituted by Sandy Weill.  In fact, Sandy Weill had, as part of the settlement with Regulators including Attorney General Eliot Spitzer, the Attorney General of the State of New York, agreed specifically that he would never again directly contact an analyst regarding a stock that analyst was analyzing without a compliance attorney for CITIGROUP being present during the conversation.  That agreement was a direct

result of Mr. Weill's inappropriate conduct with Jack Grubman with respect to AT&T as set forth in this complaint.

aa.    Sandy Weill, as chief executive officer of CITIGROUP, in directly contacting Jack Grubman and influencing him to raise his rating on AT&T was leading by example and knew that the remaining employees of CITIGROUP and SALOMON SMITH BARNEY would recognize his conduct as something they too were permitted to do and in fact, did.  The improper contacting of analysts by investment bankers permeated CITIGROUP and SALOMON SMITH BARNEY. Sandy Weill in contacting Jack Grubman had no information of value or relevance to give him regarding AT&T.  By asking him to take a "fresh look" at that stock at a time when Jack Grubman had been negative on the stock for four and a half years and with Jack Grubman knowing that Sandy Weill was CEO of CITIGROUP, could fire him with one word, was on the board of AT&T and friendly with Michael Armstrong, Jack Grubman understood that Sandy Weill expected him to change his negative outlook on AT&T and upgrade it.  Sandy Weill knew that what he was doing was wrong and violated the trust of those relying upon analysts like Jack Grubman such as the Plaintiffs and he was exerting  improper influence on Jack Grubman simply because he expected to get away with it and no one would find out about it.  His conduct relative to AT&T and Jack Grubman is an example of exactly what was wrong with CITIGROUP and SALOMON SMITH BARNEY and was changed too late for people investing in WorldCom.  The truth is the public found out after the bankruptcy of WorldCom that analysts like Jack Grubman could not be trusted because they were being bribed by investment banking fees and it was only the

pressure of the investigation conducted by regulators that forced CITIGROUP to make the changes that they did.

155.    Sandy Weill was very involved in investment banking during the period in question. On October 5, 2000, as an example, an e-mail was sent from Hart Hollis to Michael Carpenter and Allan McDonald relating to a company called State Street and its chairman, Marshall Carter and the coverage of that company by SALOMON SMITH BARNEY's analysts. In order to facilitate the receipt of investment banking fees, Sandy Weill's personal number was given to the chairman of State Street and Sandy Weill was expected to generate those investment banking fees.

156.    Sandy Weill was willing to do what was necessary to keep the investment banking fees flowing from WorldCom. On April 5, 2001, Marwan Marshe wrote an e-mail to Scott Sullivan. He promised that if the Defendants were given the position of global coordinator on their bond deal, he would make sure that Sandy Weill and Bob Rubin, Michael Carpenter and Eduardo Mestre went to the fixed income floor at the time of the pricing and tell the public that fixed income was the premier product of SALOMON SMITH BARNEY and the reason they were voted bank of the year for two years in a row.

157.    Sandy Weill certainly knew what Jack Grubman was being asked to do with respect to investment banking. On May 9, 2001, Scott Miller, an investment banker, sent an e-mail to him and Michael Carpenter with a copy to Jack Grubman. He specifically asked Sandy Weill and Jack Grubman to make a call to Bernie Ebbers regarding the upcoming bond issuance of $12 billion, the largest in the history of the world. He explained that he was very upset that despite the fact that the Defendants

104

had historically managed WorldCom's long-term debt financing transactions, WorldCom decided to give JP Morgan part of their action. He told Mr. Weill and Jack Grubman that in order to respond to JP Morgan's assault and to reaffirm the importance of the Defendants' relationship with WorldCom, he wanted Sandy Weill and Jack Grubman to place a call to Bernie Ebbers that day or the next morning. He set forth an agenda for the call and told them most importantly to reinforce to Bernie Ebbers the Defendants' desire to be as constructive and supportive of WorldCom's agenda as possible. He warned Mr. Weill that he should not be surprised if Bernie Ebbers made a statement about the fact that Sandy Weill was on the AT&T board and he told Sandy Weill to be sure to tell Bernie Ebbers that despite Sandy Weill's position on the AT&T board, CITIGROUP gave a very significant proportion of their communications business to WorldCom and had been very supportive of WorldCom's capital needs. Michael Carpenter responded in his own handwriting that that was okay and that he would be happy to make the call and that the only reason Bernie Ebbers had not heard from top management before was that they had not been asked and further stated that the Defendants should not take Bernie Ebbers for granted. No one, including Sandy Weill, said that Sandy Weill was too busy. They all assumed he would comply with the request.

158.    Sandy Weill was fully aware that there was a serious problem with Jack Grubman's integrity. On July 30, 2001, an e-mail was sent from John Bradley to Stephan Willingham, Scott Miller, Frank Yeary and John Otto concerning AT&T. The e-mail reflected that it was the Defendants' plan to build a strategy based on Sandy Weill's board position at AT&T reflecting the fact that even though Sandy Weill

was supposed to be an independent board member of AT&T, that it was the plan of the Defendants to parlay that position into increased investment banking fees for the Defendants. The e-mail went on to say that the Defendants had to consider how to manage the "situation" with Mr. Grubman. The situation that was reflected in that e-mail was the lack of integrity and lack of trust of Mr. Grubman, that the Defendants were fully aware of yet neither Mr. Weill nor anyone else did anything about it. They did nothing about it because that "situation" was accepted business practice for them at the expense of people like the Plaintiffs.

159.    Mr. Weill knew full well about the breach of trust that existed by virtue of the sacrificing of the Defendants of research integrity for investment banking fees yet did nothing about it. On October 9, 2001, he received an e-mail from Todd Krempasky which was forwarded on to Jack Grubman's supervisor, Kevin McCaffrey. That e-mail told Mr. Weill that the most important aspect of the Defendants' business was trust and that there had been some very serious breaches of trust in the Defendants' research department because investment banking relationship's had driven research opinions. There is no doubt about the meaning of that e-mail. It clearly reflects that the Defendants' research could not be trusted because it was controlled by the goal of obtaining investment banking fees and not giving honest opinions concerning stocks. Mr. Weill did nothing material about this e-mail, never attempted to investigate it or its allegations because he was fully aware that by virtue of the plan of the Defendants and his own conduct that the research department of the Defendants was breaching trust by virtue of investment banking pressures. The e-mail went on to say that when trust is lost it is almost impossible to gain and without

it the Defendants are out of business. It went on to say that the Defendants needed

to ensure that trust was not lost for the sake of a few investment banking fees. The

e-mail went on to say that the writer did not feel that it was his job to have to protect

his clients from people like Mr. Grubman and that the Defendants needed someone

to be their research police to prevent any more of these scams. Sandy Weill did

nothing about this e-mail other than forward it on because he knew that Jack

Grubman was, indeed, scamming people like the Plaintiff because of lack of oversight

by SALOMON SMITH BARNEY. He felt no responsibility to do anything about it

because it was business as usual for CITIGROUP and SALOMON SMITH BARNEY

because of the plan of the Defendants outlined in this complaint. Mr. Weill's failure to

do anything about this e-mail reflects the fact that he accepted the fact that

investment banking fees were all that mattered and research integrity was being

sacrificed for those fees.

160.    In November of 2001, Sandy Weill had a meeting with John Hoffmann

concerning Jack Grubman's compensation.   He asked John Hoffmann what

SALOMON SMITH BARNEY was going to pay Jack Grubman that year and Mr.

Hoffmann replied that Mr. Grubman would be down for a lot. Mr. Weill responded

"He better be" reflecting his understanding that Grubman was responsible for the

earning of a lot of investment banking fees and that was all that mattered when it

came to Jack Grubman's bonus.

161.    On November 14, 2001, an e-mail was sent from Ben Druskin to

Michael Carpenter. Mr. Druskin was an investment banker and was talking about a

company called Accenture. The e-mail relates to a meeting attended by Michael

107

Carpenter in which SALOMON SMITH BARNEY was in the running to be one of the joint leads on one of the next equity offers of Accenture which had a size between $1.6 and $2 billion. The e-mail states that a decision had been made that Sandy Weill would be actively involved in acquiring these investment banking fees. It was common for Sandy Weill to do these kinds of investment banking functions.

162.    Even when the false underpinning created by Jack Grubman's analyses began to come apart and stock after stock began to go to zero, the Defendants continued to pay Jack Grubman an exorbitant salary and substantial bonuses because of his investment banking pull.  On February 1, 2002, John Hoffmann sent an e-mail to Michael Carpenter in which he discussed a conversation he had had with Sandy Weill about Jack Grubman's compensation.  In it he stated that Sandy Weill had initially stated that it was a disgrace that Mr. Grubman was getting such a high salary.  John Hoffmann then said that he had shown Sandy Weill performance metrics that his department used with respect to investment banking contributions of Jack Grubman.  After sending those investment banking contributions to Sandy Weill, Jack Grubman was still paid a large income.  Sandy Weill recognized and approved this income once he had confirmed Jack Grubman's investment banking contributions.

163.    Mr. Weill has admitted under oath that the Hoffmann memorandum previously described herein as having been written by John Hoffmann on April 22, 2002, describes Salomon Smith Barney as, in fact, worse than other banks relative to its dependence on analysts producing investment banking fees and he agreed that the Hoffmann memo states that the Defendants were putting out reports and ratings

that they didn't think were appropriate in order to get investment banking business
and that should have been changed. Mr. Weill has further stated that Mr. Hoffmann's
conduct in attempting to destroy the Hoffmann memo and telling a lawyer to destroy
earlier drafts of it, was nothing short of destruction of evidence and was very wrong.

164.   On August 7, 2002, Sandy Weill sent an e-mail to all employees.  In it
he stated "As you know we are changing the way we do research and taking the lead
to build stronger roles to separate research from investment banking."    This
statement of change in policy came too late for people like the Plaintiff who
purchased WorldCom stock but it reflected an understanding of Mr. Weill of the plan
that was in effect prior to that time which did not separate research from investment
banking but instead sacrificed research integrity for investment banking fees.  Mr.
Weill was fully aware that during the period from 1998 through 2002 that the
Defendants were intentionally sacrificing research integrity for investment banking
fees yet did nothing about it.   Mr. Weill, in his e-mail, went on to say that the
Defendants were voluntarily embracing the principal that precluded investment
bankers from having any say in analysts' compensation and previewing reports. That
policy change came too late for people like the Plaintiff who purchased WorldCom
stock but was  an admission that prior to that time, investment bankers routinely
determined the compensation of people like Jack Grubman based not upon how
good an analyst he was but on how many investment banking fees he could earn for
the Defendants. It reflected the fact that investment bankers who had a direct conflict
of interest with analysts were allowed, prior to that time, to preview reports and give
input to analysts on their reports on companies like WorldCom.  This was a direct

conflict of interest and reflected the lack of integrity of these analysts including Jack Grubman.

Mr. Weill went on to say that the Defendants had called upon regulators to preclude analysts from going on investment banking pitches and road shows. The reality was that there was no regulation that needed to be enacted for the Defendants to preclude analysts from doing that. They refused to do that because, despite the fact that this reflected a lack of integrity on the part of analysts, it aided the Defendants in their goal to increase their investment banking fees from companies for whom these pitches were made. By allowing analysts to attend these investment banking pitches and road shows, the clear message to companies was that by paying investment banking fees, they were guaranteed good reports from the analysts. That was the only conceivable reason for allowing analysts to go on these pitches and road shows but the Defendants did it because that is exactly what they were promising.

165. On September 8, 2002, after WorldCom had gone bankrupt and when it was too late for investors like the Plaintiff to avoid losing everything by virtue of their belief in the honesty and integrity of the Defendants and their employees, Sandy Weill admitted "There are certain industry practices that we should all be concerned about and although we have found nothing illegal, looking back we can see that certain of our activities do not reflect the way we believe business should be done. This should never be the case and I am sorry for that." What Mr. Weill was apologizing for in this statement was the very conduct described in this complaint. His statement "We have found nothing illegal" is simply false. The conduct of the

Defendants as described in this complaint was, indeed, illegal, unethical, immoral and costs the savings of millions of Americans including the Plaintiffs.

166.   Sandy Weill was very much aware of the kind of salaries being paid to analysts and what they were being paid for.  He knew very well that not only Jack Grubman but every other analyst's salary was dependent upon the investment banking business that they could generate.  Stock option grants had to be approved by Sandy Weill and each year the global compensation process schedule had to be approved by Sandy Weill so that each year he reviewed each business for all compensation and had the final word on compensation for not only Jack Grubman but virtually every other highly paid employee of Salomon Smith Barney and CITIGROUP.

167.   It was no secret to Sandy Weill that Jack Grubman was paid approximately $20 million a year for the four (4) years from 1998 through 2001 only because he was able to earn substantial investment banking fees for the Defendants. In all four of those years, Sandy Weill attended a meeting of the Personnel Compensation and Directors Committee of CITIGROUP where these salaries were approved. Mr. Weill knew full well that Mr. Grubman was being paid not because he was an honest, independent and competent analyst but because of the enormous investment banking fees that he was responsible for by virtue of giving inflated reports in order to obtain those investment banking fees.

## CHARLES PRINCE

168.   Charles Prince became chief executive officer of CITIGROUP on

October 1, 2003. He claims that he had no knowledge of the relationship between investment bankers and analysts during the period from 1998 through 2002 but, in fact, he was very much involved with the running of that portion of the business during much of the relevant time period. He was Sandy Weill's confidant and chief protégé at CITIGROUP for much of that period of time. From October of 2002 to October of 2003, he was chief executive officer of CITIGROUP's Corporate and Investment Bank. From June of 2001 until October, 2002, he was Chief Administrative Officer of CITIGROUP. Before that, he was the head lawyer for CITIGROUP. Even as head lawyer for CITIGROUP, he was very much aware of the relationship between investment bankers and analysts. What follows are examples of the intentional acts of Charles Prince and is not intended to include all evidence of such intentional acts.

169. On April 21, 2003, Charles Prince signed as CEO of SALOMON SMITH BARNEY the Assurance of Discontinuance with the Attorney General of the State of New York. He has admitted under oath that he was fully aware of the contents of the allegations set forth in the Assurance of Discontinuance and that he would not have signed it if those allegations were not true. The allegations show the exact pattern of failure of trust, intentional deceit and the trading of research integrity for investment banking fees as is set forth in this Complaint.

170. Charles Prince, publicly apologized on April 28, 2003, for the actions of the Defendants between 1998 and 2002 and admitted that prior to that date the Defendants' research organization was not independent and, in fact, confirmed that after it was too late for people like the Plaintiffs who believed in Jack Grubman and

112

the research he was providing stating; "We announced (today) standards and policies for our research organization to ensure that its focus is strictly on investors." Both he and the Defendants were fully aware that prior to that time the research organization of the Defendants was not focused strictly on investors but, instead, had the conflicts herein described.

171.    Charles Prince admitted on May 10, 2004, that only after SALOMON SMITH BARNEY was investigated by regulators including the National Association of Security Dealers, the SEC, the Attorney General of the State of New York and the New York Stock Exchange, which investigations revealed the conflicts of interest and dishonesty set forth herein that CITIGROUP would "…. Revamp the management, structure and policies of our equity research capability, creating a separate business unit for research and retail brokerage.  We eliminated the involvement of our investment bank in the compensation of analysts and restricted the interaction between  analysts and investment bankers.  We also adopted important new, industry-leading policies in our structured finance business and in the area of IPO allocations."  In fact, Mr. Prince was well aware that from 1998 through 2002, that CITIGROUP's research analysts and investment bankers should have been separated.  He was aware that the involvement of CITIGROUP's investment bank in the compensation of analysts and by not restricting the interaction between analysts and investment bankers that this led to a hopeless conflict of interest which, in turn, resulted in the kind of false and misleading statements made by Jack Grubman and others concerning WorldCom on which the Plaintiffs relied. Mr. Prince was well aware, as was CITIGROUP, that IPO allocations made by SALOMON

113

SMITH BARNEY to Bernie Ebbers and other Board members or officers of WorldCom led to the illegal and inappropriate granting of investment banking business to SALOMON SMITH BARNEY in return for not only these IPO allocations but also for false and misleading analysis of WorldCom stock as set forth herein.

172. Mr. Prince admitted on February 17, 2005, when he discussed a five (5) point plan for changing CITIGROUP's ethics, that "we need to change the way we do business" and stated "at times our actions have put at risk our most precious commodity, the trust of our clients, the patience of our employees and the faith of our shareholders." During the period from 1998 to 2002, CITIGROUP's ethics were pervaded with dishonesty and conflicts of interest as set forth herein.

173. It was no secret to Charles Prince that Jack Grubman was paid approximately $20 million a year for the four (4) years from 1998 through 2001 only because he was able to earn substantial investment banking fees for the Defendants. In two of those years, 2000 and 2001, Charles Prince attended meetings of the Personnel, Compensation and Directors Committee of CITIGROUP where these salaries were approved. Mr. Prince knew full well that Mr. Grubman was being paid not because he was an honest, independent and competent analyst but because of the enormous investment banking fees that he was responsible for by virtue of giving inflated reports in order to obtain those investment banking fees. Those reports include the reports on WorldCom issued by Mr. Grubman which were traded for investment banking fees by the Defendants herein.

**LOANS TO BERNIE EBBERS**

174.   As part of their plan to secure investment banking fees from WorldCom at the expense of individual investors like the Plaintiffs, the Defendants made unheard of loans to Bernie Ebbers in return for his choosing SALOMON SMITH BARNEY to act as investment banker for WorldCom and thus earn investment banking fees. These loans created a situation in which SALOMON SMITH BARNEY and Jack Grubman had to issue glowing reports in order to keep the price of WorldCom stock propped up in value so that Bernie Ebbers would not suffer margin calls. John Hoffmann has admitted under oath that the loans made to Bernie Ebbers secured by WorldCom stock gave the Defendants an economic incentive to see that the stock price remained high.  Insider sales by people like Bernie Ebbers were tracked by the SEC and the marketplace.  If Bernie Ebbers sold substantial shares that he owned in WorldCom, it would cause an avalanche of stock sales because WorldCom investors would see the CEO dumping his stock.  This, in turn, would cause the market price of WorldCom to plummet, WorldCom would implode and the Defendants would lose the loans they had made to Bernie Ebbers. What follows are examples, of the evidence relating to these loans but is not intended to include all such evidence.

175.   By the fall of 1999, Travelers, a division of CITIGROUP, had given WorldCom CEO, Bernie Ebbers, a half a billion dollar loan collateralized, in large part, by his WorldCom shares.  To disguise the identity of the borrower, the loans were made to a shell corporation named Joshua Timberlands, LLC, which Bernie Ebbers set up in Mississippi just a few weeks before the first loan was made.  Bernie Ebbers

used that money to buy 548,000 acres of land in Alabama, Tennessee, Mississippi, and Louisiana.

The loans made to Bernie Ebbers were made at the same time as SALOMON SMITH BARNEY was lobbying Bernie Ebbers to convince WorldCom to select SALOMON SMITH BARNEY to be its investment banker in some of the most lucrative deals in history. In the fall of 1999, as SALOMON SMITH BARNEY was secretly arranging for the first $290 million installment in the loan from Travelers to Joshua Timberlands, LLC, SALOMON SMITH BARNEY was lobbying Bernie Ebbers to be selected as the investment banker for WorldCom's prospective $129 billion takeover of Sprint, the most lucrative corporate deal in history.

Travelers loaned Bernie Ebbers, through Joshua Timberlands, LLC, another $209 million in February of 2000, just prior to WorldCom selecting SALOMON SMITH BARNEY as the co-lead underwriter for its $5 billion bond offering in 2000 and the largest ever bond offering of $12 billion in 2001.

The loans to Bernie Ebbers gave him access to enormous sums of cash without ever requiring him to sell any of his WorldCom shares. In some instances, the land acquired from loan proceeds was immediately re-sold to third parties who paid cash to Joshua Timberlands, without any corresponding payment to reduce the loan balance. The Travelers Division had, on hundreds of occasions, affirmatively released its collateral interest in timber on the acquired property to allow Mr. Ebbers to cut that timber for cash without any commensurate pay down of the Travelers Division loans. Travelers was on the hook for huge loans whose value

116

depended on the strength of WorldCom stock and provided yet further incentives for CITIGROUP and SALOMON SMITH BARNEY to support WorldCom's share price.

On the same day Bernie Ebbers received the block of loans totaling $209 million in early 2000, Joshua Timberlands executed a document memorializing an undisclosed $1 billion mortgage owed to Travelers Division. The mortgage, dated February 15, 2002, refers to some (though not all) of the $499 million in loans given to Bernie Ebbers through that date, and refers to the possibility of additional indebtedness by Bernie Ebbers to Travelers to be covered by the mortgage. In addition to the staggering secret loan facilities, Travelers had become an equity partner with WorldCom's CEO in Joshua Timberlands. None of this was disclosed to the investing public, including the Plaintiff. Had the Plaintiff known of any of these secret loans, he would not have held WorldCom stock because of the obvious and ongoing conflicts of interest these loans created for SALOMON SMITH BARNEY and Jack Grubman's analysis of that stock.

176.   In the summer of 2000, Mr. Ebbers faced increasing pressure from various lenders. He had borrowed heavily to pay for personal investments, securing those loans with his WorldCom stock. As the WorldCom stock price dropped, Mr. Ebbers' lenders demanded more collateral. Despite entering into a forward sale of 3 million shares of WorldCom stock in September of 2000, Mr. Ebbers faced more margin calls and turned to SALOMON SMITH BARNEY for help. In less than two (2) weeks, SALOMON SMITH BARNEY persuaded CITICORP USA, INC. (Citibank), a wholly owned CITIGROUP subsidiary, not to sell any of Mr. Ebbers' stock securing the $40 million loan which they had given to Mr. Ebbers. SALOMON SMITH

BARNEY also persuaded Citibank to take over an $11 million loan to Mr. Ebbers that he had with Morgan Keegan. SALOMON SMITH BARNEY then assumed the risk of this $52 million loan, $10 million of which was unsecured even by WorldCom stock. At the time that loan was made, Mr. Ebbers' margin call secured by WorldCom stock was approximately $378 million for which 100% of his WorldCom stock was pledged as collateral.

177.    The fact that the Defendants were loaning Mr. Ebbers millions of dollars, only partially collateralized at all and then only by the very same stock that Jack Grubman was analyzing, was a direct conflict of interest.  John Hoffmann certainly knew this and has admitted that making these loans to Bernie Ebbers secured by WorldCom stock, gave SALOMON SMITH BARNEY an economic incentive to see that the stock rice remained high.  The Defendants did not tell the Plaintiffs or any investor about the existence of those loans.  Had the Plaintiffs known about that, they would have realized that the Defendants had a direct conflict of interest in keeping the price of WorldCom stock high in order not to undercollateralize these loans.  This gave Jack Grubman and other analysts working for the Defendants who were analyzing WorldCom stock yet another reason to keep their analyses positive, a direct conflict of interest not disclosed to the Plaintiffs or other investors.

178.    At the same time that this $52 million loan was made by SALOMON SMITH BARNEY to Mr. Ebbers, Mr. Ebbers had a $3.5 million margin call from Citibank.  Employees of the Defendants persuaded Citibank not to sell Ebbers' stock which formed the collateral for that loan.  These employees included SALOMON SMITH BARNEY's CEO, the head of SALOMON SMITH BARNEY's investment

banking division, the co-heads of SALOMON SMITH BARNEY's global equities division and the Vice Chairman of SALOMON SMITH BARNEY's global private client group as well as senior credit and risk management personnel, a senior executive vice president of SALOMON SMITH BARNEY, a director of private client sales for SALOMON SMITH BARNEY and Jack Grubman. The reason that was done was to persuade Bernie Ebbers to see to it that SALOMON SMITH BARNEY earned investment banking fees. None of this was disclosed to the Plaintiffs or the investing public. This was a clear conflict of interest which would have made a huge difference to any investor, including the Plaintiff, in his decision to buy or hold WorldCom stock. Had the Plaintiff known of these improper loans, he never would have held the stock as long as they did. They would have sold it at a reasonable time.

179.   Plaintiff was never informed of these inherently corrupting financial arrangements, nor was he informed that each of the WorldCom bond offering registration statements and "buy" recommendations, upon which they relied, were essentially purchased by WorldCom as an intergral part of an investment banking package of services. Investors were not informed that Mr. Gurbman's positive ratings for WorldCom were issued in exchange for WorldCom's investment banking business; that Jack Grubman had altered his valuation model in order to obscure WorldCom's deteriorating finances; that Jack Grubman orchestrated misleading public statements by WorldCom management; and that Jack Grubman's compensation depended on issuing overheated and deceptive ratings. Investors were not informed of the Four Hundred and Ninety-Nine Million Dollars ($499,000,000) in loans to WorldCom's CEO by the corporate sibling of the lead

119

underwriters for WorldCom's bond offerings. They were not informed that Bernie Ebbers and CITIGROUP's corporate sibling were actually business partners in a sprawling timber enterprise. They were not cautioned that the CEO of the nation's second largest telecommunications company was so highly leveraged that he faced personal financial ruin if the price of WorldCom stock dropped, or that he would undoubtedly be distracted by the demands of running his timber empire and the myriad other businesses, of which CITIGROUP was painfully aware.

180.    As further part of the quid pro quo corruption, CITIGROUP and the other underwriters for the $17 billion in WorldCom bonds sold in May 2000 and May, 2001, failed to perform due diligence in connection with these transactions. Among other things, CITIGROUP and other under underwriters failed to conduct due diligence to determine whether WorldCom had the means, intent, and ability to satisfy the staggering amount of debt it was accumulating.

181.    Due to the extremely large loans that CITIGROUP was covering for Bernie Ebbers, based upon WorldCom stock, CITIGROUP had a large financial interest in insuring that the value per share of WorldCom stock remained high. The only collateral CITIGROUP has to secure these loans was Bernie Ebbers' WorldCom stock. As the price of the stock fell, CITIGROUP's ability to recoup its loan also disappeared. This would certainly explain why Defendants never lowered or changed their rating on the WorldCom stock from a "1-Buy" rating. CITIGROUP created a conflict of interest by tying their ability to be repaid for the millions of dollars of loans owed by Bernie Ebbers to the per share value of the WorldCom stock.

182.   On October 17, 2000, David Trautenberg sent an e-mail to Jack Grubman asking him for a meeting to discuss selling out Bernie Ebbers on his loan. On November 1, 2000, David Trautenberg wrote an e-mail in which he said that he had spoken with Jack Grubman and Eduardo Mestre concerning the margin situation for Bernie Ebbers.  According to that e-mail, SALOMON SMITH BARNEY planned to sell Bernie Ebbers out if WorldCom stock fell below $17.50.  An e-mail was then sent from the private bank notifying SALOMON SMITH BARNEY that they would no longer be responsible for the loan if the stock fell below $16.00 a share because the contract with Bernie Ebbers provided that SALOMON SMITH BARNEY had the right to sell at any time the stock went below $17.50.  On November 10, 2000, there is an e-mail that says that Jack Grubman was advised by Bernie Ebbers that he could pledge his British Columbia ranch in exchange for SALOMON SMITH BARNEY's forbearance on the loan but it turned out that the ranch was pledged somewhere else.  On November 21, 2000, there was an e-mail which indicated that SALOMON SMITH BARNEY had agreed to take on an unsecured exposure of approximately $5 million on the strength of the business relationship between WorldCom and SALOMON SMITH BARNEY.  SALOMON SMITH BARNEY did not sell out Bernie Ebbers until four days after he resigned as CEO of WorldCom.  This special treatment of Bernie Ebbers was a direct result of the investment banking business that Bernie Ebbers was providing to SALOMON SMITH BARNEY. It violated the trust of not only people like the Plaintiff and the public but the CITIGROUP shareholders themselves.  Both Sandy Weill and Charles Prince in their sworn testimony admit this special treatment should never have taken place.

121

## IPO ALLOCATIONS

183. What follows are examples of the evidence as it relates to these IPO allocations but is not intended to include all such evidence. Part of the plan of the Defendants to obtain investment banking fees from WorldCom was to bribe Bernie Ebbers and other executives at WorldCom, including Scott Sullivan, Bert C. Roberts, Stiles Kellet, Jr., James Q. Crowe, Walter Scott, Jr., and Roy A. Wilkens, by giving them inordinant IPO allocations. Before the merger of Salomon Brothers and Smith Barney in November of 1997, Salomon had attempted to obtain the investment banking work of WorldCom without much success until August of 1996 when Bernie Ebbers personally engaged Salomon Brothers to be WorldCom's banker after WorldCom merged with MFS Communications Co., Inc. After the MFS merger, WorldCom engaged SALOMON and subsequently SALOMON SMITH BARNEY on virtually every merger, and acquisition, equity and financing transaction for which SALOMON SMITH BARNEY was eligible.

184. SALOMON obtained WorldCom's banking business which Bernie Ebbers controlled by initially making a lucrative IPO allocation on June 10, 1996, personally to Mr. Ebbers. At that time, SALOMON allocated to Mr. Ebbers 200,000 IPO shares in a company called McLeod, Inc. Mr. Ebbers invested approximately $4 million and shortly after that earned a profit of over $2 million. Traditionally, IPO allocations are made to good brokerage customers of a company like SALOMON SMITH BARNEY but before the issuance of the IPO allocation in McLeod, Mr. Ebbers had not even been a SALOMON SMITH BARNEY brokerage customer yet he

received, by far, the largest allocation among all SALOMON SMITH BARNEY's retail customers, four (4) times as much as the next largest allocation to a retail investor. This, despite the fact that McLeod was heavily oversubscribed with ten (10) times as many potential investors as there were shares available.

185.   Subsequent to the McLeod IPO offering, SALOMON SMITH BARNEY continued to provide huge IPO allocations to Ebbers, including a McLeod secondary offering on which Mr. Ebbers profited almost $400,000.00, a Quest offering on which Mr. Ebbers profited nearly $2 million, a Net Link offering on which Mr. Ebbers profited over $1.8 million and a Metromedia offering on which Mr. Ebbers profited $4.5 million.

186.   At the same time that Mr. Ebbers was receiving these massive IPO allocations, WorldCom was awarding significant investment banking work to SALOMON for which it earned over $65 million in fees.

187.   After the SALOMON-SMITH BARNEY merger in November, 1997, the Defendants were fully aware of the quid pro quo of IPO offerings for investment banking fees. They were concerned because there were investigations under way as to the impermissibility of this kind of conduct. Thus, SALOMON SMITH BARNEY instituted a written policy on November 28, 1997, that made is impermissible for their employees to directly or indirectly permit the offering  of IPOs to a corporate executive in return for receiving investment banking or other business from a corporation employing that executive. On March 27, 1998, the Defendants issued a memorandum which told the branch managers of SALOMON SMITH BARNEY, its operation managers, and syndicate desk employees that the fact that an individual

has the ability to bring SALOMON SMITH BARNEY investment banking business cannot be a factor in determining the allocation of IPOs. Despite those specific prohibitions, SALOMON SMITH BARNEY allocated between 1998 and 2000 over 200,000 shares of hot IPOs which made Bernie Ebbers millions of dollars in profits because of Mr. Ebbers' willingness to provide SALOMON SMITH BARNEY with investment banking fees.

188.    These allocations to Bernie Ebbers were made despite the fact that he was what is commonly known as a "flipper." That is, he rarely held the stock in these IPOs for more than a month. It was recognized in the industry that in planning a successful IPO, the lead underwriter strived to create a stable secondary market by avoiding significant price swings. One way to avoid those was to make sure that IPO allocations were made to investors who were viewed as long-term investors rather than flippers. Nevertheless, these allocations were made to Bernie Ebbers because of the investment banking fees that he could generate. The above-quoted March 27, 1998, memorandum also addressed the subject of flippers and specifically indicated that those types of investors should not be issued hot IPO stocks. None of this was disclosed to the Plaintiff or to the investment public. This was a clear conflict of interest which would have made a huge difference to any investor, including the Plaintiff, in his decision to buy or hold WorldCom stock. Had the Plaintiff known of the trading of IPO's for investment banking fees, he never would have held the stock as long as he did. He would have sold it at a reasonable time.

**THE COVER-UP**

124

189.   In the summer of 2002, after the false underpinning for most of the stocks being analyzed by Jack Grubman went virtually to zero or went bankrupt, public regulators began investigating the Defendants for their false statements and complicity with Jack Grubman.  These investigations included not only WorldCom but the following stocks as well:

> AT&T - - AT&T Wireless
> Focal Communications
> Metromedia Fiber Networks
> Level 3 Communications
> Williams Communications Group
> XO Communications
> Adelphia Business Solutions
> RCN Communications

190.   Recognizing that the single largest commodity sold by the Defendants was trust and that public trust would be significantly eroded if the truth came out, the Defendants began a concerted effort to cover-up their misdeeds and prevent them from becoming public.

191.   In March of 2002, when it was obvious that public investigations were going to commence, John Hoffmann attempted to forestall those investigations by overhauling his analysts rating system.  He recognized that this was long overdue but even then with impending investigations the money that was being earned by the Defendants in investment banking fees was at risk by such an overhaul.  He needed, however, to get the message across that some effort at reform had to begin.  He thus created the infamous Hoffmann memo which is discussed in Paragraphs 154 through 155 of this Complaint.  John Hoffmann recognized that the Defendants at all costs had to keep their willful acts of prostituting their analysts away from public scrutiny

and the scrutiny of regulators.  He thus took the extraordinary steps to destroy this memorandum as is detailed in Paragraphs 155 through 156 of the Complaint.  This intentional destruction of evidence was part of the plan of the Defendants to prevent the public and the Plaintiffs from ever knowing the true facts about the Defendants' intentional trade of research integrity for investment banking fees.

192.   When the inevitable investigations began, the Defendants were subpoenaed to provide all relevant information to the regulators.  The Defendants recognized that WorldCom was one of the most sensitive issues of this investigation and wanted at all costs to prevent the regulators from knowing the true facts.  As a consequence, the Defendants intentionally failed to comply with the subpoenas of the regulators to provide many of the documents referred to in this Complaint.  Included in the documents not given to the regulators, was the March 22, 2002, Hoffmann memo which was clear evidence of their intentional fraud with respect to their analysts' ratings.  They simply ignored the subpoenas and did not provide these documents so that the regulators could not adequately address their guilt with respect to WorldCom.

193.   Beginning in August of 2002, when the investigations were well underway, Charles Prince and Sandy Weill began "spinning" the true facts and made false public statements regarding the Defendants' efforts to "reform."

194.   On August 26, 2002, Jane C. Sherburne, after being subpoenaed by Congress, told Congress in writing that "The WorldCom officers and directors that received IPO allocations were very substantial retail clients of SSB large retail accounts."  That was simply not true.  Far from being one of SALOMON SMITH

BARNEY's best retail clients, Mr. Ebbers maintained a SALOMON SMITH BARNEY account but never engaged in any trading except for buying and selling the lucrative IPOs that were given to him by SALOMON SMITH BARNEY in return for the investment banking fees. In fact, Mr. Ebbers was no customer at all of SALOMON SMITH BARNEY outside of his receipt of disproportionate amounts of lucrative IPOs and secondary offering shares. These IPO allocations to Mr. Ebbers only ceased in August of 2000 because Mr. Ebbers was financially unable to continue such purchases due to the margin loan pressure he was facing from his lenders.

195.    Charles Prince, speaking for the Defendants, made public statements on May 10, 2004; November 7, 2004; February 17, 2005; and March 2, 2005; in which he told the public that only after the burst of the telecom bubble did it become apparent to the Defendants that they had a problem with respect to the conflict of interests between their analysts and their investment banking department. Charles Prince knew that this was not true. Anyone with eyes to see and ears to hear during the period from 1998 to 2002 that was in an executive position like Charles Prince knew not only that there was an irreconcilable conflict of interest between their analysts and investment banking but that it was intentional. Charles Prince simply covered up this intentional conduct with a fairy tale that he and the Defendants were oblivious to what was obvious to them. He and the Defendants made the decision to keep the true facts from the public and the Plaintiffs so as not to admit their wrongdoing.

196.    Sandy Weill, too, made public statements on April 28, 2003; September

8, 2002; and April 29, 2003. While both he and Charles Prince couched these statements in the form of apologies, they carefully worded them to cover up the true intentional misdeeds of the Defendants. Worse still, Sandy Weill couched his statements in a fashion that made it appear that the elimination of these conflicts of interest was his idea and that he and the Defendants wanted to be in the forefront of reform for the industry. The truth was that he, and the Defendants, were forced to make these reforms as part of an agreement to terminate the investigations of the regulators. Unfortunately, this deal with the regulators did not include the forced public disclosure of the Defendants' intentional acts and so the Defendants, including Sandy Weill and Charles Prince, decided to simply cover up these facts.

197. As a further effort towards covering up the Defendants' guilt, the Defendants entered into a number of contracts with former employees who had the true facts. These include, but are not limited to, contracts with Jack Grubman and John Hoffmann as well as other former or present employees of the Defendants. These contracts provided that Jack Grubman, John Hoffmann and the others would be paid substantial sums of money to "cooperate in the defense" of lawsuits such as this. This "cooperation" was nothing less than bribing a witness. Employees and former employees like Jack Grubman and John Hoffmann could easily be compelled to testify by subpoena either by the Defendants or their adverse parties. No witness is immune from such testimony whether favorable to the Defendants or not. The Defendants decided to ensure both these witnesses' silence and their favorable testimony by paying substantial sums of money and providing substantial services to these witnesses. As an example, the Defendants entered into a contract with Jack

Grubman, probably the key witness in all of these cases, providing that upon termination that he would receive some $32 million tax free as a severance package. In addition, he would be paid $200,000 per year to "cooperate in the defense" of cases like this and be provided an office in Manhattan, secretarial help, all legal fees for his personal defense of any action and the payment of any judgment against him in any such action. There was no pretense that Jack Grubman was paid for anything less than the favorable "cooperation" of his testimony and his silence as to the true facts. Contracts like Jack Grubman's with the Defendants were part of the Defendants intentional cover-up of their misdeeds. They simply paid off these employees and former employees to make sure the story never came out and that the Plaintiffs and the public would never find out the truth about what they had done as detailed in this Complaint.

198. Paragraph 40 details the telephone call recording of executives of WorldCom by the Defendants. Defendants kept those recordings secret until such time as Phil Spartis released information about them to the New York Times on September 22, 2002, and Forbes magazine in January, 2003. Only after the tape recordings became public did the Defendants produce copies of those tapes to WorldCom executives who had filed arbitration claims against SALOMON SMITH BARNEY. The clients insist that they had no knowledge of the recording but the tapes produced by the Defendants contained loud and distinct beeping sounds. Mr. Spartis has publicly stated that he was told by the office manager Michael J. Grace that the recordings contained "silent beeps," tones that were inaudible to the callers but apparently recorded on to the tapes and that he was told not to worry about it

when he expressed concern about the legality of making such calls without the executives' knowledge.  This effort to alter the tapes to make it appear that the executives were aware that they were being recorded by adding the beeps that were, in fact, absent during the telephone calls is a further part of the Defendants' attempts to cover up their actions in this case.

## THE PLAINTIFF

199.   Plaintiff, WILLIAM T. DOBYNS, is 65 years old and has been married to his wife, Barbara Dobyns, for 44 years.  MR. DOBYNS is a high school graduate who took a few college business courses but ultimately enlisted in the Navy.  In the Navy, MR. DOBYNS received valuable training in telecommunications.  He served aboard the U.S.S. Murray and learned all facets of telecommunication technology.  In the mid-60's, MR. DOBYNS was discharged from the military and went to work for Western Union Telegraph.  This led to a position at Western Union International where he worked until 1982 when WUI was purchased by MCI.

200.   In 1997, MR. DOBYNS was laid off by MCI and went to work for British Telecom.  However, at the time of his departure, MR. DOBYNS had  been maximizing all participation opportunities in MCI/WorldCom's ESPP and 401k programs.  Through both plans, MR. DOBYNS was able to accumulate over 8,000 shares of MCI/WorldCom and had a net worth of over $1,000,000.00.  These programs represented his retirement.

201.   After the WorldCom disaster, MR. DOBYNS lost 75% of his net

130

worth.  MR. DOBYNS laments that this was his stock market crash of '29.  The unthinkable had happened.  He never envisioned a scenario where his hard earned life savings would be swept away with no where to turn.

202.    MR. DOBYNS blames Jack Grubman for his losses and describes that everyone who worked for MCI/WorldCom knew of Jack Grubman's stature in the telecom industry.  He explained that MCI/WorldCom employees were persuaded to keep as much of their assets in WorldCom stock using Jack Grubman's analysis and recommendations as proof that the stock was only going higher.  MR. DOBYNS read everything Jack Grubman had to say in financial publications and periodicals and relied upon Mr. Grubman when making decisions to remain concentrated in WorldCom stock.  Jack Grubman led him to believe that the stock was not only stable, but going upward.

203.    At all times material hereto, Plaintiff relied upon the representations as set forth herein as well as other similar representations of the Defendants.  Were it not for these representations, Plaintiff would not have purchased or held the WorldCom stock and only because of the representations did Plaintiff either purchase or hold said stock.

204.    At all times material hereto, in addition, Plaintiff relied on advertisements of the Defendants which advertisements portrayed analysts such as Jack Grubman as competent and independent and those advertisements portrayed analysts employed by the Defendants, including Jack Grubman, as providing analysis of stocks, including WorldCom, which were honest and objective when, in truth, Jack. Grubman  and  other  analysts  analyzing  WorldCom  were  neither  competent,

independent, objective or honest in their analysis and, instead, had the conflicts of interest herein alleged.

205.    Plaintiff recognized that the role of a security analyst was to review and honestly report information provided by companies, regulators, the media and other sources regarding companies such as WorldCom. Plaintiff expected that the analysts of the Defendants would provide an accurate interpretation of all relevant information about WorldCom and that said analysts had an obligation to provide that information independent of any relationships between SALOMON SMITH BARNEY, CITIGROUP and WorldCom. Plaintiff believed, based upon the representations of the Defendants that its chief telecommunications analyst, Jack Grubman, was a central figure in the telecom stock surge in the late 1990's and that he was, as represented by the Defendants a respected securities analyst and he believed because of the representations of the Defendants that Jack Grubman had access to the best information about WorldCom.

206.    Plaintiff herein did not have any formal training or education in stock analysis or investments. The Plaintiff was unaware of the falsity of the advice that he was receiving and relied upon the advice of the Defendants in purchasing and retaining his WorldCom stock. As a result of that reliance and the purchase and retention of that stock, Plaintiff lost an amount in excess of the jurisdictional limits of this court by not selling his stock as he would have had it not been for the false advice given by the Defendants herein. As a result and consequence of that loss, Plaintiff's assets were significantly depleted causing him severe mental pain and suffering.

207.   In addition to the securing of investment banking business, the Defendants intentionally targeted a specific group of individuals, which included the Plaintiff, with respect to the false statements described in this Complaint.   The individuals falling within that group were persons who had purchased WorldCom stock either because of the false statements described in this Complaint or for other unrelated reasons.

208.   The Defendants recognized that they could not afford to have the people who owned WorldCom stock sell that stock and had to convince that group, which included the Plaintiff, to hold and retain that WorldCom stock rather than sell it. Defendants understood that if the Plaintiff and the others in that group sold his WorldCom stock, the stock would go down in value.   The reduction in the value of WorldCom stock would affect the Defendants in two ways.   First, any statements made by Jack Grubman or any other employee of the Defendants which were perceived by WorldCom executives as negative and thus likely to cause the Plaintiff and others in that group to sell their WorldCom stock, would result in the loss of investment banking business from WorldCom.   The WorldCom executives, such as Bernie Ebbers and Scott Sullivan, who controlled whether the Defendants got the lucrative investment banking fees the Defendants sought, had their entire fortunes tied up in WorldCom stock.   Those fortunes rose  and fell with WorldCom's stock price.   Second, because the Defendants had made the loans described in this Complaint to Bernie Ebbers which loans were collateralized by WorldCom stock, the Defendants recognized that they could not allow the value of WorldCom stock to go down by virtue of the Plaintiff and others in the aforesaid group selling their stock

133

because the collateral for the loans would drop below the level which would require the Defendants to call the loans of Bernie Ebbers.  This the Defendants knew they could not do without losing all of WorldCom's business.

209.    The Defendant, thus, made the decision that they would target the Plaintiff and others who held WorldCom stock with the positive false statements described in this Complaint made by Jack Grubman and other of Defendants' employees.  By continuing to make these false positive statements, the Defendants were assured that the targeted group, including the Plaintiff, would hold their stock and not sell it so that despite the fundamentals of that stock turning negative, Jack Grubman, unlike most analysts analyzing WorldCom, continued to insist that WorldCom was an excellent buy and should not be sold even while the price of WorldCom continued to fall.  It was, thus, not until WorldCom stock was virtually worthless and long after virtually every other analyst had downgraded it that Jack Grubman finally downgraded the stock only hours before WorldCom declared bankruptcy.

210.    The Defendants executed their plan to keep the Plaintiff from selling his stock by having Jack Grubman and others convince the Plaintiff that Jack Grubman was the ultimate telecom analyst and that he alone was an insider who knew WorldCom's true potential and he could, therefore, predict accurately that WorldCom was going to beat the odds and triumph despite the burst of the telecom bubble.  Jack Grubman's statements were intended by the Defendants to convey to the Plaintiff that WorldCom was the only stock that could  beat the odds and triumph so that Jack Grubman's price predictions would come true.

## FALSE STATEMENTS OF THE DEFENDANTS TO THE PLAINTIFF

211. What follows are examples of some of these false statements and are not intended to include all such false statement.

212. The pronouncements made in financial publications in which Plaintiff relied were made at the request of the Defendants and each of them herein. They were made with the express intent to guide the Plaintiff to either purchase or hold WorldCom stocks. These pronouncements were false at the time that they were made and the Defendants and each of them knew them to be false and the pronouncements were made in the course of the business of each of the Defendants and the Defendants had an economic interest in having these pronouncements made as set forth herein.

213. Each of the pronouncements was made by the Defendants either negligently, recklessly or intentionally and the Plaintiff was a person for whose benefit and guidance the Defendants and each of them intended to supply the false information for use in the Plaintiff's business of purchasing and retaining their stock. The Defendants fully intended that the false information they were disseminating through Jack Grubman and others would influence the Plaintiff in the business transaction of their purchase or retention of WorldCom stock. The Plaintiff justifiably relied on this false information and, as a direct and proximate consequence of that reliance, purchased and/or retained their interest in WorldCom stock to their ultimate economic damage as set forth hereinafter. Jack Grubman published notes which were intentionally made available to the media intending that they be published to

135

influence the Plaintiff and others similarly situated.   Those notes included the following:

a.   On April 24, 1998, Jack Grubman stated "Consequently we continue to believe that our current 12 month price target of $60 per share should really be closer to $70 and our 24 month price target of $90 should be at least $100 per share."

b.   On November 16, 1998, Jack Grubman stated "Third quarter results, the beginning of a powerful story."  "Add in a terrific balance sheet and lots of free cash flow on top of the unquestioned best strategic position in this industry and this is why we believe WorldCom remains the 'must-own' large CAP growth stock in anyone's portfolio."

c.   On February 12, 1999, Jack Grubman stated "Let's face it.... WorldCom is becoming a better story every day....  Thus, we would like to reiterate our $100 price target, but frankly we would admit that our price target is too low."

d.   On February 23, 1999, Jack Grubman stated "This was a fabulous quarter for WorldCom, . . . . We would be aggressive buyers of the stock."

e.   On April 29, 1999, Jack Grubman stated "At current prices, WorldCom we believe is woefully undervalued."

f.      On June 11, 1999, Jack Grubman stated "Thus, WorldCom
        continues to be one of the cheapest stocks in our universe on a
        P/E to growth rate basis with the best collection of assets."

g.      On July 30, 1999, Jack Grubman stated "WorldCom remains our
        favorite stock and we would be aggressive buyers at these
        prices. . . . We think any investor who does not take advantage
        of current prices to buy every share of WorldCom they can
        should seriously think about another vocation. . . . Stock pull-
        back presents a huge buying opportunity as historically has
        been the case.  WorldCom remains our favorite stock and we
        would be aggressive buyers."

h.      On August 17, 1999, Jack Grubman stated "WorldCom is the
        benchmark against which every telecom company in the world is
        measuring itself. . . .  We would be very aggressive buyers of
        the stock."

i.      On August 20, 1999, Jack Grubman stated " WorldCom remains
        our favorite stock and we would be aggressive buyers at these
        prices."

j.      On August 20, 1999, Jack Grubman stated "WorldCom is a
        Must-Own. . . . We would be aggressive in buying the stock at
        current levels."

k.      On October 5, 1999, Jack Grubman stated "We would massively
        aggressively buy at these prices."

l.      On October 26, 1999, Jack Grubman stated "WorldCom remains the fastest growing enterprise in one of the fastest growing industries in the world and yet it is selling at a deep discount to the market. We would aggressively take advantage of this dislocation and we strongly reiterate our buy recommendation. . . . WorldCom Seems Cheap at Current Prices, we would aggressively take advantage of the sloppiness in the stock and strongly reiterate our buy recommendation."

m.      On December 1, 1999, Jack Grubman stated "We would be aggressive buyers of the stock. We believe this is a dirt cheap large CAP growth stock which is positioned to be the growth leader in a huge global growth industry."

n.      On January 11, 2000, Jack Grubman stated "We would take advantage of disruption in the stock caused by apparent misconceptions and inaccuracies to aggressively buy shares of a world class large CAP growth company."

o.      On February 10, 2000, Jack Grubman stated "We think this is by far the best combination of value, growth, and risk profile in the telecom industry and we would be aggressive buyers of the stock."

p.      On March 2, 2000, Jack Grubman stated "We continue to be aggressive buyers of WorldCom."

q.      On November 2, 2000, Jack Grubman stated "We think this is the bottom and we would be massively aggressive buyers of the stock."

r.      On January 9, 2001, Jack Grubman stated "We strongly reiterate our buy rating on WorldCom."

s.      On February 5, 2001, Jack Grubman stated "We aggressively reiterate our buy."

t.      On February 8, 2001, Jack Grubman stated "This is a cheap growth stock, in our opinion, with a tremendous set of assets in a growth industry and we would be aggressive buyers."

u.      On June 7, 2001, Jack Grubman stated "We would be buyers of WorldCom Group at current levels as the separate tracker should allow growth investors back into the stock."

v.      On July 23, 2001, Jack Grubman stated "We would like to strongly reiterate our buy rating on WorldCom because we believe that it is probably most leveraged to what we continue to believe is an improving situation in telecom services. . . . We would be very aggressive buyers."

w.      On July 26, 2001, Jack Grubman stated "We aggressively reiterate buy."

x.      On January 11, 2002, Jack Grubman stated "WorldCom remains our top pick and we would be aggressive buyers on any weakness in the stock."

y.      On February 4, 2002, Jack Grubman stated "WorldCom has extremely good liquidity, in fact our fixed income analyst would characterize WorldCom's liquidity as the best in the telecom space."

z.      On February 8, 2002, Jack Grubman stated "In our opinion, its liquidity is superb, its balance sheet is solid, its free cash flow is dramatically improving, and its margin structure is stable.  In addition, we believe its balance sheet metric is stable and its cash flow metrics are improving."

aa.     On April 10, 2002, Jack Grubman stated "We would be buyers at current levels."

## MORE FALSE STATEMENTS

214.    Examples of the publicly published false statements made by Jack Grubman at the behest of the Defendants include but are not limited to the following. Each of these publications were repeated in media publications throughout the country which were available to the Plaintiffs and in which Plaintiffs relied.

a.  On March 16, 1998, *CNBC* reported that Jack Grubman had rated WorldCom a strong buy with a 12 month price target of $60.00 a share.

b.  On March 16, 1998, *AFX News* reported that Jack Grubman stated "We believe WorldCom should be able to sustain a multiple of EPS similar to other large capitalization growth stocks which trade at more than 30 times their EPS. WorldCom has the most diverse set of strategic assets in the telecom industry, being

the only true fully integrated provider of voice, data and internet protocol technology.

The business logic of the MCI transaction was very compelling, adding MCI's base of

large customers, world class sales force and industry leading systems, software and

product set capabilities to WorldCom, a diverse set of local and international assets."

     c.   On March 16, 1998, as published in *Reuters* WorldCom shares

gained 2-8/16[th] on a report by SALOMON SMITH BARNEY analyst, Jack Grubman.

Mr. Grubman said in his report "WorldCom represents the only legitimate large

capitalization growth stock in the entire telecommunications universe.  He said the

combined WorldCom-MCI entity would have top line growth of 17% a year over five

years and five-year earnings per share growth of 32 percent.  Mr. Grubman predicted

the stock would rise to $60 a share in the next 12 months and $90 a share in the next

24 months."

     d.   On March 17, 1998, the *Times Mirror* reported that Jack Grubman

stated "That WorldCom share would reach $60 in 12 months and $90 in 23 months."

     e.   On March 17, 1998, the *Baltimore Sun* reported that Jack Grubman

said "WorldCom  and MCI will increase their combined $39 billion in annual revenue

at a faster clip than MCI alone."

     f.   On March 19, 1998, *Communications Daily* reported that Jack

Grubman stated "CEOs with 'vision' think less defensively.  For example, WorldCom

chairman Bernard Ebbers was the only CEO to call Whitacre right after deal was

announced."

     g.   On July 6, 1998, *Forbes* quoted Jack Grubman as saying "There is

no telecom stock in the world that will be anywhere near the performer WorldCom will
be over the next several years."

h.  As reported in *Communications Daily* on October 7, 1998, Jack
Grubman said the "telecom market was heading toward 'stratified' model in which 6-7
'fully integrated' carriers will operate on global basis, providing all services needed for
multi-national companies.  MCI WorldCom is furthest towards achieving the goal."
He further said that WorldCom represented "strategic assets" for global players.

i.  Shortly after the merger between MCI Communications and
WorldCom, an article appeared in *Fortune* Magazine entitled "Ten Safe-Harbor
Stocks" in the December 21, 1998, issue.  In that article, Jack Grubman, stated
"There are few, if any, companies anywhere in the S&P 500 that are as large as
WorldCom, that have WorldCom's growth potential – and more importantly, that have
the visibility that WorldCom has for continued top-line growth."  Further, Grubman
went on to state, "This company remains the must-own large-cap growth stock for
anyone's portfolio."   Mr. Grubman predicted that the stock could be at $80.00 to
$90.00 by the end of 1999 up from $59.00 at that time.

j.  As reported on January 1, 1999, in *Money Magazine*, Mr. Grubman
stated "WorldCom is the must own large cap growth stock.  Further, according to Mr.
Grubman, many mutual fund managers have yet to discover the stock.  Only 11 of
the 50 biggest growth funds and just 7 of the 50 biggest capital appreciation funds
held the stock in mid-November. As 1999 progresses and growth becomes harder to
come by, you can bet that many of those funds will be buying WorldCom big time and

while the $60.00 a share stock is already trading at 30 times expected 1999 earnings, that is hardly excessive for a company with projected earning growth of 150% in 1999 and 50% in 2000."

      k. On January 5, 1999, *CBS MarketWatch* quoted Jack Grubman as stating "that he had lifted his price objective to $100 from $80 for WorldCom and that he believed the company was capable of earnings growth in the order of 28% annually from 1999 through 2004."

      l.    On January 5, 1999, it was reported in *Reuters* that Mr. Grubman said "we believe WorldCom with top line gross of 16% to 17% from 1999 through 2004 and EPS growth of 28% from 1999 through 2004 is generally growing faster than its S&P 500 peers. Mr. Grubman, it was reported, had raised his price target on WorldCom to 100 from 80 and reiterated a buy rating on this stock."

      m. On January 6, 1999, the *New York Times* quoted Jack Grubman as stating about WorldCom that "the long-distance company was likely to see its earnings grow nearly 50 percent in each of the next two years, and at a 28 percent annual rate through 2004."

      n.    On January 6, 1999, as reported in the *Journal Record*, Mr. Grubman stated that WorldCom should likely post earnings growth of 48% a year for the next two years and 28% annually through 2004. Further, that MCI WorldCom shares should reach 100 in the next twelve months which would be a 37% gain over that period. The same information was repeated over the Dow Jones newswires and repeated in the newspapers and magazines throughout the world.

o.      On January 7, 1999, the *Chicago Sun Times* quoted Jack

Grubman as reiterating his buy rating on WorldCom and setting his 12 month price

target at $100.00 when the stock was then trading at approximately $75.00.

p.      On January 13, 1999, it is reported in the *Financial Times* Jack

Grubman said regarding WorldCom that "there are few if any companies anywhere

that are as large as WorldCom, that have WorldCom's growth potential and the

visibility WorldCom has for continuation of top line growth." He further said that the

company had the best strategic position in the industry "we believe WorldCom

remains the must own growth stock in anyone's portfolio." He further said that "the

key to success for an international carrier is to be able to serve multi-national

customers with cross border service and that considering that WorldCom has 4,000

city network rings worldwide and network facilities that cover two-thirds of global

telecommunications traffic, nobody can capture more cross country border traffic than

WorldCom."

q.      On June 2, 1999, *CBS MarketWatch* quoted Jack Grubman as

stating "This presentation reinforces why WorldCom has been my favorite stock for

years now. Their message is clear, to target capital to drive success on their own

network. They cobble stuff together and it drives them to a new level."

r.      On July 1, 1999, *Forbes* Magazine ran an article discussing

recent drops in MCI WorldCom stock. In that article, Jack Grubman was again

quoted as  saying this is a "huge buying opportunity." Grubman went on to assert

that "we continue to believe that WorldCom, with its high quality revenue mix, the

best set of assets on the planet and its unique ability to offer the only true cross-border 'on-net' product is the best-positioned company in this industry."

        s.     On July 1, 1999, *AFX News* quoted Jack Grubman as stating that he expects the company (WorldCom) to show continued strength in the second quarter.   "We expect second-quarter core revenue to be up 15 percent year-over-year despite an almost 20 percent decline in wholesale revenues year-over-year which clearly illustrates our consistent message on MCI WorldCom, which is that the high quality revenue mix which is skewed toward data, international and internet is extremely important going forward."

        t.     On July 10, 1999, *The Record* reported Jack Grubman as stating as to WorldCom that "The voice sluggishness is temporary and the company's other strengths will more than make up for it."

        u.     On September 3, 1999, the *Investor's Business Daily* reported Jack Grubman as stating "WorldCom, Sprint and no doubt AT&T are all going to take price points for the most commoditized part of the retail business -- consumer long – distance – down to a point where it will be very difficult for the regional Bells to significantly steal customers."

        v. On October 28, 1999, *CBS MarketWatch* quoted Jack Grubman as stating that WorldCom stock will double over the next 12-15 months.  "We believe that WorldCom is categorically the biggest "Must Own" stock in the entire world of telecom" and that WorldCom has grown about double the pace of the industry as a whole.

w.  On October 28, 1999, *CBS MarketWatch* repeated the

statement of Jack Grubman that WorldCom was growing at about double the pace of

the industry as a whole.

x.  On November 8, 1999, *Fortune* Magazine quoted Jack Grubman

as saying "We do not think that any other teleco will be as fully integrated and growth-

oriented as this combination."

y.  On November 10, 1999, *CBS MarketWatch* quoted Jack

Grubman as stating "MCI WorldCom is without question the cheapest large- cap

growth stock in the entire S&P, and I have advised clients to load up the truck with

the stock."  Grubman was reported as putting a target of $130.00 on WorldCom

stock.

z.  On January 6, 2000, Jack Grubman was quoted in *CBS*

*MarketWatch* as reiterating his "buy rating on WorldCom and suggested that the

carrier likely will continue to meet and probably exceed our numbers."

aa. On January 6, 2000, *AFX News Limited* reported that Jack

Grubman had reiterated his buy on MCI WorldCom and stated "the stock is still our

favorite name." "Our revenue growth rate is now 14.4 pct for 2000 from 1999 levels,

contrasting with our previous estimate of 15.2 for that period.  These numbers still

represent growth characteristics unmatched by any telecom company WorldCom's

size , or for that matter by any companies in any industry.  Clearly WorldCom is the

furthest along of all of these carriers, given its owned network facilities around the

146

world as well s its UUNET internet protocol backbone, and the fact that it is the most data-internet protocol centric of any major carrier."

bb. In the January 6, 2000 issue of *Smart Money* Magazine, after MCI WorldCom fell nearly 8% in a single day, Jack Grubman recommended that MCI WorldCom was still a must-hold position, and in fact, recommended accumulating more of the stock given its overall position in the industry.  In the article, Grubman stated that MCI WorldCom "still represented characteristics unmatched by any telecom company," and that shares are "dirt cheap" for a company positioned to be the "growth leader in a huge global growth industry."

cc. On January 12, 2000, *TheStreet.com* stated that Jack Grubman maintains his buy rating on MCI WorldCom saying "The stock is now trading at a 'P/E discount to the market on 2000 reported earnings.'  Grubman disputed a CNBC report that the America Online-Time Warner (TWX:NYSE) merger could hurt the stock's revenue from AOL, saying ,'If AOL's customer base moved overnight to a high-speed cable infrastructure, traffic and revenues would increase to MCI WorldCom's UUNET network."

dd. On January 12, 2000, *CBS MarketWatch* quoted Jack Grubman as stating that a CNBC report "incorrectly reported that AOL/TWX merger puts WorldCom's revenue stream from AOL in jeopardy."  "We continue to believe that WorldCom is the best positioned teleco in our group and now trades at a significant P/E discount to the market on 2000 reported earnings."

ee. On January 19, 2000, *Investor's Business Daily* quoted from

147

Jack Grubman's research note in which he stated that WorldCom was "the fastest-growing megacarrier with the best set of global network and (Internet) assets in the telecom industry."

ff.  On January 24, 2000, *The Daily Deal* reported that Jack Grubman indicated his favorite stock was still MCI WorldCom.

gg.  On February 7, 2000, *CBS MarketWatch* quoting from Jack Grubman's research report said that he stated that "He was aggressively reiterating his 'buy' recommendation because he thinks the stock is 'absurdly cheap.'" "As we see it, the market completely fails to recognize the triangulation of size growth and valuation embedded in it." "And most importantly, completely ignores the fact that WorldCom has more 'sexy IP/Data assets' than any other company in the world." Jack Grubman further said that "He thinks investors have tended to view WorldCom somewhat as 'yesterday's news'" but he said the company has some 'very cool assets' that could help it participate in the industry's growth trajectory.  Grubman noted that the company's capital allocation is skewed toward the fast-growing, horizontal data/IP segments and added that it has the most ubiquitous and pervasive mix of local/long haul backbone infrastructure in the world. 'In fact,' Grubman said in his research note, 'WorldCom, being a completely vertically integrated company with a global set of assets, is in a position to take advantage of its scale and scope to leverage its cost structure via its geographic reach in network and its ability to spread SG&A (sales, general & administrative expenses) over many millions of customers."

hh.  On February 7, 2000, *CBS MarketWatch* indicated that Jack

148

Grubman was "aggressively reiterating his buy rating on WorldCom."

        ii.    On February 7, 2000, *AFX* quoted Jack Grubman as saying that he considered the WorldCom Stock "cheap."

        jj.  On February 8, 2000, *CBS MarketWatch* stated "Analyst Jack Grubman at Salomon Smith Barney said he was 'aggressively' reiterating his 'buy' rating on the stock. Grubman believes MCI has more 'sexy IP assets' than any other company. He noted that its UUNet unit's Internet protocol network was bigger than most IP backbones by a factor of 4-5."

        kk. On February 10, 2000, *AFX News Limited* quoted Jack Grubman regarding WorldCom as stating that investors should be "aggressive buyers of the stock." He characterized MCI WorldCom's overall revenue growth of 15.36 percent as "very strong" noting that the company's "revenue mix continues in the right direction with 82 pct of incremental revenues coming from data, internet protocol and international sources." He stated "MCI WorldCom reported a very good fourth quarter, with operational earnings from the MCI WorldCom stand-alone entity of 42 cents per share, in line with our estimate and a penny above the Street. Perhaps more importantly, MCI WorldCom's core telecom revenues were 8.76 bin usd, exactly in line with our 8.759 bin estimate, and represented an increase of 15.3 pct year-over-year, with better-than-expected revenue growth in commercial voice and internet protocol segments, which offset greater-than-expected declines in wholesale voice."

        ll.   On February 14, 2000, *InformationWeek* stated "Jack Grubman,

an analyst at Salomon Smith Barney, says he isn't worried about the company's slow-growing voice business. 'MCI WorldCom is going to be much more of a participant in the growth parts of this industry (data, Internet, and international) than they will ever be a victim of the devaluation of legacy services such as voice.'"

mm.    In *Business Week Magazine's* May 15, 2000 issue, Jack Grubman boasted, "I'm sculpting the industry." He further stated "I get feedback from institutions and CEOs. It feeds on itself. It's a virtuous circle." Grubman expressed his belief that "someone like me who is banking-intensive would have been looked at disdainfully by the buy side 15 years ago. Now they know that I'm in the flow of what's going on. That helps me help them think about the industry."

nn.    On June 28, 2000, on *CNN Moneyline News Hour* Jack Grubman is quoted as stating that WorldCom was "the cheapest stock by far in the world of global telecom." The same quote was repeated on CNN FN on June 28, 2000.

oo.    On June 28, 2000, the *Associated Press* reported that Jack Grubman had strongly reiterated his buy rating on WorldCom and its $87 price target despite the Justice Department's threat to block the company's proposed merger with Sprint.

pp. On June 28, 2000, *AFX.com* quoted Jack Grubman as saying "Despite the drumbeat that is deafening for WorldCom to do something on wireless, the reality is that WorldCom, which does not own a wireless, has averaged mid-teens topline growth for the last three years, which is double to triple the growth rates of its

150

peers, all of (whom) own wireless."  "We believe those who continue to worry about wireless overhang  will be sorely disappointed that they downgraded this stock."

qq.  On June 29, 2000, the *Washington Post* reported that Jack Grubman had strongly reiterated his buy rating and $87 price target despite the Justice Department's threat to block the company's proposed merger with Sprint. The same quote was in the Seattle Post-Intelligencer on the same day and in the Cleveland Plain Dealer and the Los Angeles Times, the Atlanta Journal and Constitution on AFX European Focus and in hundreds of other newspapers around the country.

rr.  On July 10, 2000, *Investor's Business Daily* reported that Jack Grubman stated "No one could prove that WorldCom is missing a beat in its growth now or even in the future by lack of a wireless asset."

ss. On July 24, 2000, *Fortune* Magazine quoted Jack Grubman as seeing WorldCom as among the winners despite the ailing deal with Sprint. "Its sales force, products, account  structure, and pervasive network will make it a dominant force." "Not only do these two have the wherewithal to become global players," said the analyst, "both stocks are dirt-cheap."

tt.  In *Fortune Magazine's* July 24, 2000 issue, Jack Grubman went on to tout a strong position involving MCI WorldCom.  He indicated that with WorldCom's sales force, products, account structure and pervasive network, it would be a dominant force which will give the stock an $85 to $90 12-month target price.

uu. In *Smart Money Magazine's* article entitled "Tech Sell-Off Hits

151

Nasdaq" which appeared in the July 27, 2000 issue, Grubman again recommended more shares of WorldCom be accumulated. Specifically, he stated, "As WorldCom transitions itself back to the future, so to speak, we believe they will emerge as one of the must-own, large-cap growth stocks … ."

vv. On July 28, 2000, the *Washington Post* quoted Jack Grubman as praising Bernie Ebbers' plans to increase growth and profitability.

ww. On July 28, 2000, the *Los Angeles Times* quoted Jack Grubman as saying "WorldCom is going back to its roots, namely a commercially oriented company." He rated WorldCom a "buy."

xx. On September 11, 2000, *Communications Today* quoted Jack Grubman as saying "Given its array of global network assets, we think that Digex – on top of the WorldCom asset base – can leverage topline growth at WorldCom to a much greater degree than is clearly being anticipated at this time." "WorldCom now has the ability to offer a whole range of high-end web-based managed services."

yy. On December 18, 2000, *Fortune* quoted Jack Grubman as stating that WorldCom will recover strongly next year. He also said that "WorldCom had less exposure to that no-growth business of long-distance than AT&T and Sprint do, and WorldCom's scale is unmatched."

zz. On December 18, 2000, in *Fortune* Magazine, Jack Grubman is quoted as saying "I would own a basket of stocks that includes WorldCom as my way to play global corporate enterprises."

aaa. In *Fortune Magazine's* issue dated December 18, 2000, Jack

Grubman took the position that no one could match WorldCom's assets.  Further, he asserted that WorldCom was still outgrowing other telecom companies.  Grubman recommended WorldCom as a stock he would buy because it had less execution risk, the best set of assets, the best revenue mix and the best balance sheet.

        bbb.    On January 2, 2001, on *CNN Moneyline News Hour* Jack Grubman is quoted as saying that WorldCom "is dirt cheap." And "that WorldCom's shares will double if the company meets its high-end of its 12 to 15 percent sales growth target."

        ccc.    On January 3, 2001, *TheStreet.com* reported that despite the market plummeting, Jack Grubman "strongly reiterated" his buy rating on WorldCom, calling it the firm's top pick in the telecom services business."

        ddd.    On January 3, 2001, *CBS MarketWatch* quoted Jack Grubman as calling WorldCom "dirt cheap" despite its share price having dropped 75 percent over the past year.  That quote was restated on January 3, 2001, in newspapers throughout the country along with Jack Grubman's quote that he expected WorldCom to meet growth projections.

        eee.  On January 4, 2001, newspapers throughout the country reported that Jack Grubman reiterated his buy rating on WorldCom and said that the stock could double or triple over the next 12 to 18 months.  The same quote was on CNN Moneyline Newshour on February 8, 2001.

        fff.    On March 14, 2001, in *TheStreet.Com*, Jack Grubman was reported as having reiterated his buy rating and raised his growth rate forecast for the

first quarter on WorldCom's data unit to 12.5% from 12% and increased its full year target to 14% from 13.2%, citing gains in Europe.

   ggg. On March 14, 2001, *CNN Moneyline News Hour* reported that Jack Grubman had issued a note raising his revenue growth estimates on the stock. The same quote was reiterated on March 14, 2001, on CNBC News.

   hhh. On March 15, 2001, the *National Post* reported that Jack Grubman had said that WorldCom's revenue is growing faster than expected.

   iii. On March 15, 2001, papers throughout the country quoted Jack Grubman as saying that "WorldCom Group unit will win more business in Europe, helping it increase sales by 14 percent this year."

   jjj. On March 15, 2001, *CNBC* quoted Jack Grubman as rating WorldCom a strong buy saying that "they expect WorldCom to progress to their 13 ½ percent revenue growth target for the year from the first-quarter's low point of 12 percent."  The same thing was repeated in newspapers throughout the country.

   kkk. On April 2, 2001, newspapers throughout the country reported that "Jack Grubman had raised his first-quarter growth expectations for WorldCom's data unit to 12.5% from 12 percent and increased the full year target to 14% from 13.2%."

   lll. On June 18, 2001, *Business Week* reported that Jack Grubman contrary to most other analysts was still recommending WorldCom as his top stock and that "WorldCom revenues would grow between 12% to 15% next year, pushing its stock from 18 to 30" according to Jack Grubman.

mmm. In the June 18, 2001 issue of *Business Week*, Grubman stated "All the riff-raff is gone." Grubman predicted WorldCom's revenues would grow 12% to 15% next year, which would push the stock from 18 to 30 within a year.

nnn.  On June 19, 2001, at a three day telecommunication and media and technology conference in Hong Kong, Jack Grubman stated that "over the next 4 to 5 years, you will have 4 to 6 global mega carriers including WorldCom."  That statement was reported in newspapers throughout the world.

ooo.    On March 16, 2002, despite an investigation into WorldCom and its accounting practices and the fact that WorldCom was dropped from Salomon Smith Barney's strategist, Tobias Lefkovich's prestigious recommended list, Jack Grubman maintained his buy rating on the stock and called the investigation irrelevant.

### COUNT III
### FALSE INFORMATION NEGLIGENTLY SUPPLIED FOR
### THE GUIDANCE OF OTHERS (RESTATEMENT SECTION 552)

215.    The Plaintiff adopts and re-alleges Paragraphs 1 through 214 as if set forth herein.

216.    As set forth herein, the Defendants and each of them supplied false information to the Plaintiff.  Said false information was provided in the course of Defendants' business and Defendants had a direct financial and economic interest in Plaintiff buying and/or retaining their stock as aforesaid.

217.    Defendants negligently, recklessly, or intentionally both obtained and communicated the aforesaid false information.

218.   Defendants, as set forth herein, intended that the Plaintiff was a person for whose benefit and guidance the Defendants intended to supply the false information for use in Plaintiff's purchase or retention of the WorldCom stock.

219.   Defendants and each of them fully intended that the false information concerning WorldCom, as set forth herein, would influence the Plaintiff in her retention and purchase of their WorldCom stock.

220.   Plaintiff justifiably relied on the false information given to him as set forth hereinabove and purchased and retained the stock because of that false information.

221.   As a direct and proximate result of Plaintiff's reliance upon the false information provided by the Defendants to them, Plaintiff purchased and retained his WorldCom stock so that it lost all of its economic value and he was greatly damaged in an amount equal to the value of the stock at the time of the misrepresentations as set forth herein were made.

WHEREFORE, Plaintiff, WILLIAM T. DOBYNS, demands judgment against the Defendants, CITIGROUP, INC., CITICORP INVESTMENT SERVICES, INC., CITIGROUP GLOBAL MARKETS, INC., formerly SALOMON SMITH BARNEY, INC., and SCOTT D. SULLIVAN, in an amount in excess of the minimum jurisdictional limits of this Court, punitive damages, plus costs and further demand trial by jury.

## COUNT IV –
## OUTRAGEOUS CONDUCT
## CAUSING SEVERE EMOTIONAL DISTRESS

222.    The Plaintiffs adopts and realleges Paragraphs 1 through 214 as if fully set forth herein.

223.    This is an action for outrageous conduct causing severe emotional distress.  This action seeks damages in an amount in excess of the jurisdictional limits of this Court for the severe emotional distress caused by the outrageous conduct of the Defendants.

224.    As set forth herein, the Defendants herein intentionally lied and misled the Plaintiff concerning the value of WorldCom stock and the propriety of retaining WorldCom stock.  Defendants lied and misled the Plaintiff with the sole intent that Plaintiff hold his WorldCom stock rather than selling it.  This falsely inflated the value of WorldCom stock and, therefore, financially benefited the Defendants herein. Defendants made these lies and misrepresentations for the sole purpose of their own financial benefit knowing full well that the Plaintiff would lose his investments, be left penniless and as a result suffer severe emotional distress.  The Defendants knew the truth that WorldCom stock did not have the value or potential value contained within the lies and misrepresentations being told to the Plaintiff and knew that, in truth, the advice they were giving was false; and that truthful advice of the advisability would have been to sell the stock at the various times Grubman made assertions concerning the stock in the various financial publications cited above.  Defendants knew that by giving this false advice it would result in Plaintiffs purchasing and retaining the stock and not selling it until the stock was valueless, thus causing the severe emotional distress set forth herein.

225.   The conduct of these Defendants was either intentional or reckless, that is they intended their behavior when they knew or should have known that severe emotional distress would likely result to the Plaintiff from the behavior set forth herein. The conduct of these Defendants was outrageous, that is, it went beyond all bounds of decency so as to be regarded as odious and utterly intolerable in a civilized community; the conduct of these Defendants as set forth herein caused the emotional distress described hereinabove and that emotional distress was severe as to the Plaintiffs.

226.   That as a direct and proximate cause of the intentional conduct or reckless disregard of the Defendants and each of them, the Plaintiffs have suffered needless severe emotional distress.

WHEREFORE, the Plaintiff, WILLIAM T. DOBYNS, demands judgment for his severe emotional distress against all of the Defendants in an amount in excess of the minimum jurisdictional limits of this Court, punitive damages, plus costs and further demand trial by jury.

**COUNT V -
FRAUD**

227.   The Plaintiff realleges and re-affirms all of Paragraphs 1 through 214 above as if fully set forth herein.

228.   As set forth herein, the Defendants made material omissions and misrepresentations to the Plaintiff regarding the holding and purchase of his WorldCom stock in that they failed to disclose any of the facts set forth herein

concerning their relationship with WorldCom, its' executives, their earning of investment banking fees from WorldCom, their agreement with WorldCom to provide false information concerning the value of WorldCom stock and their intentional inflation of that stock in order to benefit both WorldCom and themselves.

229.    As set forth herein, the Defendants communicated to the Plaintiff the false representation concerning the value of WorldCom stock and failed to disclose the material matters set forth herein.

230.    It was intended by the Defendants in making the false representations set forth herein that the Plaintiff would be induced to act in that he would retain his ownership in WorldCom stock or buy additional WorldCom stock.

231.    Plaintiff justifiably relied on the false representations made by the Defendants because of the Defendants' superior knowledge concerning the value of WorldCom stock.

232.    As a direct result of the false representations and intentional false statements made by Defendants set forth herein, Plaintiff was induced and did purchase and retain their WorldCom stock when it should have been sold and when accurate analysis of its value by the Defendants would have resulted in the sale of said stock as set forth herein and the Plaintiff held or purchased the WorldCom stock based upon those false representations when had the Plaintiff been aware of these false representations the stock never would have been purchased or held by Plaintiff. Further, Defendants' failure to disclose the facts set forth herein proximately resulted in the Plaintiff retaining WorldCom stock when it should have been sold.

233.   As a direct result of the retention and purchase of WorldCom stock, the Plaintiff was damaged in that if they had sold the WorldCom stock at the time it should have been sold when the Defendants were making their false representations, the stock's value would have been far greater than it's ultimate value.

WHEREFORE, the Plaintiff, WILLIAM T. DOBYNS, demands judgment against the Defendants, CITIGROUP, INC., CITICORP INVESTMENT SERVICES, INC., CITIGROUP GLOBAL MARKETS, INC., formerly SALOMON SMITH BARNEY, INC., and SCOTT D. SULLIVAN, in an amount in excess of the minimum jurisdictional limits of this Court, punitive damages, plus costs and further demand trial by jury.

### COUNT VI -
### VIOLATION OF FLORIDA'S BLUE SKY LAWS

234.   Plaintiff realleges and reaffirms all of Paragraphs 1 through 214 above as if fully set forth herein.

235.   Florida Statute 517.301(1)(a)(2) states:

517.301 Fraudulent transactions; falsification or concealment of facts.

(1)   It is unlawful and a violation of the provisions of this chapter for a person:

(a)   In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s.517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1.   To employ any device, scheme, or artifice to defraud;

2.   To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements

160

made, in light of the circumstances under which they were made, not misleading; or

3.    To engage in any transaction, practice, or course of business, which operates or would operate as a fraud or deceit upon a person.

(b)    To publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration.

(c)    In any matter within the jurisdiction of the department, to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.

Section 517.211, Fla. Stat. provides that if a seller is untruthful in a sale, a buyer can rescind the transaction and get his money back.

236.   As set forth herein, the Defendants and each of them were able to earn huge investment banking fees by virtue of the false statements made to the Plaintiff and others concerning the value of WorldCom stock and by inflating that value as set forth herein.

237.   The Defendants made the material misstatements and/or omissions of material facts as set forth herein and Plaintiff either purchased WorldCom stock based upon those statements or omissions or failed to sell said stock when it should

have been sold.  Plaintiff justifiably and reasonably relied upon to their detriment the statements and advice of Defendants as previously set forth herein.

WHEREFORE, the Plaintiff, WILLIAM T. DOBYNS, demands judgment against the Defendants, CITIGROUP, INC., CITICORP INVESTMENT SERVICES, INC., CITIGROUP GLOBAL MARKETS, INC., formerly SALOMON SMITH BARNEY, INC., and SCOTT D. SULLIVAN, in an amount in excess of the minimum jurisdictional limits of this Court, punitive damages, plus costs, and further demand trial by jury.

IT IS HEREBY CERTIFIED that a true copy of the foregoing has been

162

furnished, by mail, this _29th_ day of December, 2005, to: counsel on the attached

list.

        BABBITT, JOHNSON, OSBORNE & LECLAINCHE, P.A.
        Attorneys for Plaintiffs
        1450 Centrepark Boulevard, Suite 100
        Post Office Box 4426 (33402-4426)
        West Palm Beach, FL 33401
        TEL:  (561) 684-2500; FAX:  (561) 684-6308


By_____
        THEODORE BABBITT
        Florida Bar No:  091146

        JOSEPH A. OSBORNE
        Florida Bar No. 880043

## SERVICE LIST

Mark F. Bideau, Esq.
Lorie M. Gleim, Esq.
Janna S. Nugent, Esq.
Greenberg Traurig, P.A.
Suite 300 East
777 South Flagler Drive
West Palm Beach, FL  33401
Telephone:   (561) 650-7918
Fax:              (561) 655-6222
Counsel for Defendants, Citigroup, Inc.,
Citicorp Investment Services, Inc., and
Citigroup Global Markets, Inc.

L. Louis Mrachek, Esq.
Roy E. Fitzgerald, Esq.
Julie Sellers Ferguson, Esq.
Page, Mrachek, Fitzgerald & Rose, P.A.
Suite 600
505 South Flagler Drive
West Palm Beach, FL  33401
Telephone:   (561) 655-2250
Fax:              (561) 655-5537
Counsel for Defendants, Citigroup, Inc.,
Citicorp Investment Services, Inc., and
Citigroup Global Markets, Inc.

J. Elizabeth Graddy, Esq.
Adorno & Yoss, LLP
Suite 400
2525 Ponce de Leon Blvd.
Coral Gables, FL  33134
Telephone:   (305) 858-5555
Fax:              (305) 503-8906
Counsel for Scott Sullivan

Michael B. Lynch, Esq.
Law Offices of James Hooper
815 North Garland Avenue
Orlando, FL  32801-1103
Telephone:   (407) 849-0167
Counsel for Plaintiffs

JS 44 (Rev. 11/05)

# CIVIL COVER SHEET

CIV-HURLEY

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

06-80111

William T. Dobbins

**DEFENDANTS** Citigroup, Inc., Citicorp Investment Services, Inc., Citigroup Global Markets, Inc., formerly Salomon Smith Barney, In

(b) County of Residence of First Listed Plaintiff    unknown
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Theodore Babbitt, Babbitt, Johnson, Osborne & Leclainche, P.A., 1450 Centrepark Blvd., Suite 100, West Palm Beach, FL. 33401
561-684-2500

Attorneys (If Known) L. Louis Mrachek, Esq., Page, Mrachek,Fitzgerald & Rose, P.A., 505 S. Flagler Drive, Suite 600,West Palm Beach, FL. 33401

(d) Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☒ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

9:06 CV 80111-Hurley-Johnson

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☒ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV / ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☐ NO

JUDGE ___    DOCKET NUMBER ___

Unknown-Notice of Pendency of Other Actions Filed

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity): Fraud, False Information Negligently Supplied for the Guidance of Others, Outrage, Violation-Florida Blue Sky Law

LENGTH OF TRIAL via **5** days estimated for (both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ >75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD FL. Bar #886500
Roy E. Fitzgerald

DATE 01/31/06

FOR OFFICE USE ONLY
AMOUNT 250.00    RECEIPT # 536287